# BARNES & THORNBURG LLP

Suite 4400
One North Wacker Drive
Chicago, IL 60606-2833 U.S.A.
(312) 357-1313
Fax (312) 759-5646

Lee T. Polk
(312) 214-8300
lee.polk@btlaw.com

www.btlaw.com

January 12, 2007

## VIA CERTIFIED MAIL

Evanston Northwestern Healthcare
Plan Administrator
Human Resources
1301 Central Street
Evanston, IL 60201

Attn:   Jeff Johansen

Re:   Hailey, Eric and Angela Fogel

Dear Plan Administrator:

This will likely be our final ordinary correspondence. It is worth pointing out to you the errors in your letter of November 21, 2006, which warrant your attention.

It is now clear that the Plan's representatives failed to administer the program correctly, and the Fogels are being made to suffer the consequences.

The Plan Failed to Follow Its Own Rules.

Eric's June 15 Call. In our September 7 letter, we indicated that Eric called Aetna around May 31 to report Hailey's birth and was told that Hailey would be added and a new card would be issued. Your summary suggests that the call occurred on June 15 (Tab 8). Giving your account the benefit of the doubt, the fact nevertheless remains that Eric took initiative and made the call to get Hailey enrolled within the initial 30-day period. And he was told at that time Hailey had been added to the Plan.

Your letter is misleading and incomplete, suggesting that Eric was sitting on his hands. More importantly, Aetna conveyed false information which Eric relied upon to his detriment. These factors are the elements for what the law refers to as estoppel.

June 22 and 26 Entries. Your own Tab 8 entries make it clear that some "Rep" was not sure about the "permanent addition of the dependent" a week after Eric's call, and that person contacted Andrew Lindsay to clarify his or her own understanding.

Contrary to the suggestion in your letter, there was never any communication by a representative of Aetna with either Eric Fogel or Angela Fogel on or about June 26, 2006. Eric initiated every call, and none was made around that date. Moreover, your reliance on a supposed June 26 call is strange since under your 30-day rule, June 26 was already too late. You place great reliance on that conversation, but it never happened. Tab 8 does not identify the "Rep."

Chicago      Elkhart      Fort Wayne      Grand Rapids      Indianapolis      South Bend      Washington, D.C.

FOGEL 1

Evanston Northwestern Healthcare
January 12, 2007
Page 2

Who then is the individual you rely on regarding communications with Eric or Angie? Where are that person's phone records? The Fogels will testify to the absence of a call. Who is the individual who will testify that it was made? We will get to the bottom of this question eventually, so it might be less costly to do it now.

The Other Points Are Adverse to the Plan.

1.     In addition to the June 26 communication, your letter places great reliance on the assertion that Eric had gone through this entire procedure with his first child, Annabelle, and that he therefore should have known better than to sit on his hands after Hailey was born. This position is bizarre. First, if it <u>was</u> the same situation, why would Eric have knowingly delayed getting Hailey enrolled? He was already paying for family coverage when Hailey was born, and it would have been far less costly for him to add Hailey to the existing family coverage than to not do so and have to buy independent coverage for Hailey until January 1, 2007, when she will be covered by the ENH plan.

Second, your whole premise is incorrect. The earlier coverage was totally different. The year Annabelle was born, Eric had <u>single</u> coverage. He then had to make the change to family coverage for the first time to have Annabelle covered. When Hailey was born, the family coverage was already in place. Hailey was just another addition to <u>the existing family coverage</u>. Nothing like 2001 when family coverage was initiated.

2.     Eric's conduct was influenced by the fact that prior to 2006, the plan was properly constituted. When Hailey was born, it was not.

(a)     First, prior to January 1, 2006 it was announced there was a new medical program with Aetna effective January 1, 2006. The employees were told there was a new program. Contrary to your suggestion, for the average employee, the 2004 SPD was for a United Health Care program which was no longer current. A reasonable person would assume the 2004 was obsolete.

(b)     Second, you admit the new program, effective January 1, 2006, had <u>no</u> SPD at the time of Hailey's birth. The HR Department told Eric he could get one on line, but that is a <u>non-existent</u> SPD. The regulations require you to give Eric a hard copy which you failed to do because the HR Department did not have any SPDs. Another violation of ERISA.

(c)     Third, according to your most recent letter of November 21, 2006, ENH does not even have a contract with Aetna, does not have a full plan document and yet relies on Aetna for having fulfilled the plan's legal obligations to employees such as Eric Fogel. As far as I can tell, contractually speaking, Aetna is a stranger to the plan, and thus your position relies on a party which is not to be relied on.

3.     Your chronology includes Ms. Radek's letter of <u>July 31</u> announcing the availability of the SPD at local HR offices or the Benefits Department. However, even though

BARNES & THORNBURG LLP

Evanston Northwestern Healthcare
January 12, 2007
Page 3

that date was already well past the initial 30-day period, Eric did visit the local HR office on August 31 and September 5, both dates omitted from your chronology even though I listed them in my September 7 letter. As late as Eric's September 5 visit to the local HR office, he was told that the SPD was not available at that office. Your chronology does not appear to be an even-handed, good faith account of the facts.

    4.      Within a week of actually, finally, being given the enrollment forms to fill out, Eric turned them in on August 2. The chronology fails to disclose the promptness of Eric's action.

These facts paint a picture of shabby treatment of a young employee and his family. Enough said of that.

It would be prudent for you to abandon the rigidity seen to date and offer to compensate this employee for the costs he has incurred for the Plan's mistakes, in failing to follow its rules, failing to communicate the rules clearly, violating the ERISA rules, and using the services of a new service provider who failed to do its job. The Fogels have incurred $1,482.50 in doctor bills and four months of separate medical insurance for Hailey.

Based on all that has transpired, I would appreciate a response to this letter by February 15, 2007. I understand that the plan's claim procedure has been exhausted.

Thank you for your attention to this matter.

Very truly yours,

Lee T. Polk

LTP/amm

cc:    Eric and Angela Fogel

BARNES & THORNBURG LLP

FOGEL 3

**≡ENH≡** EVANSTON
NORTHWESTERN
HEALTHCARE

Human Resources

1301 Central Sreet
Evanston, Illinois 60201
(847) 570-5200

November 21, 2006

## CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Mr. Lee Polk
Barnes & Thornberg LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606-2833

    Re:    Hailey, Eric and Angela Fogel

Dear Mr. Polk:

The Plan Administrator of the Evanston Northwestern Healthcare health program ("Program") has thoroughly reviewed the appeal of Hailey Fogel's eligibility to receive benefits under the Program, and has denied the appeal for the reasons discussed in this letter. For your convenience, all documents referenced in this letter have been provided in the enclosed binder.

The current Summary Plan Description ("SPD"), effective January 1, 2006, was sent to you, as required by ERISA, due to your request. Although the current SPD had not been distributed at the time of Hailey's birth, the immediately preceding SPD (enclosed) states that to add a new dependent, the Plan Administrator must receive a completed enrollment form, documentation and any required contribution within 30 days of the birth of a new child (see pages 35-36). Therefore, the Participant was previously provided information regarding the process for adding a new dependent – a process which has not changed. In fact, the Participant completed the same process by submitting paperwork to enroll his other child in June 2001, six days after her birth, and his spouse in September 2001, twenty days after their marriage. Eric Fogel (the "Participant") did not complete the paperwork to enroll Hailey Fogel in the Program within 30 days of her birth.

Below is a timeline of the events related to this appeal:

1.    June 2004 – SPD was distributed.

2.    May 17, 2006 – Hailey Fogel is born, and is automatically added to the Program from the date of her birth through the 30 days following her birth.

3.    June 15, 2006 – Aetna representative speaks with the Participant about enrolling newborn.

4.    June 16, 2006 – Hailey Fogel's coverage under the Program terminates because no enrollment forms were received.

CH2 20195225.5
Evanston Hospital    Glenbrook Hospital    Highland Park Hospital    ENH Medical Group    ENH Foundation    ENH Research Institute

FOGEL 4

5.      June 26, 2006 – Aetna representative calls the Participant and informs him that no enrollment paperwork has been submitted.

6.      July 18, 2006 – Myron H. Singer, M.D. renders services to Hailey Fogel that results in a claim under the Program.

7.      July 31, 2006 – The Participant calls Aetna regarding coverage. Aetna denies Hailey's eligibility and again informs the Participant that Hailey was not enrolled by him through his employer.

8.      August 2, 2006 – The Participant submits a Qualified Change in Status form and a dental enrollment form which are not accepted by Human Resources.

9.      August 3, 2006 – The Participant submits an appeal asking that Hailey Fogel be added to coverage under the Program.

10.     August 11, 2006 – Aetna issues EOB that denies July 18, 2006 claim.

11.     August 18, 2006 – The Evanston Northwestern Healthcare Welfare Plan Appeals Committee ("Committee") denies the Participant's appeal.

12.     September 7, 2006 – The Participant, through legal counsel, Lee Polk, files a second appeal.

13.     September 27, 2006 – Seyfarth responds to Mr. Polk's September 7th letter to the Committee by sending him a copy of the current SPD and notifying him that the copies of any Aetna notes related to communications between Aetna and the Participant have been requested from Aetna.

14.     October 2, 2006 – Mr. Polk requests information regarding the Plan document, the administrative services agreement between Aetna Life Insurance Company and Evanston Northwestern Healthcare, and the significance of the date on the SPD provided to him.

15.     October 10, 2006 – Seyfarth responds to Mr. Polk's October 2nd letter.

16.     October 20, 2006 – Mr. Polk asks for clarification of points addressed in the October 10, 2006 letter from Seyfarth (addressed herein).

The timeline you provided to the Committee, in your letter dated September 7, 2006, fails to indicate that, in addition to the telephone call on June 15, 2006, an Aetna representative spoke with the Participant on June 26, 2006 and told him that he needed to complete the paperwork to add Hailey Fogel to the Program (see enclosed Aetna records). However, the Participant made no attempt to submit the appropriate enrollment forms until August 2nd.

The Participant was on notice that enrollment forms needed to be completed because of (1) the language on the 2006 enrollment forms and in the 2006 BeneFacts Open Enrollment Guide (enclosed); (2) his previous experience in enrolling a newborn in the Program on June 26, 2001 and a spouse on September 14, 2001; (3) the language in the 2004 SPD; and (4) the telephone conversations with the Aetna representative. Notwithstanding this notice, the Participant took no action to submit the required paperwork until 10 weeks after his daughter's birth, and more than one month after an Aetna representative called him to remind him about the need for the paperwork. When the Participant finally attempted to submit the paperwork, he

2

FOGEL 5

submitted paperwork only with respect to dental coverage, not medical coverage (see enclosed Qualified Change in Status Form and Dental Insurance Enrollment Form).

In previous correspondence, you requested a copy of the wrap plan document related to the Program and the administrative services agreement between Evanston Northwestern Healthcare and Aetna. Neither document has been executed. As Seyfarth indicated in a letter dated October 10, 2006, a copy of the wrap plan document will be forwarded to you when it is completed.

As required by ERISA, the Plan Administrator reviewed the initial claim, dated July 18, 2006, the claim denial, dated August 11, 2006, the first appeal, dated August 3, 2006, the appeal denial, dated August 18, 2006, and the second appeal and additional information provided by Aetna and the Participant (through your letter, dated September 7, 2006). Because the process for enrolling a newborn child was not followed, the Plan Administrator denies the appeal asking for current coverage, as well as for reimbursement of any medical and insurance expenses that the Participant incurred by not timely enrolling his daughter in the Program. The decision of the Plan Administrator is final and binding, and exhausts the Participant's administrative remedies under the Program. No further appeals are available under the Program.

The Participant now has the right to bring a civil action under Section 502(a) of ERISA, if he chooses to pursue this eligibility claim.

Regards,

EVANSTON NORTHWESTERN HEALTHCARE
PLAN ADMINISTRATOR

Jeff Johansen

3

FOGEL 6

# ENH EVANSTON NORTHWESTERN HEALTHCARE MEDICAL GROUP

**ENH Faculty Practice Associates**
9532 Eagle Way
Chicago, IL 60678-1095

| Patient Name | Statement Date | Account Number |
|---|---|---|
| HAILEY FOGEL | September 05, 2006 | EPB548789 |

| Amount Now Due | Amount Enclosed |
|---|---|
| $1,094.75 | $ |

Make check payable to:

ENH Faculty Practice Associates
9532 Eagle Way
Chicago, IL 60678-1095

738

ERIC FOGEL
916 GLENVIEW RD
GLENVIEW IL 60025-3133

☐ Check here if your address or insurance information has changed. Please indicate changes on the back of this page.

To pay online go to www.enh.org/billing.

To pay by credit card: Please indicate your credit card preference, provide the account information, and sign below.

☐ VISA     ☐ MasterCard     ☐ DISCOVER

Account No. _____

Expiration Date _____

Signature X _____

* Please print your AVS 3 digit code located on the back of your card in the signature area.

---

This is a bill for services rendered by a physician/provider of ENH Medical Group. You may receive a separate bill for hospital services.

## Important Message

Thank you for choosing Evanston Northwestern Healthcare Medical Group for your healthcare. This is a statement of your account for services rendered by our physicians. Detailed information on each service can be found on the following pages. The balances due for each service are added together to arrive at the total amount due from you.

PLEASE PAY THE AMOUNT DUE IMMEDIATELY TO AVOID REFERRAL TO COLLECTIONS.

## Insurance Information

| JRANCE COMPANY | GROUP/PLAN | POLICY/ID | SUBSCRIBER NAME | AMOUNT DUE |
|---|---|---|---|---|
| 1) AETNA EMPLOYEE PLAN | 6591150100 | W142404588 | ERIC FOGEL | $1,094.75 |

## Detail of Services, Charges, Claims and Payments for: HAILEY FOGEL

| Service Date: 06/20/2006 | Patient Name: HAILEY FOGEL | Patient ID: 014924401 |
|---|---|---|

**Provider:** MYRON H. SINGER, MD

### Services and Charges:

| | | |
|---|---|---|
| 06/20/2006 99391 | PREVENTIVE VISIT,EST,INFANT | $137.00 |
| 06/20/2006 90744 | HEPATITIS B VACCINE,UNDER 11 | $84.00 |
| 06/20/2006 90465 | IMMUNE ADMIN 1 INJ, < 8YRS | $54.00 |
| Total Charges: | | $275.00 |

Referring Physician: MYRON H. SINGER, MD

### Claims, Payments and Adjustments:

| | | |
|---|---|---|
| 06/20/2006 COPAY PYMT/PT PYMT | | $20.00- |
| 07/06/2006 AETNA ERA PAYMENT | | $0.00 |
| 04/24/2006 COPAY PYMT/PT PYMT | | $20.00- |
| 07/06/2006 AETNA ERA PAYMENT | | $0.00 |
| 07/03/2006 AETNA ERA PAYMENT | | $0.00 |

Insurance Claim Sent
Patient Payment: $0.00
Insurance Balance: $0.00
Patient Balance: $235.00

| Sub Total For This Visit: | $235.00 |
|---|---|

| Service Date: 07/18/2006 | Patient Name: HAILEY FOGEL | Patient ID: 014924401 |
|---|---|---|

**Provider:** MYRON H. SINGER, MD

### Services and Charges:

| | | |
|---|---|---|
| 07/18/2006 99391 | PREVENTIVE VISIT,EST,INFANT | $137.00 |
| 07/18/2006 90700 | DTAP IMMUNIZATION | $52.00 |
| 07/18/2006 90713 | POLIOMYELITIS IMMUNIZATION | $68.00 |
| 07    006 90645 | HIB TITER VACCINE, HBOC, IM (O | $65.00 |

---

To pay online or for help understanding your bill, go to www.enh.org/billing and select ENH Medical Group Bill Type A.

Evanston Hospital    Glenbrook Hospital    Highland Park Hospital    ENH Medical Group    ENH Home Services    ENH Research Institute

**Questions about your bill?** Call 877-210-4351 Monday - Friday 8:00 am - 6:00 pm CST. FOGEL 7

See additional Detail of Services on the following pages

This is a bill for services rendered by a physician/provider of ENH Medical Group. You may receive a separate bill for hospital services.

Thank you for choosing Evanston Northwestern Healthcare Medical Group for your healthcare. This is a statement of your account for services rendered by our physicians. Detailed information on each service can be found on the following pages. The balances due for each service are added together to arrive at the total amount due from you.

YOUR ACCOUNT IS PAST DUE. PLEASE PAY AMOUNT DUE.

When not specified, payments are applied to the oldest balances.

| PATIENT NAME | PATIENT ID | STATEMENT DATE | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| HAILEY FOGEL | 014924401 | 04/10/2007 | 04/30/07 | $742.12 |
| ANNABELLE FOGEL | 012631693 | 04/10/2007 | 04/30/07 | $0.00 |
| ANGELA FOGEL | 005023478 | 04/10/2007 | 04/30/07 | $20.00 |

| INSURANCE COMPANY | GROUP/PLAN | POLICY/ID NUMBER | SUBSCRIBER NAME |
|---|---|---|---|
| AETNA EMPLOYEE PLAN | 0659115010 | W142404588 | HAILEY FOGEL |
| AETNA EMPLOYEE PLAN | 0659115010 | W142404588 | ANNABELLE FOGEL |
| AETNA EMPLOYEE PLAN | 0659115010 | W142404588 | ANGELA FOGEL |

## Detail of Services, Charges, Claims, and Payments for: ANNABELLE FOGEL

Service Date: 01/24/07      Patient Name: ANNABELLE FOGEL

Provider: SELIGMAN, ILANA      Patient ID: 014924401

Services and Charges

| | | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|---|
| 01/24/07 | 69436 | CREATE EARDRUM OPENING,GEN ANE | $496.00 | 03/19/07 AETNA ERA PAYMENT | $58.67 |
| 01/24/07 | 69436 | CREATE EARDRUM OPENING,GEN ANE | $496.00 | 03/19/07 AETNA ERA PAYMENT | $117.33 |
| | | | | Insurance Balance | $816.00 |
| | | | | Patient Balance | $0.00 |

Total   ...ges ....................................................................................... $992.00

Sub Total for this visit: $0.00

## Detail of Services, Charges, Claims, and Payments for: HAILEY FOGEL

See additional Detail of Services on the following pages.

**To pay online or for help understanding your bill, go to www.enh.org/billing and select ENH Medical Group Bill Type A.**
Evanston Hospital • Glenbrook Hospital • Highland Park Hospital • ENH Medical Group • ENH Home Services • ENH Research Institute
**Questions about your bill? Call: 877-210-4351 Monday - Friday 8:00 am - 6:00 pm CST**

FOGEL 8

ENH FACULTY PRACTICE ASSOCIATES
9532 EAGLE WAY
CHICAGO IL 60678-1095

**Evanston Northwestern Healthcare — Medical Group**

**Account Number:** EP546789
**Statement Date:** 04/10/2007
Please keep this page for future reference.

## Continuation of Detail of Services

| Service Date: 02/20/07 | | Patient Name: HAILEY FOGEL | | Patient ID: 014924401 |
|---|---|---|---|---|
| Provider: SINGER, MYRON H. | | | | |

| Services and Charges | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|
| 02/20/07  90669 | PNEUMOCOCCAL VACCINE, PED (OUT | $314.80 | 03/19/07 AETNA ERA PAYMENT | $200.36 |
| | | | 03/19/07 ADJUSTMENT | $94.44 |
| | | | Insurance Balance | $0.00 |
| | | | Patient Balance | $20.00 |

Total charges .................................................................................. $314.80

**Sub Total for this visit: $20.00**

Referring Physician: SINGER, MYRON H.

## Detail of Services, Charges, Claims, and Payments for: ANGELA FOGEL

| Service Date: 03/02/07 | | Patient Name: ANGELA FOGEL | | Patient ID: 014924401 |
|---|---|---|---|---|
| Provider: RAMIREZ, LEO | | | | |

| Services and Charges | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|
| 03/02/07  99213 | OFFICE/OUTPT VST,EST,LEVL III | $126.00 | 03/28/07 AETNA ERA PAYMENT | $51.99 |
| | | | 03/28/07 ADJUSTMENT | $54.01 |
| | | | Insurance Balance | $0.00 |
| | | | Patient Balance | $20.00 |

Total charges .................................................................................. $126.00

**Sub Total for this visit: $20.00**

Referring Physician: GIBES, JOSEPH P.

## Detail of Services, Charges, Claims, and Payments for: ANNABELLE FOGEL

| Service Date: 04/06/07 | | Patient Name: ANNABELLE FOGEL | | Patient ID: 014924401 |
|---|---|---|---|---|
| Provider: SELIGMAN, ILANA | | | | |

| Services and Charges | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|
| 04/06/07  99213 | OFFICE/OUTPT VST,EST,LEVL III | $126.00 | 04/06/07 COPAY PYMT/PT PYMT | $30.00 |
| | | | Insurance Balance | $96.00 |
| | | | Patient Balance | $0.00 |

Total charges .................................................................................. $126.00

**Sub Total for this visit: $0.00**

Referring Physician: SINGER, MYRON H.

## Detail of Services, Charges, Claims, and Payments for: HAILEY FOGEL

See additional Detail of Services on the following pages.

**To pay online or for help understanding your bill, go to www.enh.org/billing and select ENH Medical Group Bill Type A.**
Evanston Hospital • Glenbrook Hospital • Highland Park Hospital • ENH Medical Group • ENH Home Services • ENH Research Institute
**Questions about your bill? Call: 877-210-4351 Monday - Friday 8:00 am - 6:00 pm CST**

Tax ID: 363738206

FOGEL 9

f10001          acc1128  001-20070410043317-1-43610185          Tue Apr 10 04:41:49 2007          Page 2 of 3

ENH FACULTY PRACTICE ASSOCIATES
9532 EAGLE WAY
**Medical Group** CHICAGO IL 60678-1095

EVANSTON NORTHWESTERN HEALTHCARE

**Account Number:** EP546789
**Statement Date:** 04/10/2007
— Please keep this page for future reference.

## Continuation of Detail of Services

| Service Date: 12/12/06 | Patient Name: HAILEY FOGEL | Patient ID: 014924401 |
|---|---|---|

**Provider:** SINGER, MYRON H.

| Services and Charges | | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|---|
| 12/12/06 | 90669 | PNEUMOCOCCAL VACCINE, PED (OUT | $314.80 | 01/16/07 HUMANA PAYMENT | $0.00 |
| 12/12/06 | 90680 | ROTAVIRUS VACCINE, ORAL | $265.32 | 02/20/07 COPAY PYMT/PT PYMT | $20.00 |
| 12/12/06 | 90467 | IMMUNE ADMIN O OR N < 8YRS | $54.00 | 02/28/07 INSURANCE DENIAL | $0.00 |
| 12/12/06 | 90468 | IMMUNE ADMIN O/N ADDL < 8YRS | $162.00 | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | Insurance Balance | $54.00 |
| | | | | Patient Balance | $722.12 |

| Total charges ............................................................................ $796.12 | |
|---|---|
| Referring Physician: SINGER, MYRON H. | Sub Total for this visit: $722.12 |

**To pay online or for help understanding your bill, go to www.enh.org/billing and select ENH Medical Group Bill Type A.**
Evanston Hospital • Glenbrook Hospital • Highland Park Hospital • ENH Medical Group • ENH Home Services • ENH Research Institute
**Questions about your bill? Call: 877-210-4351 Monday - Friday 8:00 am - 6:00 pm CST**

Tax ID: 363738206

f10001          acc1128_001-20070410043317-1-43610185          Tue Apr 10 04:41:49 2007          Page 3 of 3

**ENH** EVANSTON NORTHWESTERN HEALTHCARE
**Medical Group**

ENH FACULTY PRACTICE ASSOCIATES
9532 EAGLE WAY
CHICAGO IL 60678-1095

**Account Number:** EP546789
**Statement Date:** 03/13/2007 **Due Date:** 04/02/07
**To Pay Online Go To:** www.enh.org/billing.
**Please Make Checks Payable To:**
ENH FACULTY PRACTICE ASSOCIATES

**FORWARDING SERVICE REQUESTED**
ADDRESSEE

ERIC FOGEL
916 GLENVIEW RD
GLENVIEW IL 60025-3133

| IF PAYING BY CREDIT CARD, FILL OUT BELOW. |
| --- |

☐ DISCOVER ☐ MasterCard ☐ VISA

| CARD NUMBER | SECURITY CODE* | EXP. DATE |
| --- | --- | --- |

**FULL NAME (Please Print)**

**SIGNATURE**

| ADDRESS | | ZIP CODE |
| --- | --- | --- |

| AMOUNT NOW DUE | AMOUNT ENCLOSED |
| --- | --- |
| $762.12 | $ |

* 3-digit number printed on back of card.

**REMIT TO**

ENH FACULTY PRACTICE ASSOCIATES
9532 EAGLE WAY
CHICAGO IL 60678-1095

☐ Please check box if address is incorrect or insurance information has changed and indicate change(s) on reverse side.

Please detach and return this portion with payment.

This is a bill for services rendered by a physician/provider of ENH Medical Group. You may receive a separate bill for hospital services.

Thank you for choosing Evanston Northwestern Healthcare Medical Group for your healthcare. This is a statement of your account for services rendered by our physicians. Detailed information on each service can be found on the following pages. The balances due for each service are added together to arrive at the total amount due from you.

PLEASE PAY THE AMOUNT DUE OR CALL OUR OFFICE TO INQUIRE ABOUT PAYMENT ARRANGEMENT OPTIONS.

When not specified, payments are applied to the oldest balances.

| PATIENT NAME | PATIENT ID | STATEMENT DATE | DUE DATE | AMOUNT DUE |
| --- | --- | --- | --- | --- |
| HAILEY FOGEL | 014924401 | 03/13/2007 | 04/02/07 | $742.12 |
| ANNABELLE FOGEL | 012631693 | 03/13/2007 | 04/02/07 | $0.00 |
| ERIC FOGEL | 002046399 | 03/13/2007 | 04/02/07 | $0.00 |
| ANGELA FOGEL | 005023478 | 03/13/2007 | 04/02/07 | $20.00 |

| INSURANCE COMPANY | GROUP/PLAN | POLICY/ID NUMBER | SUBSCRIBER NAME |
| --- | --- | --- | --- |
| AETNA EMPLOYEE PLAN | 6591150100 | W142404588 | HAILEY FOGEL |
| AETNA EMPLOYEE PLAN | 6591150100 | W142404588 | ANNABELLE FOGEL |
| AETNA EMPLOYEE PLAN | 6591150100 | W142404588 | ERIC FOGEL |
| AETNA EMPLOYEE PLAN | 6591150100 | W142404588 | ANGELA FOGEL |

**Detail of Services, Charges, Claims, and Payments for: ANNABELLE FOGEL**

| Service Date: 01/24/07 | Patient Name: ANNABELLE FOGEL | Patient ID: 014924401 |
| --- | --- | --- |

**Provider:** SELIGMAN, ILANA

**Services and Charges**

| | | | | **Claims, Payments, Adjustments** | |
| --- | --- | --- | --- | --- | --- |
| 01/24/07 | 42830 | REMOVAL ADENOIDS,PRIMARY,<12 Y | $619.00 | | |
| 01/24/07 | 69436 | CREATE EARDRUM OPENING,GEN ANE | $496.00 | Insurance Balance | $1611.00 |
| 01/24/07 | 69436 | CREATE EARDRUM OPENING,GEN ANE | $496.00 | Patient Balance | $0.00 |

| **Total charges** ......................................................... | **$1611.00** | Sub Total for this visit: $0.00 |
| --- | --- | --- |

**Detail of Services, Charges, Claims, and Payments for: ERIC FOGEL**

See additional Detail of Services on the following pages.

**To pay online or for help understanding your bill, go to www.enh.org/billing and select ENH Medical Group Bill Type A.**
Evanston Hospital • Glenbrook Hospital • Highland Park Hospital • ENH Medical Group • ENH Home Services • ENH Research Institute
**Questions about your bill? Call:** 877-210-4351 Monday - Friday 8:00 am - 6:00 pm CST

Tax ID: 363738206

**ENH** EVANSTON NORTHWESTERN HEALTHCARE
**Medical Group**

ENH FACULTY PRACTICE ASSOCIATES
9532 EAGLE WAY
CHICAGO IL 60678-1095

**Account Number:** EP546789
**Statement Date:** 03/13/2007
Please keep this page for future reference.

## Continuation of Detail of Services

| Service Date: 02/15/07 | | Patient Name: ERIC FOGEL | | Patient ID: 014924401 |
|---|---|---|---|---|

**Provider:** NATANAUAN, JANUARIO

| Services and Charges | | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|---|
| 2/15/07 | 99213 | OFFICE/OUTPT VST,EST,LEVL III | $126.00 | 02/15/07 COPAY PYMT/PT PYMT | $20.00 |
| | | | | Insurance Balance | $106.00 |
| | | | | Patient Balance | $0.00 |

Total charges .......................................................................... **$126.00**
Referring Physician: LITZA, JANICE A.

Sub Total for this visit: $0.00

## Detail of Services, Charges, Claims, and Payments for: HAILEY FOGEL

| Service Date: 02/20/07 | | Patient Name: HAILEY FOGEL | | Patient ID: 014924401 |
|---|---|---|---|---|

**Provider:** SINGER, MYRON H.

| Services and Charges | | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|---|
| 2/20/07 | 99391 | PREVENTIVE VISIT,EST,INFANT | $137.00 | 02/20/07 COPAY PYMT/PT PYMT | $20.00 |
| 2/20/07 | 90748 | HEPATITIS B/HIB VACCINE,IM (OU | $126.00 | | |
| 2/20/07 | 90700 | DTAP IMMUNIZATION, IM (OUTPT) | $93.46 | Insurance Balance | $777.26 |
| 2/20/07 | 769 | PNEUMOCOCCAL VACCINE, PED (OUT | $314.80 | Patient Balance | $0.00 |
| 2/20/07 | 65 | IMMUNE ADMIN 1 INJ, < 8YRS | $54.00 | | |
| 2/20/07 | 90466 | IMMUNE ADMIN ADDL, INJ, < 8YRS | $72.00 | | |

Total charges .......................................................................... **$797.26**
Referring Physician: SINGER, MYRON H.

Sub Total for this visit: $0.00

## Detail of Services, Charges, Claims, and Payments for: ERIC FOGEL

| Service Date: 02/22/07 | | Patient Name: ERIC FOGEL | | Patient ID: 014924401 |
|---|---|---|---|---|

**Provider:** NATANAUAN, JANUARIO

| Services and Charges | | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|---|
| 2/22/07 | 99213 | OFFICE/OUTPT VST,EST,LEVL III | $126.00 | 02/22/07 COPAY PYMT/PT PYMT | $20.00 |
| | | | | Insurance Balance | $106.00 |
| | | | | Patient Balance | $0.00 |

Total charges .......................................................................... **$126.00**
Referring Physician: BIGI, LINDA ROSE

Sub Total for this visit: $0.00

## Detail of Services, Charges, Claims, and Payments for: ANGELA FOGEL

See additional Detail of Services on the following pages.

To pay online or for help understanding your bill, go to www.enh.org/billing and select ENH Medical Group Bill Type A.
Evanston Hospital • Glenbrook Hospital • Highland Park Hospital • ENH Medical Group • ENH Home Services • ENH Research Institute
**Questions about your bill? Call: 877-210-4351 Monday - Friday 8:00 am - 6:00 pm CST**

Tax ID: 363738206

**ENH FACULTY PRACTICE ASSOCIATES**
9532 EAGLE WAY
Medical Group   CHICAGO IL 60678-1095

**Account Number:** EP546789
**Statement Date:** 03/13/2007
Please keep this page for future reference.

## Continuation of Detail of Services

| Service Date: 02/28/07 | Patient Name: ANGELA FOGEL | | Patient ID: 014924401 |
|---|---|---|---|
| **Provider:** RAMIREZ, LEO | | | |

| Services and Charges | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|
| 02/28/07  99213 | OFFICE/OUTPT VST,EST,LEVL III | $126.00 | 02/28/07 COPAY PYMT/PT PYMT | $20.00 |
| 02/28/07  87880 | STREP A ASSAY W/OPTIC | $44.00 | | |
| | | | Insurance Balance | $150.00 |
| | | | Patient Balance | $0.00 |

Total charges ..................................................................... **$170.00**
Referring Physician: LITZA, JANICE A.

Sub Total for this visit: $0.00

## Detail of Services, Charges, Claims, and Payments for: ANNABELLE FOGEL

| Service Date: 03/02/07 | Patient Name: ANNABELLE FOGEL | | Patient ID: 014924401 |
|---|---|---|---|
| **Provider:** SELIGMAN, ILANA | | | |

| Services and Charges | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|
| 03/02/07  99213 | OFFICE/OUTPT VST,EST,LEVL III | $126.00 | 03/02/07 COPAY PYMT/PT PYMT | $30.00 |
| | | | Insurance Balance | $96.00 |
| | | | Patient Balance | $0.00 |

Total charges ..................................................................... **$126.00**
Referring Physician: SINGER, MYRON H.

Sub Total for this visit: $0.00

## Detail of Services, Charges, Claims, and Payments for: ANGELA FOGEL

| Service Date: 03/02/07 | Patient Name: ANGELA FOGEL | | Patient ID: 014924401 |
|---|---|---|---|
| **Provider:** RAMIREZ, LEO | | | |

| Services and Charges | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|
| 03/02/07  99213 | OFFICE/OUTPT VST,EST,LEVL III | $126.00 | Insurance Balance | $106.00 |
| | | | Patient Balance | $20.00 |

Total charges ..................................................................... **$126.00**
Referring Physician: GIBES, JOSEPH P.

Sub Total for this visit: $20.00

## Detail of Services, Charges, Claims, and Payments for: HAILEY FOGEL

See additional Detail of Services on the following pages.

**To pay online or for help understanding your bill, go to www.enh.org/billing and select ENH Medical Group Bill Type A.**
Evanston Hospital • Glenbrook Hospital • Highland Park Hospital • ENH Medical Group • ENH Home Services • ENH Research Institute
**Questions about your bill? Call:** 877-210-4351 Monday - Friday 8:00 am - 6:00 pm CST

Tax ID: 363738206

**ENH** EVANSTON NORTHWESTERN HEALTHCARE ENH FACULTY PRACTICE ASSOCIATES
**Medical Group** 9532 EAGLE WAY
CHICAGO IL 60678-1095

**Account Number:** EP546789
**Statement Date:** 03/13/2007
Please keep this page for future reference.

## Continuation of Detail of Services

| Service Date: 12/12/06 | | Patient Name: HAILEY FOGEL | Patient ID: 014924401 |
|---|---|---|---|

**Provider:** SINGER, MYRON H.

| Services and Charges | | | | Claims, Payments, Adjustments | |
|---|---|---|---|---|---|
| 12/12/06 | 90669 | PNEUMOCOCCAL VACCINE, PED (OUT | $314.80 | 01/16/07 HUMANA PAYMENT | $0.00 |
| 12/12/06 | 90680 | ROTAVIRUS VACCINE, ORAL | $265.32 | 02/28/07 INSURANCE DENIAL | $0.00 |
| 12/12/06 | 90467 | IMMUNE ADMIN O OR N < 8YRS | $54.00 | 02/28/07 INSURANCE DENIAL | $0.00 |
| 12/12/06 | 90468 | IMMUNE ADMIN O/N ADDL < 8YRS | $162.00 | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | 02/28/07 INSURANCE DENIAL | $0.00 |
| | | | | Insurance Balance | $54.00 |
| | | | | Patient Balance | $742.12 |

**Total charges** .................................................................... **$796.12**
**Referring Physician:** SINGER, MYRON H.

Sub Total for this visit: $742.12

**To pay online or for help understanding your bill, go to www.enh.org/billing and select ENH Medical Group Bill Type A.**
Evanston Hospital • Glenbrook Hospital • Highland Park Hospital • ENH Medical Group • ENH Home Services • ENH Research Institute
**Questions about your bill? Call:** 877-210-4351 Monday - Friday 8:00 am - 6:00 pm CST

**Tax ID:** 363738206

# HUMANA.

HAILEY FOGEL
916 GLENVIEW RD
GLENVIEW, IL   60025-3133
UNITED STATES

*Register on www.humana.com today and
review claims, benefits and copays any time!*

## EXPLANATION OF BENEFITS - THIS IS NOT A BILL

| MEMBER NAME AND ADDRESS | | | PATIENT | NAME: | HAILEY FOGEL | 2- 2 | SEQUENCE NO. 00095432 |
|---|---|---|---|---|---|---|---|
| FOGEL, HAILEY | | | | PAT. NO.: | EP25845100 | PRODUCT LINE: 5F | |
| 916 GLENVIEW RD | | | | CLAIM NO.: | 251595155 | GROUP NO.: N5352014 | DATE |
| GLENVIEW, IL   60025-3133 | | | | REL.: | EE | | 01-03-07 |
| ID NO.: H2O177617 | | | | | | | |

| DATE OF SERVICE FROM | TO | PROVIDER | SERVICE CODE | CHARGE | EXCLUDED AMOUNT | REMARKS | DEDUCT/COPAY | COVERED CHARGE | % | BENEFIT AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90669I | 314.80 | 314.80 | XW | | .00 | | .00 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90680I | 265.32 | 265.32 | XW | | .00 | | .00 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90468I | 162.00 | 162.00 | XW | | .00 | | .00 |

**EST. MEMBER RESPONSIBILITY • $742.12
(SEE REVERSE SIDE FOR EXPLANATION)** **TOTALS ▸**   742.12   742.12   .00   .00

### COORDINATION OF BENEFITS

| SERVICE CODE | | |
|---|---|---|
| 90669I | INJECTIONS | |
| 90680I | INJECTIONS | |
| 90468I | INJECTIONS | |

ELIGIBLE AMOUNT

MINUS AMT. PAID BY

**AMOUNT PAID BY HUMANA ▸**   .00

BENEFITS PAID TO THE FOLLOWING

**XW     SEE REVERSE SIDE FOR EXPLANATION**

### ANY QUESTIONS - PLEASE CONTACT

HUMANA CLAIMS OFFICE
P.O. BOX 14635
LEXINGTON, KY 40512-4635
OR CALL 1-800-833-6917

SEE REVERSE SIDE FOR APPEAL MESSAGE

HELP STOP INSURANCE FRAUD.  IF YOU KNOW OR SUSPECT ILLEGAL ACTIVITY REGARDING
YOUR INSURANCE CLAIMS, CALL THE TELEPHONE NUMBER ON THIS FORM.

# HUMANA.
*www.humana.com*

Form No. GHX013P  Rev. 09/05

HUMANA
P.O. BOX 14635
LEXINGTON, KY 40512-4635

GROUP #: N5352014
7C TYPE W/PREV CARE
HUMANA INSURANCE COMPANY

# HUMANA.

HAILEY FOGEL
916 GLENVIEW RD
GLENVIEW, IL   60025-3133
UNITED STATES

*Register on www.humana.com today and
review claims, benefits and copays any time!*

## EXPLANATION OF BENEFITS - THIS IS NOT A BILL

| MEMBER NAME AND ADDRESS | | | | | SEQUENCE NO. |
|---|---|---|---|---|---|
| FOGEL, HAILEY<br>916 GLENVIEW RD<br>GLENVIEW, IL   60025-3133 | PATIENT | NAME:   HAILEY FOGEL | | 1- 2 | 00095431 |
| | | PAT. NO.:   EP25845110 | PRODUCT LINE: 5F | | |
| | | CLAIM NO.:   251595137 | GROUP NO.:   N5352014 | | |
| ID NO.:   H20177617 | | REL:   EE | | | DATE   01-03-07 |

| DATE OF SERVICE FROM | TO | PROVIDER | SERVICE CODE | CHARGE | EXCLUDED AMOUNT | REMARKS | DEDUCT/COPAY | COVERED CHARGE | BENEFIT % | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 99391C | 137.00 | 1.58 | PC | | 135.42 | 80 | 108.34 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90645I | 114.44 | 80.94 | PC | | 33.50 | 80 | 26.80 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90700I | 93.46 | 47.15 | PC | | 46.31 | 80 | 37.05 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90713I | 68.00 | 27.03 | PC | | 40.97 | 80 | 32.78 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90465I | 54.00 | 21.65 | PC | | 32.35 | 80 | 25.88 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90466I | 11.44 | | | | 11.44 | 80 | 9.15 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90467I | 54.00 | 54.00 | 6N | | .00 | | .00 |
| 12/12/06 | 12/12/06 | MYRON H SINGER MD | 90466I | 24.56 | 24.56 | XW | | .00 | | .00 |

EST. MEMBER RESPONSIBILITY =   $84.55
(SEE REVERSE SIDE FOR EXPLANATION)

**TOTALS ▸**   556.90   256.91   299.99   240.00

### SERVICE CODE

99391C   PHYSICIAN VISIT
90645I   INJECTIONS
90700I   INJECTIONS
90713I   INJECTIONS
90465I   INJECTIONS
90466I   INJECTIONS
90467I   INJECTIONS

### EXCLUDED CODE REMARKS

PC   SEE REVERSE SIDE FOR EXPLANATION
6N   SEE REVERSE SIDE FOR EXPLANATION
XW   SEE REVERSE SIDE FOR EXPLANATION

### CLAIM INFORMATION

SEE REVERSE SIDE FOR APPEAL MESSAGE

HELP STOP INSURANCE FRAUD.  IF YOU KNOW OR SUSPECT ILLEGAL ACTIVITY REGARDING
YOUR INSURANCE CLAIMS, CALL THE TELEPHONE NUMBER ON THIS FORM.

### COORDINATION OF BENEFITS

ELIGIBLE AMOUNT

MINUS AMT. PAID BY

| AMOUNT PAID BY HUMANA ▸ | 240.00 |
|---|---|

BENEFITS PAID TO THE FOLLOWING

MYRON H SINGER MD   240.00

### ANY QUESTIONS - PLEASE CONTACT

HUMANA CLAIMS OFFICE
P.O. BOX 14835
LEXINGTON, KY 40512-4835
OR CALL 1-800-833-6917

# HUMANA.
**www.humana.com**

Form No. GHX013P  Rev. 09/05

**Van Ru Credit Corporation**

PO Box 46549
Lincolnwood IL 60646-0549
RETURN SERVICE REQUESTED

1350 E Touhy Ave Suite 100e
Des Plaines Il 60018-3307
Telephone # 877-891-9207 Ext 4283

June 5, 2007

74058665-129-R05   235129   27891

Eric Carl Fogel
916 Glenview Rd
Glenview IL 60025-3133

Van Ru
PO Box 1018
Park Ridge IL 60068-7018

RE: Hailey Elizabet Fogel
Account # 74058665
Balance: $ 722.12

***Detach Upper Portion And Return With Payment***

| Creditor | Account # | Balance |
|---|---|---|
| Enh Medical Group | 014924401-00005467890 | $   702.12 |
| Enh Medical Group | 005023478-00005467890 | $    20.00 |

The above balance has been placed with us for collection.

**This is an important matter and deserves your immediate attention.** Your payment may be mailed in the enclosed envelope. If you have any questions, or wish to discuss your account with one of our representatives, you may call us at the <u>toll free</u> number listed above.

**This communication is from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.**

**Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice this office will provide you with the name and address of the original creditor, if different from the current creditor.**

Yours truly,

*Van Ru Credit Corporation*

36ONVANR05129

FOGEL 17

ENH
ENH Faculty Practice Associates     ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789


ERIC CARL FOGEL                      ENH
916 GLENVIEW RD                      ENH Faculty Practice Associates

GLENVIEW, IL 60025                   CHICAGO, IL 60678

| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMNT | PAT POR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/18/06 | FOGEL,HAILEY ELIZABE | INITIAL CARE. | 5 | 1 | 99431 | 185.00 | 0.00 | 81.50 | 0.00 | 103.50 | 0.00 |
| 06/07/06 | AETNA ERA PAYMENT | | | | | 81.50 | | | | | |
| 06/07/06 | ADJUSTMENT | | | | | 103.50 | | | | | |
| 05/23/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 05/19/06 | FOGEL,HAILEY ELIZABE | F/U NEWBORN C | 6 | 1 | 99433 | 98.00 | 0.00 | 42.54 | 0.00 | 55.46 | 0.00 |
| 06/07/06 | AETNA ERA PAYMENT | | | | | 42.54 | | | | | |
| 06/07/06 | ADJUSTMENT | | | | | 55.46 | | | | | |
| 05/23/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 05/20/06 | FOGEL,HAILEY ELIZABE | F/U NEWBORN C | 7 | 1 | 99433 | 98.00 | 0.00 | 42.54 | 0.00 | 55.46 | 0.00 |
| 05/23/06 | INSURANCE DENIAL | | | | | 0.00 | | | | | |
| 06/28/06 | AETNA ERA PAYMENT | | | | | 42.54 | | | | | |
| 06   6 | ADJUSTMENT | | | | | 55.46 | | | | | |
| 05/23/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 06/10/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 05/21/06 | FOGEL,HAILEY ELIZABE | HOSPITAL DISC | 8 | 1 | 99238 | 144.00 | 0.00 | 95.38 | 0.00 | 48.62 | 0.00 |
| 05/23/06 | INSURANCE DENIAL | | | | | 0.00 | | | | | |
| 06/28/06 | AETNA ERA PAYMENT | | | | | 95.38 | | | | | |

CONTINUED

ENH

```
ENH
ENH Faculty Practice Associates     ERIC CARL FOGEL

CHICAGO, IL 60678
                                    06/06/07          546789
```

```
ERIC CARL FOGEL                     ENH
916 GLENVIEW RD                     ENH Faculty Practice Associates

GLENVIEW, IL 60025                  CHICAGO, IL 60678
```

| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|----------|---------|-----------|-----|-----|-----|--------|-----------|----------|----------|----------|---------|
| 06/28/06 | ADJUSTMENT | | | | | 48.62 | | | | | |
| 05/23/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 06/10/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 05/24/06 | FOGEL,HAILEY ELIZABE | PREVENTIVE VI | 11 | 1 | 99381 | 176.00 | 0.00 | 122.21 | 20.00 | 33.79 | 0.00 |
| 05/24/06 | COPAY PYMT/PT PYMT | | | | | 20.00 | | | | | |
| 06/07/06 | AETNA ERA PAYMENT | | | | | 122.21 | | | | | |
| 06/07/06 | ADJUSTMENT | | | | | 33.79 | | | | | |
| 05/25/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 05/24/06 | FOGEL,HAILEY ELIZABE | HEPATITIS B V | 12 | 1 | 90744 | 84.00 | 0.00 | 84.00 | 0.00 | 0.00 | 0.00 |
| 06/07/06 | AETNA ERA PAYMENT | | | | | 84.00 | | | | | |
| 05/25/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 05, 6 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 13 | 1 | 90465 | 54.00 | 0.00 | 25.68 | 0.00 | 28.32 | 0.00 |
| 06/07/06 | AETNA ERA PAYMENT | | | | | 25.68 | | | | | |
| 06/07/06 | ADJUSTMENT | | | | | 28.32 | | | | | |
| 05/25/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 06/20/06 | FOGEL,HAILEY ELIZABE | PREVENTIVE VI | 23 | 1 | 99391 | 137.00 | 0.00 | 0.00 | 45.00 | 92.00 | 0.00 |
| 06/20/06 | COPAY PYMT/PT PYMT | | | | | 20.00 | | | | | |

CONTINUED

ENH

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07            546789

ERIC CARL FOGEL                    ENH
916 GLENVIEW RD                    ENH Faculty Practice Associates

GLENVIEW, IL 60025                 CHICAGO, IL 60678

| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTNT | PAT POR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/06/06 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |
| 04/24/06 | COPAY PYMT/PT PYMT | | | | 20.00 | | | | | | |
| 10/03/06 | COPAY PYMT/PT PYMT | | | | 5.00 | | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | 92.00 | | | | | | |
| 06/22/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 06/20/06 | FOGEL,HAILEY ELIZABE | HEPATITIS B V | 24 | 1 | 90744 | 84.00 | 0.00 | 0.00 | 0.00 | 84.00 | 0.00 |
| 07/06/06 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | 84.00 | | | | | | |
| 06/22/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 06/20/06 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 25 | 1 | 90465 | 54.00 | 0.00 | 0.00 | 0.00 | 54.00 | 0.00 |
| 07/06/06 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |
| 11, 6 | VANRU BAD DEBT WRITE-OFF | | | | 54.00 | | | | | | |
| 06/24/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 07/18/06 | FOGEL,HAILEY ELIZABE | PREVENTIVE VI | 32 | 1 | 99391 | 137.00 | 0.00 | 0.00 | 20.00 | 117.00 | 0.00 |
| 07/18/06 | COPAY PYMT/PT PYMT | | | | 20.00 | | | | | | |
| 08/03/06 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | 117.00 | | | | | | |

CONTINUED

ENH

ENH
ENH Faculty Practice Associates          ERIC CARL FOGEL

CHICAGO, IL 60678
                                         06/06/07          546789


ERIC CARL FOGEL                          ENH
916 GLENVIEW RD                          ENH Faculty Practice Associates

GLENVIEW, IL 60025                       CHICAGO, IL 60678


| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT FOR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/20/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 07/18/06 | FOGEL,HAILEY ELIZABE | DTAP IMMUNIZA | 33 | 1 | 90700 | 52.00 | 0.00 | 0.00 | 0.00 | 52.00 | 0.00 |
| 08/03/06 | AETNA ERA PAYMENT | | | | | 0.00 | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | | 52.00 | | | | | |
| 07/20/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 07/18/06 | FOGEL,HAILEY ELIZABE | POLIOMYELITIS | 34 | 1 | 90713 | 68.00 | 0.00 | 0.00 | 0.00 | 68.00 | 0.00 |
| 08/03/06 | AETNA ERA PAYMENT | | | | | 0.00 | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | | 68.00 | | | | | |
| 07/20/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 07/18/06 | FOGEL,HAILEY ELIZABE | HIB TITER VAC | 35 | 1 | 90645 | 65.00 | 0.00 | 0.00 | 0.00 | 65.00 | 0.00 |
| 08/03/06 | AETNA ERA PAYMENT | | | | | 0.00 | | | | | |
| 11/   5 | VANRU BAD DEBT WRITE-OFF | | | | | 65.00 | | | | | |
| 07/2 ,06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 07/18/06 | FOGEL,HAILEY ELIZABE | PNEUMOCOCCAL | 36 | 1 | 90669 | 174.00 | 0.00 | 0.00 | 0.00 | 174.00 | 0.00 |
| 08/03/06 | AETNA ERA PAYMENT | | | | | 0.00 | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | | 174.00 | | | | | |
| 07/20/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |

CONTINUED


ENH

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789


ERIC CARL FOGEL                    ENH
916 GLENVIEW RD                    ENH Faculty Practice Associates

GLENVIEW, IL 60025                 CHICAGO, IL 60678

| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|----------|---------|-----------|----|----|-----|--------|-----------|----------|----------|----------|---------|
| 07/18/06 | FOGEL,HAILEY ELIZABE | ROTAVIRUS VAC | 37 | 1 | 90680 | 221.75 | 0.00 | 0.00 | 0.00 | 221.75 | 0.00 |
| 08/03/06 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | 221.75 | | | | | | |
| 07/20/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 07/18/06 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 38 | 1 | 90465 | 54.00 | 0.00 | 0.00 | 0.00 | 54.00 | 0.00 |
| 08/03/06 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | 54.00 | | | | | | |
| 07/20/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 07/18/06 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 39 | 3 | 90466 | 108.00 | 0.00 | 0.00 | 0.00 | 108.00 | 0.00 |
| 08/03/06 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | 108.00 | | | | | | |
| 07/20/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 10/ 06 | FOGEL,HAILEY ELIZABE | PREVENTIVE VI | 46 | 1 | 99391 | 137.00 | 0.00 | 0.00 | 20.00 | 117.00 | 0.00 |
| 10/03/06 | COPAY PYMT/PT PYMT | | | | 20.00 | | | | | | |
| 10/25/06 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | 117.00 | | | | | | |
| 10/07/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |

CONTINUED

ENH

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789


ERIC CARL FOGEL                     ENH
916 GLENVIEW RD                     ENH Faculty Practice Associates

GLENVIEW, IL 60025                  CHICAGO, IL 60678


| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/03/06 | FOGEL,HAILEY ELIZABE | ROTAVIRUS VAC | 47 | 1 | 90680 | 221.75 | 0.00 | 0.00 | 0.00 | 221.75 | 0.00 |
| 10/25/06 | AETNA ERA PAYMENT | | | | | 0.00 | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | | 221.75 | | | | | |
| 10/07/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 10/03/06 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 48 | 1 | 90465 | 54.00 | 0.00 | 0.00 | 0.00 | 54.00 | 0.00 |
| 10/25/06 | AETNA ERA PAYMENT | | | | | 0.00 | | | | | |
| 11/26/06 | VANRU BAD DEBT WRITE-OFF | | | | | 54.00 | | | | | |
| 10/07/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | PREVENTIVE VI | 61 | 1 | 99391 | 137.00 | 0.00 | 108.34 | 27.08 | 1.58 | 0.00 |
| 12/12/06 | COPAY PYMT/PT PYMT | | | | | 25.00 | | | | | |
| 01/12/07 | HUMANA PAYMENT | | | | | 108.34 | | | | | |
| 01/  /07 | ADJUSTMENT | | | | | 1.58 | | | | | |
| 02/  /07 | PATIENT PAYMENT | | | | | 2.08 | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | DTAP IMMUNIZA | 62 | 1 | 90700 | 93.46 | 0.00 | 37.05 | 9.26 | 47.15 | 0.00 |
| 01/12/07 | HUMANA PAYMENT | | | | | 37.05 | | | | | |
| 01/12/07 | ADJUSTMENT | | | | | 47.15 | | | | | |

CONTINUED


ENH


FOGEL 23

ENH
ENH Faculty Practice Associates     ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789


ERIC CARL FOGEL                     ENH
916 GLENVIEW RD                     ENH Faculty Practice Associates

GLENVIEW, IL 60025                  CHICAGO, IL 60678

| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/22/07 | PATIENT PAYMENT | | | | 9.26 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | POLIOMYELITIS | 63 | 1 | 90713 | 68.00 | 0.00 | 32.78 | 8.19 | 27.03 | 0.00 |
| 01/12/07 | HUMANA PAYMENT | | | | 32.78 | | | | | | |
| 01/12/07 | ADJUSTMENT | | | | 27.03 | | | | | | |
| 02/22/07 | PATIENT PAYMENT | | | | 8.19 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | HIB TITER VAC | 64 | 1 | 90645 | 114.44 | 0.00 | 26.80 | 6.70 | 80.94 | 0.00 |
| 01/12/07 | HUMANA PAYMENT | | | | 26.80 | | | | | | |
| 01/12/07 | ADJUSTMENT | | | | 80.94 | | | | | | |
| 02/22/07 | PATIENT PAYMENT | | | | 6.70 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | PNEUMOCOCCAL | 65 | 1 | 90669 | 314.80 | 0.00 | 0.00 | 60.00 | 254.80 | 0.00 |
| 02/27/07 | INSURANCE DENIAL | | | | 0.00 | | | | | | |
| 02/27/07 | INSURANCE DENIAL | | | | 0.00 | | | | | | |
| 02/20/07 | COPAY PYMT/PT PYMT | | | | 20.00 | | | | | | |
| 04/19/07 | PATIENT PAYMENT | | | | 40.00 | | | | | | |

CONTINUED

ENH

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789


ERIC CARL FOGEL                    ENH
916 GLENVIEW RD                    ENH Faculty Practice Associates

GLENVIEW, IL 60025                 CHICAGO, IL 60678


| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT FOR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/03/07 | VANRU BAD DEBT WRITE-OFF | | | | 254.80 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 02/13/07 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | ROTAVIRUS VAC | 66 | 1 | 90680 | 265.32 | 0.00 | 0.00 | 0.00 | 265.32 | 0.00 |
| 02/27/07 | INSURANCE DENIAL | | | | 0.00 | | | | | | |
| 02/27/07 | INSURANCE DENIAL | | | | 0.00 | | | | | | |
| 06/03/07 | VANRU BAD DEBT WRITE-OFF | | | | 265.32 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 02/13/07 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 67 | 1 | 90465 | 54.00 | 0.00 | 25.88 | 6.47 | 21.65 | 0.00 |
| 01/12/07 | HUMANA PAYMENT | | | | 25.88 | | | | | | |
| 01/ 7 | ADJUSTMENT | | | | 21.65 | | | | | | |
| 02/2 07 | PATIENT PAYMENT | | | | 6.47 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 68 | 1 | 90466 | 36.00 | 0.00 | 9.15 | 2.29 | 24.56 | 0.00 |
| 12/12/06 | HUMANA PAYMENT | | | | 9.15 | | | | | | |
| 01/12/07 | ADJUSTMENT | | | | 24.56 | | | | | | |

CONTINUED


ENH

ENH
ENH Faculty Practice Associates       ERIC CARL FOGEL

CHICAGO, IL 60678
                                      06/06/07        546789


ERIC CARL FOGEL                       ENH
916 GLENVIEW RD                       ENH Faculty Practice Associates

GLENVIEW, IL 60025                    CHICAGO, IL 60678


| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/22/07 | PATIENT PAYMENT | | | | 2.29 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 69 | 1 | 90467 | 54.00 | 54.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 01/12/07 | HUMANA PAYMENT | | | | 0.00 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 12/12/06 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 70 | 3 | 90468 | 162.00 | 0.00 | 0.00 | 0.00 | 162.00 | 0.00 |
| 02/27/07 | INSURANCE DENIAL | | | | 0.00 | | | | | | |
| 02/27/07 | INSURANCE DENIAL | | | | 0.00 | | | | | | |
| 06/03/07 | VANRU BAD DEBT WRITE-OFF | | | | 162.00 | | | | | | |
| 12/15/06 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 02/13/07 | INS FILED: HUMANA PPO-HUMANA PPO | | | | | | | | | | |
| 02/ 7 | FOGEL,HAILEY ELIZABE | PREVENTIVE VI | 97 | 1 | 99391 | 137.00 | 0.00 | 107.48 | 0.00 | 29.52 | 0.00 |
| 03/19/07 | AETNA ERA PAYMENT | | | | 107.48 | | | | | | |
| 03/19/07 | ADJUSTMENT | | | | 29.52 | | | | | | |
| 02/24/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 02/20/07 | FOGEL,HAILEY ELIZABE | HEPATITIS B/H | 98 | 1 | 90748 | 126.00 | 0.00 | 88.20 | 0.00 | 37.80 | 0.00 |
| 03/19/07 | AETNA ERA PAYMENT | | | | 88.20 | | | | | | |

CONTINUED


ENH

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789

ERIC CARL FOGEL                    ENH
916 GLENVIEW RD                    ENH Faculty Practice Associates

GLENVIEW, IL 60025                 CHICAGO, IL 60678

| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|----------|---------|-----------|----|----|-----|--------|-----------|----------|----------|----------|---------|
| 03/19/07 | ADJUSTMENT | | | | | 37.80 | | | | | |
| 02/24/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 02/20/07 | FOGEL,HAILEY ELIZABE | DTAP IMMUNIZA | 99 | 1 | 90700 | 93.46 | 0.00 | 36.75 | 0.00 | 56.71 | 0.00 |
| 03/19/07 | AETNA ERA PAYMENT | | | | | 36.75 | | | | | |
| 03/19/07 | ADJUSTMENT | | | | | 56.71 | | | | | |
| 02/24/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 02/20/07 | FOGEL,HAILEY ELIZABE | PNEUMOCOCCAL | 100 | 1 | 90669 | 314.80 | 0.00 | 200.36 | 0.00 | 114.44 | 0.00 |
| 03/19/07 | AETNA ERA PAYMENT | | | | | 200.36 | | | | | |
| 03/19/07 | ADJUSTMENT | | | | | 94.44 | | | | | |
| 06/03/07 | VANRU BAD DEBT WRITE-OFF | | | | | 20.00 | | | | | |
| 02/24/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 02, 7 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 101 | 1 | 90465 | 54.00 | 0.00 | 25.68 | 0.00 | 28.32 | 0.00 |
| 03/ | AETNA ERA PAYMENT | | | | | 25.68 | | | | | |
| 03/19/07 | ADJUSTMENT | | | | | 28.32 | | | | | |
| 02/24/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 02/20/07 | FOGEL,HAILEY ELIZABE | IMMUNE ADMIN | 102 | 2 | 90466 | 72.00 | 0.00 | 30.20 | 0.00 | 41.80 | 0.00 |
| 03/19/07 | AETNA ERA PAYMENT | | | | | 30.20 | | | | | |

CONTINUED

ENH

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789


ERIC CARL FOGEL                    ENH
916 GLENVIEW RD                    ENH Faculty Practice Associates

GLENVIEW, IL 60025                 CHICAGO, IL 60678


| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/19/07 | ADJUSTMENT | | | | | 41.80 | | | | | |
| 02/24/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 05/12/06 | FOGEL,ANNABELLE | OFFICE/OUTPT | 4 | 1 | 99213 | 106.00 | 0.00 | 51.99 | 20.00 | 34.01 | 0.00 |
| 05/12/06 | COPAY PYMT/PT PYMT | | | | | 20.00 | | | | | |
| 06/01/06 | AETNA ERA PAYMENT | | | | | 51.99 | | | | | |
| 06/01/06 | ADJUSTMENT | | | | | 34.01 | | | | | |
| 05/17/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 08/15/06 | FOGEL,ANNABELLE | PREVENTIVE VI | 43 | 1 | 99393 | 159.00 | 0.00 | 139.00 | 20.00 | 0.00 | 0.00 |
| 08/15/06 | COPAY PYMT/PT PYMT | | | | | 20.00 | | | | | |
| 08/30/06 | AETNA ERA PAYMENT | | | | | 139.00 | | | | | |
| 08/17/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 10/ 5 06 | FOGEL,ANNABELLE | POLIOMYELITIS | 49 | 1 | 90713 | 68.00 | 0.00 | 32.79 | 0.00 | 35.21 | 0.00 |
| 11/01/06 | AETNA ERA PAYMENT | | | | | 32.79 | | | | | |
| 11/01/06 | ADJUSTMENT | | | | | 35.21 | | | | | |
| 10/14/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 10/03/06 | FOGEL,ANNABELLE | IMMUNE ADMIN | 50 | 1 | 90465 | 54.00 | 0.00 | 51.35 | 0.00 | 2.65 | 0.00 |
| 11/01/06 | AETNA ERA PAYMENT | | | | | 51.35 | | | | | |

CONTINUED


ENH

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07        546789


ERIC CARL FOGEL                    ENH
916 GLENVIEW RD                    ENH Faculty Practice Associates

GLENVIEW, IL 60025                 CHICAGO, IL 60678


| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/01/06 | ADJUSTMENT | | | | 2.65 | | | | | | |
| 10/14/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 12/26/06 | FOGEL,ANNABELLE | OFFICE CONSUL | 72 | 1 | 99244 | 350.00 | 0.00 | 320.00 | 30.00 | 0.00 | 0.00 |
| 12/28/06 | COPAY PYMT/PT PYMT | | | | 20.00 | | | | | | |
| 01/10/07 | AETNA ERA PAYMENT | | | | 320.00 | | | | | | |
| 02/22/07 | PATIENT PAYMENT | | | | 10.00 | | | | | | |
| 12/27/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 01/02/07 | FOGEL,ANNABELLE | OFFICE/OUTPT | 75 | 1 | 99213 | 106.00 | 0.00 | 86.00 | 20.00 | 0.00 | 0.00 |
| 01/02/07 | COPAY PYMT/PT PYMT | | | | 20.00 | | | | | | |
| 01/24/07 | AETNA ERA PAYMENT | | | | 86.00 | | | | | | |
| 01/07/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 01   7 | FOGEL,ANNABELLE | OFFICE/OUTPT | 85 | 1 | 99213 | 126.00 | 0.00 | 99.98 | 20.00 | 6.02 | 0.00 |
| 01/2./07 | COPAY PYMT/PT PYMT | | | | 20.00 | | | | | | |
| 01/31/07 | AETNA ERA PAYMENT | | | | 99.98 | | | | | | |
| 01/31/07 | ADJUSTMENT | | | | 6.02 | | | | | | |
| 01/18/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 01/24/07 | FOGEL,ANNABELLE | REMOVAL ADENO | 106 | 1 | 42830 | 619.00 | 0.00 | 279.56 | 0.00 | 339.44 | 0.00 |

CONTINUED


ENH

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789


ERIC CARL FOGEL                    ENH
916 GLENVIEW RD                    ENH Faculty Practice Associates

GLENVIEW, IL 60025                 CHICAGO, IL 60678

| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|----------|---------|-----------|-----|-----|-----|--------|-----------|----------|----------|----------|---------|
| 03/19/07 | AETNA ERA PAYMENT | | | | 279.56 | | | | | | |
| 03/19/07 | ADJUSTMENT | | | | 339.44 | | | | | | |
| 03/01/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 01/24/07 | FOGEL,ANNABELLE | CREATE EARDRU | 107 | 1 | 69436 | 496.00 | 437.33 | 58.67 | 0.00 | 0.00 | 0.00 |
| 03/19/07 | AETNA ERA PAYMENT | | | | 58.67 | | | | | | |
| 03/01/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 01/24/07 | FOGEL,ANNABELLE | CREATE EARDRU | 108 | 1 | 69436 | 496.00 | 378.67 | 117.33 | 0.00 | 0.00 | 0.00 |
| 03/19/07 | AETNA ERA PAYMENT | | | | 117.33 | | | | | | |
| 03/01/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 03/02/07 | FOGEL,ANNABELLE | OFFICE/OUTPT | 112 | 1 | 99213 | 126.00 | 0.00 | 41.99 | 30.00 | 54.01 | 0.00 |
| 03/02/07 | COPAY PYMT/PT PYMT | | | | 30.00 | | | | | | |
| 03   07 | AETNA ERA PAYMENT | | | | 41.99 | | | | | | |
| 03/ 1/07 | ADJUSTMENT | | | | 54.01 | | | | | | |
| 03/03/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 04/06/07 | FOGEL,ANNABELLE | OFFICE/OUTPT | 137 | 1 | 99213 | 126.00 | 0.00 | 41.99 | 30.00 | 54.01 | 0.00 |
| 04/06/07 | COPAY PYMT/PT PYMT | | | | 30.00 | | | | | | |
| 04/18/07 | AETNA ERA PAYMENT | | | | 0.00 | | | | | | |

CONTINUED

ENH

FOGEL 30

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678

06/06/07          546789


ERIC CARL FOGEL                    ENH
916 GLENVIEW RD                    ENH Faculty Practice Associates

GLENVIEW, IL 60025                 CHICAGO, IL 60678


| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/06/06 | FOGEL,ANGELA | OB ANTEPARTUM | 2 | 1 | OB001 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Pending | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 06/29/06 | FOGEL,ANGELA | OB POSTPARTUM | 29 | 1 | OB002 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Pending | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 11/30/06 | FOGEL,ANGELA | OFFICE CONSUL | 59 | 1 | 99244 | 350.00 | 0.00 | 320.00 | 30.00 | 0.00 | 0.00 |
| 11/30/06 | COPAY PYMT/PT PYMT | | | | | 30.00 | | | | | |
| 12/20/06 | AETNA ERA PAYMENT | | | | | 320.00 | | | | | |
| 12/01/06 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 01/22/07 | FOGEL,ANGELA | OFFICE/OUTPT | 88 | 1 | 99213 | 126.00 | 0.00 | 89.98 | 30.00 | 6.02 | 0.00 |
| 01/22/07 | COPAY PYMT/PT PYMT | | | | | 30.00 | | | | | |
| 02/15/07 | AETNA ERA PAYMENT | | | | | 89.98 | | | | | |
| 02   07 | ADJUSTMENT | | | | | 6.02 | | | | | |
| 01/  07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 03/02/07 | FOGEL,ANGELA | OFFICE/OUTPT | 113 | 1 | 99213 | 126.00 | 0.00 | 51.99 | 0.00 | 74.01 | 0.00 |
| 03/28/07 | AETNA ERA PAYMENT | | | | | 51.99 | | | | | |
| 03/28/07 | ADJUSTMENT | | | | | 54.01 | | | | | |
| 06/03/07 | VANRU BAD DEBT WRITE-OFF | | | | | 20.00 | | | | | |

CONTINUED


ENH


FOGEL 31

ENH
ENH Faculty Practice Associates    ERIC CARL FOGEL

CHICAGO, IL 60678
06/06/07          546789


ERIC CARL FOGEL                ENH
916 GLENVIEW RD                ENH Faculty Practice Associates

GLENVIEW, IL 60025             CHICAGO, IL 60678


| SVC DATE | PATIENT | PROCEDURE | TR | UN | CPT | CHARGE | INS FILED | INS PAID | PAT PAID | ADJUSTMT | PAT POR |
|----------|---------|-----------|----|----|----|--------|-----------|----------|----------|----------|---------|
| 03/08/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 02/28/07 | FOGEL,ANGELA | OFFICE/OUTPT | 114 | 1 | 99213 | 126.00 | 0.00 | 51.99 | 20.00 | 54.01 | 0.00 |
| 02/28/07 | COPAY PYMT/PT PYMT | | | | 20.00 | | | | | | |
| 03/28/07 | AETNA ERA PAYMENT | | | | 51.99 | | | | | | |
| 03/28/07 | ADJUSTMENT | | | | 54.01 | | | | | | |
| 03/09/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |
| 02/28/07 | FOGEL,ANGELA | STREP A ASSAY | 115 | 1 | 87880 | 44.00 | 0.00 | 20.95 | 0.00 | 23.05 | 0.00 |
| 03/28/07 | AETNA ERA PAYMENT | | | | 20.95 | | | | | | |
| 03/28/07 | ADJUSTMENT | | | | 23.05 | | | | | | |
| 03/09/07 | INS FILED: AETNA EMPLOYEE PLAN-AETNA EMPLOYEE PLAN | | | | | | | | | | |


* denotes new activity                                    Undistributed Credits    20.00

06/06/07    ERIC CARL FOGEL                    546789              **-20.00**
                                                  ENH

        363738206


    0.00              0.00              0.00              0.00              0.00

FOGEL 32

# SEYFARTH
**ATTORNEYS** SHAW LLP

131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000
fax (312) 460-7000
www.seyfarth.com

Writer's direct phone
(312) 460-5923
Writer's e-mail
Jsellstrom@seyfarth.com

November 19, 2007

**VIA FEDERAL EXPRESS**

Mr. Lee Polk
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606-2833

    Re:    Evanston Northwestern Healthcare Welfare Plan

Dear Mr. Polk:

    Although we have no obligation under law to provide the enclosed plan document to you, we are providing it because we indicated that we would forward a copy to you when it was completed.

        Sincerely,

        SEYFARTH SHAW LLP

        Joy Sellstrom

JS:ss

cc:    Noble & Cassano, Attention:  Lawrence Cassano (w/enc.)
       Eric Fogel (w/enc.)

BRUSSELS    WASHINGTON, D.C.    SAN FRANCISCO    SACRAMENTO    NEW YORK    LOS ANGELES    HOUSTON    CHICAGO    BOSTON    ATLANTA



RECEIVED
DEC - 6 2007

FOGEL 33

# EVANSTON NORTHWESTERN HEALTHCARE
# WELFARE PLAN

**As Amended and Restated Effective January 1, 2006**

CH1 10780302.19

FOGEL 34

Table of Contents

Page

ARTICLE I ESTABLISHMENT AND PURPOSE ...................................................1
    Section 1.01    Establishment...........................................................1
    Section 1.02    Purpose....................................................................1
    Section 1.03    Benefit Programs ....................................................1
    Section 1.04    Annual Reporting Requirements............................2
    Section 1.05    Applicability of Plan ..............................................2

ARTICLE II DEFINITIONS ................................................................................2
    Section 2.01    Account...................................................................2
    Section 2.02    Administrator..........................................................2
    Section 2.03    Affiliate .................................................................2
    Section 2.04    Authorized Employee ............................................3
    Section 2.05    Benefit Program ....................................................3
    Section 2.06    Cafeteria Program ..................................................3
    Section 2.07    Certificate of Creditable Coverage ........................3
    Section 2.08    Change in Status ....................................................5
    Section 2.09    Claimant.................................................................5
    Section 2.10    Claims Administrator (or Claims Fiduciary) ...................................6
    Section 2.11    COBRA...................................................................6
    Section 2.12    Code.......................................................................6
    Section 2.13    Committee..............................................................6
    Section 2.14    Company ................................................................6
    Section 2.15    Compensation ........................................................6
    Section 2.16    Concurrent Care Claim ..........................................6
    Section 2.17    Covered Person ......................................................6
    Section 2.18    Dependent .............................................................6
    Section 2.19    Dependent Care Expenses.......................................8
    Section 2.20    Domestic Partner....................................................8
    Section 2.21    Effective Date ........................................................8
    Section 2.22    Election Form.........................................................8
    Section 2.23    Electronic Protected Health Information or Electronic PHI or EPHI..............8
    Section 2.24    Employee ...............................................................9
    Section 2.25    Employer................................................................9
    Section 2.26    ERISA ...................................................................9
    Section 2.27    FMLA ..................................................................10
    Section 2.28    Health Care Claim................................................10
    Section 2.29    Health Care Component.........................................10
    Section 2.30    Health Care Operations.........................................10
    Section 2.31    Highly Compensated Participant ..........................11
    Section 2.32    HIPAA ................................................................11
    Section 2.33    HIPAA Enrollment Date.......................................11
    Section 2.34    HIPAA Health Plan...............................................11
    Section 2.35    HIPAA Program....................................................11

FOGEL 35

Table of Contents
(continued)

Section 2.36    Hybrid Entity ..................................................................................11
Section 2.37    Insurance Company .........................................................................11
Section 2.38    Late Enrollee ...................................................................................11
Section 2.39    Leave of Absence.............................................................................11
Section 2.40    Medicaid ..........................................................................................11
Section 2.41    Medicare ..........................................................................................11
Section 2.42    Medical Care Expenses....................................................................11
Section 2.43    Participant ........................................................................................12
Section 2.44    Payment............................................................................................12
Section 2.45    Plan ..................................................................................................12
Section 2.46    Plan Year..........................................................................................12
Section 2.47    Post-Service Claim...........................................................................12
Section 2.48    Pre-Service Claim ............................................................................12
Section 2.49    Privacy and Security Official...........................................................12
Section 2.50    Privacy Policy ..................................................................................13
Section 2.51    Privacy Rule .....................................................................................13
Section 2.52    Program Document ..........................................................................13
Section 2.53    Protected Health Information or PHI................................................13
Section 2.54    Qualified Medical Child Support Order or QMCSO......................13
Section 2.55    Security Incident ..............................................................................13
Section 2.56    Security Rule ....................................................................................13
Section 2.57    Significant Break in Coverage .........................................................13
Section 2.58    Spouse ..............................................................................................13
Section 2.59    Third Party .......................................................................................13
Section 2.60    Uniformed Service ...........................................................................14
Section 2.61    Urgent Care Claim ...........................................................................14
Section 2.62    USERRA...........................................................................................14

ARTICLE III  ELIGIBILITY AND PARTICIPATION ...............................................14
Section 3.01    Eligibility to Participate ...................................................................14
Section 3.02    Participation Conditions...................................................................15
Section 3.03    Termination of Participation.............................................................15
Section 3.04    Termination of Employment.............................................................16
Section 3.05    Continuation of Participation During Leave of Absence................16
Section 3.06    Reinstatement of Former Participant ...............................................17

ARTICLE IV  BENEFIT CHOICES...............................................................................18
Section 4.01    Benefit Choices................................................................................18
Section 4.02    Election of Benefit Choices .............................................................18
Section 4.03    Participant Contributions Required for Plan Coverage ..................18
Section 4.04    Domestic Partners ...........................................................................18

CH1 10780302.19

FOGEL 36

Table of Contents
(continued)

Page

ARTICLE V  ENROLLMENT AND ELECTIONS ....................................................18
Section 5.01    Initial Enrollment................................................................18
Section 5.02    Annual Enrollment..............................................................19
Section 5.03    Election Forms....................................................................19
Section 5.04    Failure to Return Election Form .........................................19
Section 5.05    Special Enrollment Rules....................................................20
Section 5.06    Modifying and Revoking Elections .....................................22
Section 5.07    Nondiscrimination Requirements ........................................27

ARTICLE VI  FUNDING AND ACCOUNTS ..........................................................27
Section 6.01    Funding, Trust Agreements, and Insurance.........................27
Section 6.02    Benefits Supported Only by Benefit Program ....................28
Section 6.03    Maintenance of Accounts....................................................28
Section 6.04    Rights of Participants..........................................................29
Section 6.05    Forfeitures...........................................................................29

ARTICLE VII  HEALTHCARE FLEXIBLE SPENDING ACCOUNT ......................30
Section 7.01    Type of Benefit...................................................................30
Section 7.02    Maximum Contribution.......................................................30
Section 7.03    Benefits After Termination and Reinstatement After Return ........30
Section 7.04    Medical Care Expenses.......................................................30
Section 7.05    Claim and Payment Procedures ..........................................31
Section 7.06    Forfeitures...........................................................................32
Section 7.07    Statements...........................................................................32

ARTICLE VIII  DEPENDENT CARE FLEXIBLE SPENDING ACCOUNT...............32
Section 8.01    Type of Benefit...................................................................32
Section 8.02    Maximum Contribution.......................................................32
Section 8.03    Benefits After Termination .................................................32
Section 8.04    Dependent Care Expenses...................................................33
Section 8.05    Earned Income Limit ..........................................................34
Section 8.06    Claim and Payment Procedures ..........................................35
Section 8.07    Forfeitures...........................................................................35
Section 8.08    Statements...........................................................................35

ARTICLE IX  SPECIAL COVERAGE PROVISIONS..............................................35
Section 9.01    COBRA Continuation Coverage..........................................35
Section 9.02    Conversion of Coverage .....................................................43
Section 9.03    Other Continuation Coverage .............................................43
Section 9.04    Certificates of Creditable Coverage....................................46
Section 9.05    Required Coverage..............................................................47

CHI 10780302.19

FOGEL 37

Table of Contents
(continued)

Page

ARTICLE X  COORDINATION OF BENEFITS AND RECOVERY OF BENEFIT
OVERPAYMENT .......................................................................................................48
Section 10.01    Coordination of Benefits...............................................................48
Section 10.02    Medicare-Eligible Employees and Dependents ............................51
Section 10.03    Subrogation, Reimbursement and Recovery for Third Party Liability..........51
Section 10.04    Recovery of Benefit Overpayment ................................................54

ARTICLE XI  ADMINISTRATION.........................................................................................55
Section 11.01    Administration ..............................................................................55
Section 11.02    Committee......................................................................................55
Section 11.03    Liability and Indemnification .......................................................55
Section 11.04    Powers and Authority of Administrator.........................................56
Section 11.05    Records and Reports .....................................................................56

ARTICLE XII  CLAIMS ADMINISTRATION .........................................................................57
Section 12.01    General...........................................................................................57
Section 12.02    Processing of Claims.....................................................................58
Section 12.03    Health Care Claims .......................................................................58
Section 12.04    Disability Claims ..........................................................................62
Section 12.05    All Other Claims...........................................................................65
Section 12.06    Second Appeal ..............................................................................67
Section 12.07    Exhaustion of Administrative Remedies .......................................67
Section 12.08    Incompetency................................................................................68

ARTICLE XIII  AMENDMENT AND TERMINATION ............................................................68
Section 13.01    Amendment....................................................................................68
Section 13.02    Termination of the Plan .................................................................68

ARTICLE XIV  PARTICIPATING EMPLOYERS.....................................................................69
Section 14.01    Adoption of Plan...........................................................................69
Section 14.02    Administration ..............................................................................69
Section 14.03    Company as Agent for Employers.................................................69
Section 14.04    Termination....................................................................................69

ARTICLE XV  HIPAA PRIVACY AND SECURITY ...............................................................69
Section 15.01    General...........................................................................................69
Section 15.02    Authorized Employees...................................................................69
Section 15.03    Permitted Uses and Disclosures.....................................................71
Section 15.04    Certification Requirement..............................................................72
Section 15.05    Mitigation......................................................................................73

ARTICLE XVI  MISCELLANEOUS PROVISIONS...................................................................73
Section 16.01    Limitation of Rights......................................................................73

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| Section 16.02 | Rights to Employers' Assets | 74 |
| Section 16.03 | No Assignments | 74 |
| Section 16.04 | Severability | 74 |
| Section 16.05 | No Guarantee of Tax Consequences | 74 |
| Section 16.06 | Gender and Number | 74 |
| Section 16.07 | Governing Law | 74 |
| Section 16.08 | Headings | 75 |

APPENDIX A Benefit Programs ... 76

APPENDIX B Participating Employers ... 78

CH1 10780302.19

FOGEL 39

# EVANSTON NORTHWESTERN HEALTHCARE

## WELFARE PLAN

## ARTICLE I
## ESTABLISHMENT AND PURPOSE

**Section 1.01 Establishment.**  Evanston Northwestern Healthcare Corporation (the "Company") hereby amends and restates the Evanston Hospital Corporation Health Care Benefits Plan and the Evanston Hospital Corporation Flexible Benefits Plan, as the **Evanston Northwestern Healthcare Welfare Plan** (the "Plan"), effective January 1, 2006.  The Plan is a consolidation, amendment and restatement of various employee welfare benefit plans previously maintained by the Company and set forth in the relevant summary plan descriptions and related plan documents.

**Section 1.02 Purpose.**  The purpose of the Plan is to (a) offer eligible Employees an opportunity to obtain certain medical, dental, life, accident, employee assistance, and disability benefits; (b) provide eligible Employees an opportunity to pay for certain benefits on a pre-tax basis; and (c) to provide eligible Employees an opportunity to fund certain unreimbursed medical care expenses and certain qualifying dependent care expenses on a pre-tax basis.  Benefits are provided under the Plan through a number of Benefit Programs.

The Plan is to be administered and interpreted in a manner consistent with the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), applicable provisions of the Internal Revenue Code of 1986, as amended (the "Code"), including the requirements of Sections 79, 125, 129, and 105(h) of the Code, and the regulations promulgated thereunder. Nothing in this Plan document, however, shall subject any Benefit Program to ERISA if the Benefit Program would not otherwise be covered by ERISA.  The Benefit Programs not subject to ERISA are identified in Appendix A.

**Section 1.03 Benefit Programs.**  The Plan consolidates a broad range of welfare plan benefits (as defined in Section 3(1) of ERISA), and a Cafeteria Program within the meaning of Section 125 of the Code.  The Cafeteria Program includes, among other benefits, a "dependent care assistance plan" (as defined in Section 129 of the Code), a health flexible spending account (within the meaning of Section 125 of the Code), and a "self-insured medical reimbursement plan" (as defined in Section 105 of the Code).

Benefits are provided to Participants and their respective Beneficiaries through one or more Benefit Programs sponsored or maintained by one or more of the Employers.  Such Benefit Programs may be funded or unfunded, insured or uninsured, or a combination thereof, and may provide varying benefits to different groups of current and former Employees of the Employers and their respective covered Dependents.  The separate Benefit Programs that are consolidated into the Plan are listed in Appendix A.  Separate Program Documents which describe the specific benefits provided by each Benefit Program, the individuals covered by each Benefit Program, and the other terms and conditions of each Benefit Program, as amended from time to time, shall be incorporated herein by this reference.  The Plan supersedes and replaces any program document defining the terms of or describing a Benefit Program which is not incorporated and

made part of the Plan. If the Benefit Program is insured and there is a conflict between the specific terms of a Program Document and the terms of the Plan, the Program Document shall control. For all other Benefit Programs, if there is a conflict between the specific terms of a Program Document and the terms of the Plan, the Plan shall control (unless contrary to applicable law), except that any terms exclusively applicable to a Benefit Program shall be set forth in the applicable Program Document.

**Section 1.04 Annual Reporting Requirements.** All Benefit Programs offered under the Plan shall constitute a single plan for purposes of the annual reporting requirements of the Code and ERISA. Notwithstanding the foregoing, any separate Benefit Program required to receive an opinion from an independent qualified public accountant pursuant to Section 103(a)(3) of ERISA shall be deemed a separate employee benefit plan for purposes of the annual reporting requirement of the Code and ERISA.

**Section 1.05 Applicability of Plan.** The Plan shall apply only to eligible individuals who are Participants (as defined in Section 2.43) on or after January 1, 2006.

## ARTICLE II
## DEFINITIONS

Whenever used in the Plan, the following words and phrases shall have the respective meanings specified in this Section unless the context plainly requires a different meaning, and when the defined meaning is intended the term shall be capitalized in the Plan.

**Section 2.01 Account** means a bookkeeping record maintained by the Plan with respect to each Participant pursuant to Article VI which reflects, from time to time, the amounts attributable to Compensation reduction contributions made on the Participant's behalf, and/or the amounts designated by the Company, which are available for the Participant's benefits under Article VI, subject to any forfeitures incurred under that Article.

(a) **Dependent Care Flexible Spending Account** means the Account established for a Participant to record the contributions which the Participant has elected to make to such Account and the reimbursements made to such Participant for eligible Dependent Care Expenses.

(b) **Healthcare Flexible Spending Account** means the Account established and maintained for a Participant to record the contribution that the Participant has elected to make to such Account and the reimbursements made to such Participant for eligible Medical Care Expenses.

**Section 2.02 Administrator** means the Committee, other entity, or individual designated from time to time by the Board of Directors or Chief Executive Officer of the Company to supervise the administration of the Plan in accordance with Article XI. Except as provided in Section 12.01, the Administrator shall be the "named fiduciary" of the Plan, within the meaning of Section 402(a) of ERISA.

**Section 2.03 Affiliate** means any of the following entities: (a) any corporation or other business entity which is (i) a member of a controlled group of corporations (within the meaning

2

FOGEL 41

of Section 414(b) of the Code) of which the Company is also a member; (ii) a trade or business under common control with the Company, within the meaning of Section 414(c) of the Code; (iii) a member of an affiliated service group (within the meaning of Section 414(m) of the Code) of which the Company is also a member; or (iv) required to be aggregated with the Company pursuant to regulations issued under Section 414(o) of the Code; or (b) any other corporation or entity related to the Company.

**Section 2.04  Authorized  Employee** means  an  employee  (including  a  contract, temporary, or leased employee) of the HIPAA Health Plans or of the Company whose duties (a) require that the employee have access to PHI or EPHI for purposes of Payment or Health Care Operations; or (b) make it likely that he will receive or have access to PHI or EPHI.  Persons designated as Authorized Employees are described in the Privacy Policy and Section 14.02 herein. An Authorized Employee shall also include any other employee (other than a designated Authorized Employee), including a "responsible employee" as described in the Privacy Policy, who creates or receives PHI or EPHI on behalf of a HIPAA Health Plan, even though his duties do  not  (or  are  not  expected  to)  include  creating  or  receiving  PHI  or  EPHI.    Authorized Employees are within the Company's HIPAA firewall when they perform HIPAA Health Plan functions.

**Section 2.05  Benefit  Program** means  a  separate  welfare  plan  program  which  is sponsored by an Employer and which forms part of the Plan and is incorporated herein by this reference.  A Benefit Program shall also include the Cafeteria Program, the terms and conditions of which are specified herein.  The Administrator shall maintain records as to the particular Benefit Programs from time to time forming part of the Plan.

**Section 2.06  Cafeteria  Program** means the Benefits Program set forth herein which permits eligible Employees to choose between certain benefits provided by the Employer or additional cash compensation, as described in Article IV.  The Cafeteria Program is intended to qualify as a "cafeteria plan" under Section 125 of the Code and only qualified benefits as defined in Section 125(f) of the Code will be offered under the Cafeteria Program.

**Section 2.07  Certificate of Creditable Coverage** means a written certification of the period of continuous Creditable Coverage of an individual under a qualifying health plan.

(a)    Creditable  Coverage  includes  coverage  of  an  individual  under  any  of  the following:

(i)    a group health plan;

(ii)    health insurance coverage;

(iii)    Medicare;

(iv)    Title XIX of the Social Security Act, other than coverage consisting solely of benefits under Section 1928 (Medicaid);

(v)    Chapter  55  of  Title  10,  United  States  Code  (uniformed  services healthcare);

3

FOGEL 42

     (vi)    a medical care program of the Indian Health Service or of a tribal organization;

     (vii)   a state health benefits risk pool (as defined in regulations);

     (viii)  a health plan offered under Chapter 89 of Title 5, United States Code (Federal Employees Health Benefits Program);

     (ix)    a public health plan (as defined in regulations);

     (x)     a health benefit plan under Section 5(e) of the Peace Corps Act (22 U.S.C. 2504(e)); or

     (xi)    Title XXI of the Social Security Act (State Children's Health Insurance Program).

(b)    Creditable Coverage does not include the following:

     (i)     coverage only for accident or disability income insurance, or any combination thereof;

     (ii)    coverage issued as a supplement to liability insurance;

     (iii)   liability insurance, including general liability insurance and automobile liability insurance;

     (iv)   workers' compensation or similar insurance;

     (v)     automobile medical payment insurance;

     (vi)    credit-only insurance;

     (vii)   coverage for on-site medical clinics;

     (viii)  other similar insurance coverage, specified in regulations, under which benefits for medical care are secondary or incidental to other insurance benefits;

     (ix)    limited scope dental or vision benefits, benefits for long-term care, nursing home care, home health care, community-based care, or any combination thereof, and such other similar, limited benefits as are specified in regulations; provided that such benefit is offered under a separate policy, certificate or contract of insurance or not an integral part of a HIPAA Program.

     (x)     coverage only for a specified disease or illness, and Company indemnity or other fixed indemnity insurance; provided that the benefit is offered under a separate policy, certificate, or contract of insurance, there is no coordination between provision of such benefits and any exclusion of

FOGEL 43

benefits under a HIPAA Program, and such benefits are paid without regard to whether benefits are provided under such program; or

(xi)    if offered as a separate insurance policy, Medicare supplemental health insurance (as defined under Section 1882(g)(1) of the Social Security Act), coverage supplemental to the coverage provided under Chapter 55 of Title 10, United States Code, or similar supplemental coverage provided under a group health plan.

**Section 2.08  Change in Status** means one of the following events, as well as any other event included under subsequent changes to regulations issued under Section 125 of the Code which the Administrator (in its sole discretion) decides to recognize on a uniform and consistent basis. A Participant may make a new election upon the occurrence of certain events, including a Change in Status, if the requirements of Section 5.06 are met.

(a)    an event that changes the Employee's legal marital status, including marriage, death of the Employee's Spouse, divorce, legal separation or annulment;

(b)    a change in the number of the Employee's Dependents, including the birth, adoption, placement for adoption (as defined under HIPAA), or death of a Dependent;

(c)    any change in employment status of the Participant or the Participant's Dependent that affects benefit eligibility under a Benefit Program, including:  the termination or commencement of employment; the commencement of or return from an unpaid leave of absence; or a change in employment status that causes the individual to become or cease to be eligible under a Benefit Program (e.g., switching from part-time to full-time status or vice versa, or a similar change if such change causes the individual to lose eligibility for coverage);

(d)    a change in employment or marital status that causes the Employee to become eligible for coverage under his or her Spouse's or Dependent's plan if the Employee actually obtains coverage thereunder;

(e)    an event that causes a Dependent to satisfy or cease to satisfy the eligibility requirements for a particular Benefit Program including, but not limited to, attaining a specified age, getting married, or ceasing to be a student;

(f)    a change in employment status of a Spouse which results in a loss of coverage under the Spouse's plan;

(g)    a change in the place of residence of the Employee, Spouse or Dependent that seriously affects access to coverage; or

(h)    any other event recognized for purposes of changing Plan elections under applicable law and regulations.

**Section 2.09  Claimant** means any person who believes he or she is entitled to receive a benefit under the Plan and files a claim in accordance with Article XII.

5

FOGEL 44

**Section 2.10 Claims Administrator (or Claims Fiduciary)** means an Insurance Company or other party that has contracted with an Employer to provide administrative services to a Benefit Program or is responsible for determining whether a particular claim is covered by such Benefit Program. If no other individual or entity is designated for a Benefit Program, the Administrator shall be the Claims Administrator.

**Section 2.11 COBRA** means the coverage rights conferred by Section 4980B, *et seq.* of the Code, as amended from time to time, and Section 601, *et seq.* of ERISA, as amended from time to time (as such statutes were created by Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, and amended thereafter).

**Section 2.12 Code** means the Internal Revenue Code of 1986, as amended from time to time, and applicable regulations issued and effective thereunder.

**Section 2.13 Committee** means the Welfare Committee, if any, appointed in accordance with Section 11.02.

**Section 2.14 Company** means Evanston Northwestern Healthcare Corporation and any successor or assign thereof which adopts the Plan by action of its governing body or which contractually assumes the obligations of the Company under the Plan.

**Section 2.15 Compensation** means the total salary, wages, bonuses, overtime pay, vacation, weekend and shift differential pay, holiday and sick pay paid to the Participant by an Employer for services rendered as an Employee of such entity with respect to the period during which the Employee is a Participant of this Plan for any Plan Year, and excludes unreimbursed expenses and any other forms of cash remuneration or fringe benefits. For purposes of this Plan, Compensation shall include amounts by which the Participant elects a reduction of salary or wages under this Plan and any plan of deferred compensation maintained by an Employer or qualified transportation fringe benefit.

**Section 2.16 Concurrent Care Claim** means, with respect to an ongoing course of treatment to be provided over a period of time or number of treatments, a Health Care Claim to extend such ongoing course of treatment beyond the period of time or number of treatments authorized by the Administrator or Claims Administrator.

**Section 2.17 Covered Person** means any Participant or Dependent who is covered under a Program Document and who is eligible to receive benefits in accordance with the terms of the applicable Program Document.

**Section 2.18 Dependent** means the Participant's Spouse, Domestic Partner, and any other individual who is a dependent under an applicable Program Document. Notwithstanding the foregoing, individuals who are otherwise "Dependents" shall not be eligible for coverage under the Plan if they serve in the military of any country or permanently reside outside of the United States or Canada, unless residing with an Employee on foreign assignment.

(a)  For purposes of this Plan where Dependent is not otherwise defined, Dependent means the Participant's Spouse and any individual who is a qualifying child or qualifying relative, as defined in Code Section 152, except:

CH1 10780302.19

FOGEL 45

(i)    For purposes of any Benefit Programs providing medical care that do not define dependent:

(A)    Dependent is as defined in Code Section 152 without regard to subsections (b)(1) (relating to individuals who are claimed as a dependent on another taxpayer's return), (b)(2) (relating to married dependents), and (d)(1)(B) (relating the income limitation for a qualifying relative);

(B)    any child to whom Code Section 152(e) applies, regarding a child of divorced parents where one or both parents have custody of the child for more than one half of the calendar year and where the parents together provide more than half of the child's support for the calendar year, is treated as a Dependent of both parents; and

(C)    any individual who is determined to be an alternate recipient of a Participant under a qualified medical child support order ("QMCSO") is treated as a Dependent, and

(ii)    For purposes of the Dependent Care Flexible Spending Accounts, Dependent is as defined in Code Section 152 without regard to subsections (b)(1) (relating to individuals who are claimed as a dependent on another taxpayer's return), (b)(2) (relating to married dependents), and (d)(1)(B) (relating to an individual who is not a qualifying child and who does not meet the income limitation for a qualifying relative, but who will nonetheless be considered a dependent).

(b)    A "qualifying child" must satisfy the requirements of Code Section 152(c), including but not limited to the following:

(i)    Relationship Requirement – The individual must be the taxpayer's child, stepchild, foster child, sibling, step-sibling or a descendant of one of these;

(ii)    Residence Requirement – The individual must have the same principal residence as the taxpayer for more than one-half of the tax year (temporary absences for school count as time lived at same residence);

(iii)    Age Requirement – The individual must be age 18 (or 23 if a full-time student) or under at the close of the calendar year, unless permanently and totally disabled; and

(iv)    Support Requirement – The individual must not provide more than one-half of his or her own support for the year.

(c)    A "qualifying relative" may include an individual who is not a qualifying child and who satisfies the requirements of Code Section 152(d), including but not limited to the following:

7

FOGEL 46

(i)    Income Limitation Requirement – Under Section 152(d)(1)(B), the individual must have a gross income less than the exemption amount ($3,300 in 2006);

(ii)   Relationship Requirement – The individual must have a specified relationship with the taxpayer (e.g., child, sibling or step-sibling, parent or step-parent, niece or nephew, aunt or uncle, certain in-laws, or a non-spouse who has the same place of abode and is a member of the taxpayer's household);

(iii)  Support Requirement – The individual must receive more than one-half of his or her support from the taxpayer.

Under Section 152(b), to qualify as a Dependent, (1) if an individual is treated as a dependent of the taxpayer, that individual must be treated as having no dependents, (2) the individual must not be married filing a joint return, and (3) the individual must be a U.S. citizen or national, or a resident of the U.S., Mexico or Canada.

**Section 2.19 Dependent Care Expenses** mean expenses described in Section 8.04 of Article VIII.

**Section 2.20 Domestic Partner** means an individual who has a committed relationship with a Participant, provided that the Participant and the Domestic Partner certify that they are:

(i)    each other's sole domestic partner and intend to remain so indefinitely;

(ii)   living in the same residence and have been so continuously for the twelve (12) months preceding the enrollment of the Domestic Partner;

(iii)  not legally married to anyone under statutory or common law;

(iv)   both at least age 18 and mentally competent to consent;

(v)    not related by blood to a degree of closeness which would prohibit legal marriage in the State of Illinois; and

(vi)   jointly responsible for each other's common welfare and share financial obligations.

**Section 2.21 Effective Date** means January 1, 2006, which is the date on which this restatement became effective.

**Section 2.22 Election Form** means such form as the Administrator may approve from time to time for the purpose of enrolling in the Plan or changing or revoking an election. An Election Form may be written, electronic, or voice response.

**Section 2.23 Electronic Protected Health Information or Electronic PHI or EPHI** means PHI that is transmitted by or maintained in electronic media.

8

FOGEL 47

**Section 2.24  Employee** means an individual who is treated as a regular employee of an Employer (a) who is paid a salary, wages or other compensation by an Employer; (b) who is considered by an Employer to be an employee at the time of the payment of such salary, wages or other compensation; and (c) whose salary, wages or other compensation is treated by an Employer at the time of such payment as being subject to statutorily required payroll tax withholding, such as withholding of federal or state income or withholding of the employee's share of social security tax.

All other individuals shall not be included within the definition of "Employee," even if one or more of such other individuals is determined by a court, the Internal Revenue Service or any other entity under any federal or state law, rule or regulation to be (or have been) a common law or statutory employee of an Employer for some or all of the period of time in question. Without limiting who is excluded, the following individuals are expressly excluded from the definition of the term "Employee":

(a)  any nonresident alien employee;

(b)  any individual who is performing services for an Employer under an independent contractor or consultant agreement or arrangement with an Employer (even if a court, the Internal Revenue Service, or any other entity determines that such individual is a common law employee);

(c)  any individual who shall be treated as an employee of an Employer for limited purposes under the leased employee provisions of Section 414(n) of the Code;

(d)  any individual covered by a collective bargaining agreement that does not provide for coverage under the Plan, provided that the type of benefits provided under the Plan was the subject of good faith bargaining between the individual's bargaining representative and an Employer;

(e)  any individual classified by an Employer as a temporary or contract employee;

(f)  any individual providing services to the Employer pursuant to an agreement between the Employer and a third party (even if a court, the Internal Revenue Service, or any other entity determines that such individual is a common law employee); or

(g)  a person who performs services for an Employer but who is treated for payroll purposes as other than an Employee of the Employer (even if a court, the Internal Revenue Service, or any other entity determines that such individual is a common law employee).

**Section 2.25  Employer** means the Company and any Affiliate that, with the consent of the Company, adopts one or more of the Benefit Programs under the Plan by resolution of its Board of Directors or its delegate.  A list of Affiliates who are "Employers" for purposes of this Plan is contained in Appendix B.

**Section 2.26  ERISA** means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the applicable regulations issued and effective thereunder.

9

FOGEL 48

**Section 2.27 FMLA** means the Family and Medical Leave Act of 1993, as amended from time to time, and the applicable regulations issued and effective thereunder.

**Section 2.28 Health Care Claim** means a request by a Claimant for a benefit under a Benefit Program that is a group health plan (i.e., an employee welfare benefit plan within the meaning of Section 3(1) on ERISA to the extent that such plan provides "medical care" within the meaning of Section 733(a) of ERISA) that is made in accordance with the rules and procedures established by the Claims Administrator.

**Section 2.29 Health Care Component** means the Benefit Programs which constitute HIPAA Health Plans, including the Healthcare Flexible Spending Account.

**Section 2.30 Health Care Operations** as defined under 45 C.F.R. Section 164.501, means any of the following activities to the extent that they are related to a HIPAA Health Plan's covered functions:

(a)   Conducting quality assessment and improvement activities; population-based activities related to health improvement, reduction of health care costs, case management and care coordination; contacting health care providers and patients regarding treatment alternatives; and related functions that do not include treatment;

(b)   Reviewing competence or qualifications of health care professionals and evaluating provider and HIPAA Health Plan performance;

(c)   Underwriting and other activities that relate to the creation, renewal, or replacement of a contract of health insurance or health benefits, and ceding, securing, or placing a contract for reinsurance of risk relating to claims for health care (including stop-loss insurance);

(d)   Conducting or arranging for medical review, legal services, and auditing functions, including fraud and abuse detection and compliance programs;

(e)   Business planning and development, such as cost-management and planning-related analysis related to managing and operating the HIPAA Health Plan, and development or improvement of coverage policies; and

(f)   Business management and general administrative activities, including, but not limited to: (i) management activities related to implementation of and compliance with the requirements of the Privacy and Security Rules; (ii) customer service, including the provision of data analyses for the HIPAA Health Plan sponsor, provided that PHI is not disclosed to the HIPAA Health Plan sponsor; (iii) resolution of internal grievances; (iv) due diligence related to the sale, transfer, merger, or consolidation of all or part of a HIPAA Health Plan with another entity directly regulated under the Privacy and Security Rules, or an entity that, following such activity, will be subject to the Privacy and Security Rules; and (v) consistent with applicable requirements of the Privacy Rule, creating de-identified information, as defined in 45 C.F.R. Section 164.514(b)(2), or a limited data set, as defined under 45 C.F.R. Section 164.514(d)(2).

10

FOGEL 49

**Section 2.31 Highly Compensated Participant** means a Participant who is a "highly compensated participant," as defined in Section 125(e) of the Code.

**Section 2.32 HIPAA** means the Health Insurance Portability and Accountability Act of 1996, as codified in Section 9801, *et seq.*, of the Code, and Section 701, *et seq.*, of ERISA and the applicable regulations issued and effective thereunder, as amended from time to time.

**Section 2.33 HIPAA Enrollment Date** means the effective date of the Employee's or Dependent's enrollment in the applicable HIPAA Program, or, if earlier, the first day of the waiting period for such enrollment.

**Section 2.34 HIPAA Health Plan** means a health plan subject to the Privacy and Security Rules that provides, or pays the cost of, medical care, and includes those plans and arrangements listed in 45 C.F.R. Section 160.103.

**Section 2.35 HIPAA Program** means a Benefit Program subject to the portability and administrative simplification requirements of HIPAA, as required by Section 9801(f) of the Code.

**Section 2.36 Hybrid Entity** as defined under 45 C.F.R. Section 164.103, means a single legal entity that is a covered entity whose business activities include both covered and non-covered functions, and that designates Health Care Components in accordance with 45 C.F.R. Section 164.105(a)(2)(iii)(C).

**Section 2.37 Insurance Company** means an insurance company through which Benefit Program benefits are insured or which provides administrative services to a Benefit Program. For purposes of this definition, a health maintenance organization ("HMO") or preferred provider organization may constitute an Insurance Company. Any insurance contract or certificate and any contract with a HMO or preferred provider organization maintained in connection with a Benefit Program shall form part of the Plan and is incorporated herein by this reference.

**Section 2.38 Late Enrollee** means an Employee or Dependent who enrolls under a HIPAA Program other than during (a) the first period in which the individual is eligible to enroll under the HIPAA Program; (b) a special enrollment period as provided in Section 5.05; or (c) an open enrollment period, if applicable.

**Section 2.39 Leave of Absence** means a period of Employer-approved absence from service that is not treated as a termination of employment in accordance with an Employer's employment policies.

**Section 2.40 Medicaid** means Title XIX of the Social Security Act.

**Section 2.41 Medicare** means Title XVIII of the Social Security Act.

**Section 2.42 Medical Care Expenses** mean expenses described in Section 7.04 of Article VII.

FOGEL 50

**Section 2.43 Participant** means (a) a current Employee who participates in a Benefit Program, or (b) a former Employee who is covered by a Benefit Program or is eligible to receive a benefit under a Benefit Program.

**Section 2.44 Payment** as defined under 45 C.F.R. Section 164.501, means activities undertaken by a HIPAA Health Plan to obtain contributions or to determine or fulfill its responsibility for coverage and provision of benefits, or to obtain or provide reimbursement for the provision of health care. Such activities include, but are not limited to:

(a)    Determinations of eligibility or coverage (including coordination of benefits or the determination of cost sharing amounts), and adjudication or subrogation of health benefit claims;

(b)    Risk adjusting amounts due based on enrollee health status and demographic characteristics;

(c)    Billing, claims management, collection activities, obtaining payment under a contract for reinsurance (including stop-loss insurance and excess loss insurance), and related health care data processing;

(d)    Review of health care services with respect to medical necessity, coverage under a health plan, appropriateness of care, or justification of charges;

(e)    Utilization review activities, including precertification and preauthorization of services, and concurrent and retrospective review of services; and

(f)    Disclosure to consumer reporting agencies of necessary information relating to collection of premiums or reimbursement.

**Section 2.45 Plan** means the Evanston Northwestern Healthcare Welfare Plan, as set forth herein, together with any and all amendments, supplements and appendices hereto.

**Section 2.46 Plan Year** means, except for the "initial plan year," the calendar year, consisting of the 12 consecutive month period commencing on January 1 and ending on the next following December 31.

**Section 2.47 Post-Service Claim** means a Heath Care Claim that is not a Pre-Service Claim, Urgent Care Claim or Concurrent Care Claim. For purposes of Article XII, all requests for reimbursement from a Participant's Healthcare Flexible Spending Account shall constitute Post-Service Claims.

**Section 2.48 Pre-Service Claim** means a Health Care Claim with respect to which the terms of a Benefit Program condition receipt of the benefit, in whole or in part, on approval of the benefit in advance by the Administrator or Claims Administrator in advance of obtaining medical care.

**Section 2.49 Privacy and Security Official** means the Manager of Benefits, or other appropriate committee, entity, or individual as designated by the Company.

12

FOGEL 51

**Section 2.50  Privacy Policy** means the HIPAA Privacy Policies and Procedures for the Group Health Plans Sponsored by Evanston Northwestern Healthcare Corporation, as presently stated and as may be restated or amended from time to time.

**Section 2.51  Privacy Rule** means the regulations issued under HIPAA concerning the privacy of health information.

**Section 2.52  Program Document** means the written description of the terms of each separate Benefit Program, including but not limited to a summary plan description (or summary of material modification), schedule of benefits, benefits booklet, or Insurance Company contract or certificate.

**Section 2.53  Protected Health Information or PHI** means individually identifiable health information that (a) relates to the past, present, or future physical or mental condition of a current or former Participant, provision of health care to a Participant, or payment for such health care; (b) can either identify the Participant, or there is a reasonable basis to believe the information can be used to identify the Participant; and (c) is received or created by or on behalf of a HIPAA Health Plan.

**Section 2.54  Qualified Medical Child Support Order or QMCSO** means a medical child support order that satisfies the requirements of the QMCSO procedures established by the Administrator.

**Section 2.55  Security Incident** as defined under 45 C.F.R. Section 164.304, means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.

**Section 2.56  Security Rule** means the regulations issued under HIPAA concerning the security of Electronic PHI.

**Section 2.57  Significant Break in Coverage** means a period of 63 consecutive days during all of which an individual did not have any Creditable Coverage, but does not include Benefit Program waiting periods and affiliation periods.

**Section 2.58  Spouse** means an individual who is recognized as the lawful husband or lawful wife of a Participant under both the Federal Defense of Marriage Act and the laws of the state of Illinois, and who is covered by a Benefit Program.  Spouse does not include an individual who is married under common law or who is legally separated from a Participant, unless recognized under the applicable Program Document or required by law.  In addition, for purposes of the Dependent Care Flexible Spending Account, "Spouse" shall not include an individual who, although married to the Participant, files a separate federal income tax return, maintains a separate principal residence during the last six months, and does not furnish more than one-half of the cost of maintaining the principal residence of the qualifying individual (as defined in Section 8.04(b)).

**Section 2.59  Third Party** means any person or entity who is or may be liable for an injury, illness, disability, or death of a Covered Person, including without limitation, an insurance company for such third party or a potentially liable person or entity; worker's

CHI 10780302.19

FOGEL 52

compensation; homeowner's insurance; all coverages under an automobile policy of the Covered Person or a member of the Covered Person's family, including "no fault" coverage, medical coverage, and uninsured or underinsured motorist coverage; and other similar coverages. If appropriate under the circumstances, the Covered Person or any insurer of the Covered Person may be considered a Third Party if the Covered Person is or may be responsible for the injury, illness, disability or death of a Covered Person and/or the Covered Person has insurance coverage for such injury, illness, disability or death.

**Section 2.60 Uniformed Service** means the performance of duty on a voluntary or involuntary basis under competent authority, and includes active duty, inactive duty for training, initial active duty for training, full-time National Guard duty, and a period during which an Employee is absent from employment with an Employer for the purpose of an examination to determine the fitness of the Employee to perform any such duty in the United States Armed Forces, the Army National Guard and the Air National Guard (when engaged in active duty for training, inactive duty training or full-time National Guard duty), the commissioned corps of the Public Health Service and any other category of person designated by the President of the United States in time of war or emergency.

**Section 2.61 Urgent Care Claim** means a Health Care Claim for medical care not yet performed but, if delayed:

(a)    could seriously jeopardize the Claimant's life, health, or the ability to regain maximum function; or

(b)    in the opinion of a physician who has knowledge of the Claimant's medical condition, would subject the Claimant to severe pain that cannot be adequately managed without the care or medical treatment for which the Claimant is filing the claim.

**Section 2.62 USERRA** means the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended from time to time.

### ARTICLE III
### ELIGIBILITY AND PARTICIPATION

**Section 3.01 Eligibility to Participate.** Specific eligibility requirements are set forth in the Program Documents for each Benefit Program. Except as specifically provided otherwise in an applicable Program Document, each Benefit Program shall cover Employees who are regularly scheduled to work 20 or more hours per week; provided, however, that no former Employee or his or her Dependents shall be covered by any Benefit Program unless such Benefit Program expressly covers the individual as a former Employee or as a Dependent of a former Employee, such as in the case of COBRA continuation coverage.

An Employee who is eligible to participate in a Benefit Program shall become a Participant upon the later of meeting the eligibility requirements set forth in the applicable Program Document, and enrolling in the Benefit Program at a time and in a manner set forth in the Program Document and acceptable to the Administrator.

14

FOGEL 53

Except as specifically provided otherwise in an applicable Program Document, in no event shall an Employee be covered as both a Participant and Dependent, or a Dependent be covered as a Dependent of more than one Participant.

An Employee who commences a paid leave of absence shall not be eligible to participate in the Dependent Care Spending Account unless the Employee elects to continue contributions while of leave.

**Section 3.02 Participation Conditions.** As a condition of participation and receipt of benefits under this Plan, each Participant shall:

(a)    submit an application to participate under the Plan to the Administrator in accordance with Article V;

(b)    designate a portion of his Compensation as a Contribution to the Plan in accordance with Article IV and consent to have such amount withheld as a salary reduction contribution;

(c)    observe all Plan rules and regulations;

(d)    consent to the Administrator's inquiries with respect to any physician hospital, or other medical care provider or other services involved in a determination for eligibility of coverage or a benefits claim under the Benefit Programs, or for reimbursement of Medical Expenses or Dependent Care Expenses; and

(e)    submit to the Administrator all reports, bills, and other information that the Administrator may reasonably require, including written substantiation by a third party of the amount of any Medical Expense or Dependent Care Expense to be reimbursed, and a written statement by the Participant that such expense is not reimbursable through other sources.

**Section 3.03 Termination of Participation.**

(a)    Except as otherwise specifically provided herein or in the applicable Program Document, coverage for a Participant under a Benefit Program shall terminate when the first of the following events occurs:

(i)    The Participant ceases to be an Employee of all Employers;

(ii)    The Participant is no longer eligible to participate in the Plan;

(iii)    The Company terminates the Benefit Program, or amends the Benefit Program in a manner that it no longer applies to the Participant or Dependent;

(iv)    The Participant commences service in the military for any country outside of the U.S;

(v)    The date the Participant goes on strike or is locked out;

15

FOGEL 54

(vi)     The last day of the Plan Year preceding the Plan Year in which the Participant elects not to participate in a Benefit Program during Annual Enrollment;

(vii)    The Participant fails to timely pay any required Participant contributions; or

(viii)   30 days after the Administrator requests repayment from the Participant (or any Dependent) of amounts that are subject to reimbursement under any Benefit Program, overpayments or mistaken payments from a Benefit Program, unless such Participant (or Dependent) repays such amounts or sets up a repayment schedule for same that is approved by the Administrator in its sole discretion.

(b)     Except as otherwise specifically provided herein or in the applicable Program Document, coverage for a Participant's covered Dependent under a Benefit Program shall terminate when the first of the following occurs:

(i)      The Participant ceases to be covered, or

(ii)     The covered Dependent is no longer an eligible Dependent.

(c)     In the event that coverage under a Benefit Program terminates upon one of the events identified in subparagraph (i) through (v) of Section 3.03(a), such termination shall be effective at the end of the month for which employee premiums have been paid and accepted. In the event that coverage under a Benefit Program terminates upon one of the events identified in subparagraph (v) through (viii) of Section 3.03(a), such termination shall be effective as of the date of the event.

(d)     Notwithstanding the provisions of this Section, the Administrator retains the discretion to permit Participants whose employment with the Employer terminates under a voluntary or involuntary severance or separation program, plan or agreement to continue coverage under the Plan.

(e)     Notwithstanding the foregoing, if a Participant and/or his covered Dependent are eligible for and elect COBRA in accordance with Section 9.01, participation shall terminate at the end of the applicable COBRA continuation coverage period.

**Section 3.04  Termination of Employment.**  Notwithstanding any provision of the Plan to the contrary, a Participant who terminates employment with all Employers may, as applicable, receive benefits after such termination under Section 7.03, Section 8.03 or Article IX.  To the extent that a Participant's termination constitutes a Change in Status, the Participant may modify or revoke his or her prior Plan elections in accordance with Section 5.06(a).

**Section 3.05  Continuation of Participation During Leave of Absence.**  A Participant taking a paid or unpaid Leave of Absence may continue to participate in the Plan using the benefit election that is in effect on the day immediately preceding the first day of such leave; provided, however, that to the extent that the Leave of Absence constitutes a Change in Status,

16

the Participant may modify his or her Plan election as provided in Section 5.06(a). Notwithstanding the foregoing, a Participant shall only be allowed to maintain coverage under the Plan while on a Leave of Absence if the Participant continues to have an employment relationship with an Employer, maintains his or her eligibility to participate in the applicable Benefit Program, and makes all required Participant contributions.

(a)     Participating During an Unpaid Leave of Absence.  A Participant taking an unpaid Leave of Absence who elects to continue his or her participation during such leave shall pay any required contributions under the pay-as-you-go option.  Under the pay-as-you-go option a Participant must pay his or her required contributions during a Leave of Absence on an after-tax basis by remitting the required Participant contributions on or before the first day of each pay period in which the contributions would have been deducted from his or her paycheck if the Participant were actively employed, provided that any delinquent required contributions must be paid within 30 days of such date.

(b)     Participation During a Paid Leave of Absence.  A Participant who is on a paid Leave of Absence may continue to participate in the Plan on the same basis as an active Employee, and his or her required contributions will be deducted from paychecks he or she receives during the paid Leave of Absence.  If the Participant does not receive a paycheck from the Employee (e.g., a disability leave is paid through insurance), the Participant must pay his or her require contributions on an after-tax basis by remitting the Participant contributions as specified in Section 3.05(a) above.

### Section 3.06  Reinstatement of Former Participant.

(a)     Rehires.     Except as provided in Article IX, a Participant who terminates employment shall be deemed to have revoked his or her election and terminated his or her receipt of benefits under this Article with respect to expenses incurred after the date of such employment termination.  If a Participant who terminates employment is rehired within 30 days, however, the Participant's prior election will be automatically reinstated.  If a Participant is rehired more than 30 days after termination of employment, the rehired Employee may make a new election under Article V.  In addition, a rehired Employee may make an election that corresponds with the special enrollment rights set forth in Section 5.05.  With respect to the Healthcare Flexible Spending Account, if a Participant is rehired within 30 days, the Participant will have access to the full amount designated by the Participant to be credited to such Account for that entire Plan Year, and the Participant shall not be required to make up any contributions missed during the period of termination of employment.

Upon return from an unpaid leave of absence, the Employee will be reinstated in all Benefit Programs in which the Employee participated prior to commencement of the unpaid leave of absence, unless the Employee notifies the Plan Administrator at least two weeks prior to his or her return that the Employee does not want coverage to resume.  See Section 7.03(b) regarding reinstatement of coverage under the Healthcare Flexible Spending Account.

FOGEL 56

## ARTICLE IV
## BENEFIT CHOICES

**Section 4.01  Benefit Choices**.  An eligible Employee may choose under this Plan to receive his or her unreduced Compensation for any Plan Year in cash (except where income is imputed) or to have a portion of it applied by the Employer on a pre-tax or after-tax basis (as the case may be) toward any one or more of the optional Benefit Programs for which the Employee is eligible and has elected for the Plan Year.  While a Participant's election to receive and pay for certain benefits may be made under this Plan, the benefits shall be provided pursuant to the applicable Program Documents.

**Section 4.02  Election of Benefit Choices**.  An eligible Employee may elect under this Plan to obtain coverage under the optional Benefit Programs for which he or she is eligible in accordance with the procedures described in Article V.

**Section 4.03  Participant Contributions Required for Plan Coverage**.  A Participant who is an Employee may be required to contribute to the cost of coverage under one or more of the optional Benefit Programs elected under the Plan.

**Section 4.04  Domestic Partners**.  If permitted by applicable Program Documents, an eligible Employee may elect under this Plan to provide coverage under a group health plan for a Domestic Partner.  If the Domestic Partner qualifies as a Dependent under Code Section 152, the Employee may elect under the Plan to pay any required contributions for the Domestic Partner's coverage on a pre-tax basis by reducing a portion of the Employee's Compensation.

If the Domestic Partner does not qualify as a Dependent under Code Section 152, then the Employee may elect under the Plan to pay any required contributions for the Domestic Partner's coverage on an after-tax basis.  Additionally, if the Domestic Partner does not qualify as a Dependent under Code Section 152, then the excess of the fair market value of the Domestic Partner's coverage provided by the Employer over the amount paid by the Employee for such coverage shall be included in the Employee's gross income.   The fair market value for a Domestic Partner's coverage shall be determined using the COBRA rate charged to a similarly situated individual Employee under the applicable Benefit Program.

## ARTICLE V
## ENROLLMENT AND ELECTIONS

**Section 5.01  Initial Enrollment.**  Each Employee who becomes eligible to participate in a Benefit Program under the Plan shall be furnished with enrollment materials and given the opportunity to elect to participate.  A Participant's enrollment shall become effective pursuant to the provisions of the applicable Benefit Program.

(a)    Mid-Year Enrollment.  Any individual who was not eligible to participate as of the first day of a Plan Year but who becomes eligible to participate in the Plan during that Plan Year may elect to participate in the Plan.  Such individual must file with the Administrator a completed Election Form within 30 days of becoming eligible to participate in the Plan (after receiving a written description of the available Benefit Programs).  If such an individual fails to file a completed Election Form within 30 days, such individual shall be treated as waiving his

18

FOGEL 57

or her right to participate in the optional Benefit Programs under the Plan for the remainder of such Plan Year, subject to Section 5.05.

Mid-year enrollment under this Section shall become effective for claims incurred on or after the later of: (i) the date the new Participant becomes eligible to participate in the Plan; and (ii) the date the new Participant files a completed Election Form with the Administrator. Compensation reductions to pay for the cost of coverage elected under this Section shall begin in the payroll period coinciding with or next following the effective date of mid-year enrollment.

(b)    Initial Enrollment for Subsequent Plan Years.  Any Employee who is eligible to participate but who previously waived or revoked participation may commence participation in the Plan as of the start of a subsequent Plan Year by filing with the Administrator, within the designated enrollment period, a completed Election Form by which the Employee elects to participate in one or more of the optional Benefit Programs for such Plan Year.  Any election made under this Section shall be subject to the terms of the underlying Program Document.

**Section 5.02  Annual Enrollment.**    Before the first day of each Plan Year, each Employee who is eligible to participate in the Plan as of the start of the next upcoming Plan Year and each Employee on FMLA leave shall be furnished with an Election Form and given the opportunity to elect to participate in the optional Benefit Programs for that next Plan Year. Enrollment in a insured Benefit Program may be conditional upon the insurer's receipt of evidence of insurability.  (An Employee's entitlement to a Benefit Program other than a group health benefit while on FMLA leave shall be determined by the Employer's policies for providing such benefits while an Employee is on non-FMLA leave.)  A current description of the Benefit Programs for which the Employee would be eligible if he or she elected to participate shall be available to the Participant before or at the start of the election period.  To be valid, the Election Form must be completed and returned to the Administrator on or before the end of the designated election period for the Plan Year to which it applies.

(a)    On the Election Form, the Employee shall designate the optional Benefit Programs in which he or she elects to participate for the applicable Plan Year.

(b)    The Election Form shall take effect as of the first day of such Plan Year and shall remain in effect throughout the Plan Year unless modified or revoked in accordance with Section 5.05 or 5.06.  Each Participant's Election Form shall be valid for one Plan Year and must be renewed from Plan Year to Plan Year subject to Section 5.04(b).

**Section 5.03  Election Forms.**    Elections and revocations of elections shall be made on such forms, including telephonic or electronic media, and in accordance with such rules as may be provided or established from time to time by the Administrator.  The Administrator shall make Election Forms available to Employees or Participants (a) upon request, (b) within a reasonable time following an Employee's date of hire and before an Employee becomes a Participant, and (c) within a reasonable time before the beginning of each Plan Year.

### Section 5.04  Failure to Return Election Form.

(a)    Initial Election.  If an Employee fails to return a completed election form to the Administrator on or before the specified due date for the initial Plan Year, that failure shall

19

FOGEL 58

constitute an election not to participate in the optional Benefit Programs and an election to receive the Employee's full Compensation in cash.

(b)     Automatic Renewals.  A Participant's failure to return a completed Election Form to the Administrator on or before the specified due date for any subsequent Plan Year shall constitute (i) a re-election of the same Benefit Program benefits and coverage, if any, as were in effect for the Participant immediately before the end of the preceding Plan Year; and (ii) an agreement to reduce the Participant's Compensation for the subsequent Plan Year equal to the Participant's share of the cost during such Plan Year of the relevant optional Benefit Programs and coverages.  Any Participant who does not desire the same Benefit Program benefits and coverage for the next Plan Year must, on or before the end of the designated election period, file with the Administrator a completed Election Form with respect to the upcoming Plan Year.

**Section 5.05  Special Enrollment Rules.**  Notwithstanding anything contained herein to the contrary, if an Employee does not timely enroll in a HIPAA Program when such program would otherwise permit the Employee to enroll himself or herself (and/or his or her eligible Dependents) and the Employee subsequently wishes to elect such coverage, the Employee may do so in appropriate circumstances under these special enrollment rules and shall be offered all HIPAA Programs available to similarly situated individuals who timely enrolled.

(a)     Loss of Coverage.  An Employee may enroll for health coverage under a HIPAA Program for the Employee and his or her eligible Dependents if:

> (i)     the Employee (and, if applicable, his or her eligible Dependents) is eligible for health coverage under that program but is not currently enrolled;
>
> (ii)    the Employee declined health coverage under that program when it was offered previously and gave the existence of alternative health coverage as the reason for waiving such coverage on the Employee's health Benefit Program enrollment form; and
>
> (iii)   the alternative coverage has terminated because of one or more of the following reasons:
>
>> (A)     it was COBRA continuation coverage that has been exhausted (this does not include COBRA coverage that terminates because of failure to pay contributions or for cause).
>>
>> (B)     eligibility for the alternative coverage was lost, including, but not limited to, as a result of:
>>
>>> (1)     legal separation;
>>>
>>> (2)     divorce;
>>>
>>> (3)     death;

20

FOGEL 59

(4)     termination of employment;

(5)     reduction in the number of hours of employment;

(6)     an individual ceasing to reside, live, or work in an HMO service area (whether or not within the choice of the individual), in the case of coverage under an HMO (or other arrangement) that does not provide benefits to individuals who cease to reside, live, or work in the service area;

(7)     an individual meeting or exceeding a lifetime limit on benefits;

(8)     cessation of Dependent status;

(9)     the plan no longer offering benefits to the class of similarly situated individuals that includes the individual; or

(10)    reasons other than the individual's failure to pay contributions or for cause, as provided in applicable regulations.

(C)     employer contributions toward the cost of the coverage terminated.

In this case, the Employee must submit a completed Election Form within 30 days after the date on which (i) COBRA continuation coverage was exhausted, or (ii) the coverage terminated because of loss of eligibility for coverage or the termination of employer contributions toward the cost of the coverage. Enrollment in a HIPAA Program pursuant to this paragraph will be effective as of the first day of the month immediately following the Administrator's receipt of a completed election form.

(b) New Dependent. In addition, an Employee may enroll for health coverage under a HIPAA Program for the Employee and his or her eligible Dependents if (i) the Employee is eligible for health coverage under that program but is not currently enrolled, or is currently enrolled but his or her new Dependent is not currently enrolled; and (ii) another individual (a Spouse or child) has become a Dependent of the Employee through marriage, birth, adoption, or placement for adoption.

In this case, the Employee must submit a completed Election Form within 30 days of the marriage, birth, adoption or placement for adoption unless a Benefit Program allows a longer period of time. If the eligible Employee timely completes and submits the Election Form during 30 days after a birth, adoption or placement for adoption, coverage under a HIPAA Program pursuant to this subsection will be effective as of the date of the event. If the Employee timely completes and submits the Election Form during 30 days after marriage, coverage under a HIPAA Program pursuant to this subsection will be effective as of the first day of the month immediately following the Administrator's receipt of a completed Election Form.

~~Regardless whether an Employee has elected family coverage under the Plan, if the Employee does not notify the Administrator within 30 days of the birth of a new eligible dependent, the Employee may not add the new eligible dependent to his coverage until the next open enrollment period or the next time a special enrollment rule is triggered.~~

**Section 5.06  Modifying and Revoking Elections.**  Except as provided in this Section 5.06, a Participant's election made under this Article shall be irrevocable after it is filed with the Administrator; provided, however, that if an Employee fails to make required contributions, his or her election will be deemed to have been revoked, and benefits shall cease.

(a)  Change in Status.  An Employee may revoke his or her election for the Plan Year and make a new election if he or she experiences a Change in Status and the election change is consistent with the Change in Status.  An election change must be on account of, and correspond with, a Change in Status that affects eligibility for coverage under said Benefit Program.  With respect to an Employee's election to contribute to a Dependent Care Flexible Spending Account, an election change may be made where a Change in Status affects Dependent Care Expenses.  The Administrator (in its sole discretion) shall determine based on prevailing IRS guidance, whether a requested change is on account of and corresponds with a Change in Status.

(b)  QMCSOs.  The Administrator shall be permitted to modify an Employee's election to provide coverage under an accident or health plan for a child or foster child who is a dependent of the Employee if a judgment decree or order resulting from divorce, legal separation, annulment or change in legal custody (including a QMCSO) requires coverage for the child.  An Employee shall be permitted to revoke his or her election for the Plan Year and make a new election to provide for or cancel coverage for the child if the order requires the Spouse, former Spouse or other individual to provide coverage for the child.  The Administrator, in its sole discretion, shall determine whether the order qualifies as a QMCSO in accordance with procedures established for such purpose.  The Employee's new election shall take effect as of the effective date provided in the QMCSO Procedures established by the Administrator.

(c)  Medicare or Medicaid Entitlement.  If an Employee or his or her Dependent receiving coverage under a Benefit Program becomes enrolled for coverage under Medicare or Medicaid (other than coverage under a program solely providing pediatric vaccinations), the Employee may cancel or reduce coverage prospectively for that individual under an accident or health plan.  In addition, if an Employee or Dependent becomes ineligible for Medicare or Medicaid coverage, the Employee may prospectively make a new election to commence or increase coverage for that individual under an accident or health plan.

(d)  Change in Cost.  The following rules are not applicable to a Healthcare Flexible Spending Account under the Plan.  For purposes of this Section 5.06(d), "similar coverage" means coverage for the same category of benefits for the same individuals (e.g., family to family or single to single).  For example, two plans that provide major medical coverage are considered to be similar coverage.  For purposes of this definition, a medical care flexible spending account (FSA) is not similar coverage with respect to a health plan that is not an FSA;

22

FOGEL 61

an HMO and PPO are considered to be similar coverage; and coverage by another employer, such as a Spouse's or Dependent's employer, is treated as similar coverage.

(i) <u>Insignificant Cost Changes</u>. Participants are required to increase their elective contributions to reflect insignificant increases in their required contribution for elected Benefit Programs, and to decrease their elective contributions to reflect insignificant decreases in their required contribution. The Administrator, in its sole discretion and on a uniform and consistent basis, will determine whether an increase or decrease is insignificant based upon all the surrounding facts and circumstances, including, but not limited to, the dollar amount or percentage of the cost change. The Administrator, on a reasonable and consistent basis, will automatically effectuate this increase or decrease in affected employees' elective contributions on a prospective basis.

(ii) <u>Significant Cost Increases</u>. If the Administrator determines that the cost charged to an Employee of a Participant's Benefit Program option significantly increases during a Plan Year, the Participant may (A) make a corresponding prospective increase in his or her elective contributions; (B) revoke his or her election for that coverage, and in lieu thereof, receive on a prospective basis coverage under another option available and offered under the Benefit Program that provides similar coverage; or (C) revoke his or her election and drop coverage prospectively if there is no other coverage option available that provides similar coverage. The Administrator, in its sole discretion and on a uniform and consistent basis, will decide whether a cost increase is significant in accordance with prevailing IRS guidance.

(iii) <u>Significant Cost Decreases</u>. If the Administrator determines that the cost of any Benefit Program option significantly decreases during a Plan Year, the Administrator may permit the following election changes: (A) Participants who are enrolled in a coverage option may change their election on a prospective basis to elect the Benefit Program coverage option that has decreased in cost; and (B) Employees who are otherwise eligible may elect the Benefit Program coverage option that has decreased in cost on a prospective basis; subject to the terms and limitations of the Benefit Program coverage option. The Administrator, in its sole discretion and on a uniform and consistent basis, will decide whether a cost decrease is significant in accordance with prevailing IRS guidance.

(e) <u>Change in Coverage</u>. The following rules are not applicable to a Healthcare Flexible Spending Account under the Plan. The definition of "similar coverage" under Section 5.06(d) applies also to this Section 5.06(e).

(i) <u>Significant Curtailment</u>. If coverage is "significantly curtailed" (as defined in subsection (A) below), Participants may elect coverage under another Benefit Program coverage option that provides similar coverage.

CH1 10780302.19

FOGEL 62

In addition, as set forth in subsection (B) below, if the coverage curtailment results in a "Loss of Coverage" (as defined in subsection (C) below), Participants may drop coverage if no similar coverage is offered. The Administrator in its sole discretion, on a uniform and consistent basis, will decide, in accordance with prevailing IRS guidance, whether a curtailment is "significant," and whether a Loss of Coverage has occurred.

(A)   <u>Significant Curtailment Without Loss of Coverage</u>.   If the Administrator determines that a Participant's coverage under a Benefit Program coverage option under this Plan (or the Participant's Spouse's or Dependent's coverage under his or her employer's plan) is significantly curtailed without a Loss of Coverage during a Plan Year, the Participant may revoke his or her election for the affected coverage, and in lieu thereof, prospectively elect coverage under another Benefit Program coverage option that provides similar coverage.  Coverage under a plan is deemed to be "significantly curtailed" only if there is an overall reduction in coverage provided under the plan so as to constitute reduced coverage generally.

(B)   <u>Significant Curtailment With a Loss of Coverage</u>.   If the Administrator determines that a Participant's coverage under a Benefit Program coverage option under this Plan (or the Participant's Spouse's or Dependent's coverage under his or her employer's plan) is significantly curtailed, and such curtailment results in a Loss of Coverage during a Plan Year, the Participant may revoke his or her election for the affected coverage, and may either prospectively elect coverage under another Benefit Program coverage option that provides similar coverage, or drop coverage if no other Benefit Program coverage option providing similar coverage is offered.

(C)   <u>Definition of Loss of Coverage</u>.   For purposes of this Section 5.06(e), a "Loss of Coverage" means a complete loss of coverage (including the elimination of a Benefit Program coverage option, a coverage option ceasing to be available where the Participant or his or her Spouse or Dependent resides, or a Participant or his or her Spouse or Dependent losing all coverage under the Benefit Program coverage option by reason of an overall lifetime or annual limitation).  In addition, the Administrator in its sole discretion, on a uniform and consistent basis, may treat the following as a Loss of Coverage:

  - a substantial decrease in the medical care providers available under a health plan coverage option (such as a major hospital ceasing to be a member of a

preferred provider network or a substantial decrease in the number of physicians participating in a PPO);

- a reduction in benefits for a specific type of medical condition or treatment with respect to which the Participant or his or her Spouse or Dependent is currently in a course of treatment; or

- any other similar fundamental loss of coverage.

(ii)  Addition or Significant Improvement of a Health Insurance Plan Coverage Option.  If during a Plan Year, a new Benefit Program coverage option is added to an existing Benefit Program coverage option or is significantly improved, the Administrator may permit an election change to Salary Reductions if: (1) Participants who are enrolled in a Benefit Program coverage option other than the newly added or significantly improved Benefit Program coverage option change their election on a prospective basis to elect the newly added or significantly improved Benefit Program coverage option; and (2) Employees who are otherwise eligible elect the newly added or significantly improved Benefit Program coverage option on a prospective basis; subject to the terms and limitations of the Benefit Program coverage option.  The Administrator, in its sole discretion and on a uniform and consistent basis, will decide whether there has been an addition of, or a significant improvement in, a Benefit Program coverage option in accordance with prevailing IRS guidance.

(iii)  Loss of Coverage Under Other Group Health Coverage.  A Participant may prospectively change his or her election to add group health coverage for the Participant or his or her Spouse or Dependent, if such individual(s) loses coverage under any group health coverage sponsored by a governmental or educational institution, including (but not limited to) the following: a state children's health insurance program (SCHIP) under Title XXI of the Social Security Act; a medical care program of an Indian Tribal government (as defined in Code § 7701(a)(40)), the Indian Health Service, or a tribal organization; a state health benefits risk pool; or a foreign government group health plan, subject to the terms and limitations of the applicable Benefit Program coverage option(s).

(iv)  Change in Coverage Under Another Employer Plan.  A Participant may make a prospective election change that is on account of and corresponds with a change made under an employer plan (including a plan of the Employer or a plan of the Spouse's or Dependent's employer), so long as (1) the other cafeteria plan or qualified benefits plan permits its participants to make an election change that would be permitted under applicable IRS regulations; or (2) the Plan permits Participants to make an election for a Plan Year that is different from the plan year under the other cafeteria plan or qualified benefits plan.  For example, if an election is

25

FOGEL 64

made by the Participant's Spouse during his or her employer's open enrollment to drop coverage, the Participant may add coverage to replace the dropped coverage. The Administrator, in its sole discretion and on a uniform and consistent basis, will decide whether a requested change is on account of and corresponds with a change made under the other employer plan, in accordance with prevailing IRS guidance.

(f)     Loss of Governmental or Educational Institution Sponsored Coverage.   An Employee may make an election to participate in a Benefit Program if the Employee or his or her Dependent loses coverage under any group health program sponsored by a governmental or educational institution.

(g)     FMLA Leave.   An Employee taking an FMLA leave may revoke an existing election for the remaining portion of the Plan Year. Employees on FMLA leave shall have the right to enroll in the Plan or change their election while they are on leave in the same manner as active Employees, rather than having to wait until returning to work. These rights shall be in addition to any right to change an election under paragraphs (a) through (f) above. See Sections 3.06(b), 7.03(b) and 9.03(b) for special rules that apply to FMLA leave.

(h)     HIPAA Special Enrollment Rights.   An Employee who acquires special enrollment rights under HIPAA may revoke his previous Benefit Program elections for the Plan Year and make a new election that corresponds with such enrollment rights, regardless of whether the HIPAA special enrollment also qualifies as a Change in Status. The Employee's new benefit election shall take effect on the date that coverage for the special enrollment is effective under HIPAA.

(i)     Domestic Partners.

(i)     If a Domestic Partner qualifies as a Dependent under Code Section 152, then: (A) the commencement or termination of a domestic partnership, or the death of a Domestic Partner would constitute a Change in Status for purposes of Section 5.06(a); and (B) the loss or addition of coverage by a Domestic Partner would be a change in coverage for purposes of Section 5.06(e)(iv).

(ii)     If a Domestic Partner does not qualify as a Dependent under Code Section 152, then group health coverage for the Domestic Partner is not provided under the Cafeteria Program. As such, if an Employee commences or terminates a domestic partnership, then the Employee may modify and/or revoke his or her own and the Domestic Partner's group health coverage election(s) for the Plan Year consistent with the change in domestic partnership status.

(j)     Procedure for Modifying Election.   An Employee shall make election changes under this Article by filing a new Election Form with the Administrator within 30 days (or such longer time as the Administrator may allow) after the date of the applicable event described in the applicable subsection.

26

FOGEL 65

(k)     Effective Date of Modified Election. Except as provided below, an Employee's election changes pursuant to this Section 5.06 and new contribution levels shall become effective under each affected Benefit Program as soon as the applicable Program Documents allow, following the Employee's filing of his or her Election Form with the Administrator.

(l)     Becoming Ineligible. Upon an Employee, Spouse or Dependent becoming ineligible under an underlying plan, the Participant's election will be changed automatically as of the date the individual becomes ineligible.

(m)     Other Events. In the sole discretion of the Administrator, an Employee may be permitted to revoke or change an election upon any other event recognized for purposes of changing Plan elections under applicable law and regulations.

Subject to the provisions of the underlying HIPAA Program, elections made to add health coverage for a newborn or newly adopted Dependent child pursuant to a HIPAA special enrollment right may be retroactive to the date of birth, adoption, or placement for adoption, if enrollment occurs within 30 days of the date of birth, adoption, or placement for adoption. In the case of the Employee's marriage, the modified elections shall be effective no later than the first day of the first calendar month beginning after the date on which the Administrator receives the timely completed Election Form.

### Section 5.07 Nondiscrimination Requirements.

(a)     The Administrator may periodically conduct such testing as it deems necessary to comply with the nondiscrimination requirements under Sections 105(h), 125 and 129 of the Code. The Administrator has the right to adjust any Participant's Compensation reduction election made under this Article at any time and from time to time (i) to ensure that the Plan complies with any applicable nondiscrimination requirements under Sections 105(h), 125 and 129 of the Code, and (ii) to rectify erroneous Compensation reductions, contributions and credits.

(b)     The Plan shall not provide any qualified benefits (as defined in Section 125(f) of the Code) in a Plan Year to key employees (as defined in Section 416(i)(1) of the Code) in excess of 25 percent of the aggregate of such benefits provided to all Employees under the Plan. For purposes of the preceding sentence, qualified benefits shall not include benefits which (without regard to this Section) are includable in the Participant's gross income.

### ARTICLE VI
### FUNDING AND ACCOUNTS

### Section 6.01 Funding, Trust Agreements, and Insurance.

(a)     General. The Benefit Programs may be funded through the use of trusts (including, where applicable, one or more trusts meeting the requirements of Section 501(c)(9) of the Code), Insurance Company contracts, or otherwise, in accordance with the various documents forming part of the Plan and the respective Benefit Programs. The benefits provided by the Benefit Programs shall be supported by the contributions of the Employer, Participants and covered Dependents, as the case may be, in accordance with the Program Documents for

FOGEL 66

the respective Benefit Programs. To the extent that a trust or insurance contract funds part or all of the benefits provided by a particular Benefit Program, such trust agreement or contract shall be deemed part of the Plan and incorporated herein by this reference.

(b) Insurance. An Employer shall have the right to enter into a contract with one or more Insurance Companies for the purposes of providing any benefits under the Plan and to replace any of such Insurance Companies or contracts. Any dividends, retroactive rate adjustments or other refunds of any type which may become payable under any such insurance contract shall not be assets of the Plan but shall be the property of, and shall be retained by, the Employer to the extent such amounts are not attributable to employee contributions. The Employer will not be liable for any loss or obligation relating to any insurance coverage except as is expressly provided by this Plan. Such limitation shall include, but not be limited to, losses or obligations which pertain to the following:

(i) Once insurance is applied for or obtained, the Employer will not be liable for any loss which may result from the failure to pay premiums to the extent premium notices are not received by the Employer.

(ii) To the extent premium notices are received by an Employer, the Employer's liability for the payment of such premiums will be limited to such premiums and will not include liability for any other loss which results from such failure.

(iii) An Employer will not be liable for the payment of any insurance premium or any loss which may result from the failure to pay an insurance premium if the benefits available under this Plan are not enough to provide for such premium cost at the time it is due. In such circumstances, the Employee will be responsible for and see to the payment of such premiums. The Employer will undertake to notify a Participant if available benefits under this Plan are not enough to provide for an insurance premium, but will not be liable for any failure to make such notification.

(iv) When employment ends, the Employer will have no liability to take any step to maintain any policy in force except as may be specifically required otherwise in this Plan, and the Employer will not be liable for or responsible to see to the payment of any premium after employment ends.

**Section 6.02 Benefits Supported Only by Benefit Program.** Any person having any claim under a Benefit Program will look solely to the assets of the Benefit Program, if any, for satisfaction. In no event will the Employer, any officers or agents thereof, or any member of the board of directors or other governing body be liable to any person under the provisions of the Benefit Program.

**Section 6.03 Maintenance of Accounts**. The Administrator or its delegate shall maintain a separate bookkeeping Account for each Benefit Program elected by each Participant for the Plan Year for which Participant contributions are required. Each Account shall be credited periodically with such contributions from Compensation as the Participant has

28

FOGEL 67

designated for allocation toward such Benefit Program with respect to the pay periods since the last such credit was made. The Accounts shall not be funded and shall not earn or accrue any interest for the benefit of any Participant.

The Administrator shall deduct from the applicable Account the amount necessary to pay the Participant's share of costs for the applicable Benefit Program. Total deductions from any Account for a Plan Year shall not exceed the total amount allocated by the Participant to such Account for such Plan Year.

**Section 6.04 Rights of Participants**. No Participant shall have any right to any amount credited to his Account at any time, except as follows:

(a) A Participant shall have the right to have such credits applied toward the cost of coverage for his elected Benefit Program in accordance with the Plan; and

(b) A Participant shall have the right to have any excess amounts which were deducted from his Compensation and credited to his Account by mistake of the Administrator restored to him as though part of Compensation. Such restoration shall be made only if: (i) the Participant makes a written request for such restoration that is received by the Administrator within one year after the mistaken credit was made; and (ii) the mistaken amount has not already been applied toward the cost of coverage for his elected Benefit Program. If such restoration cannot be made solely due to clause (ii), then the Employer may adjust the Participant's future Compensation reductions under the Plan to rectify the prior mistake. No interest shall accrue or be owed to any Participant with respect to any restoration of Compensation under this Section.

**Section 6.05 Forfeitures**. Effective as of the last day of the Plan Year, any amounts credited to a Participant's Account which remain after making deductions for such Plan Year pursuant to Section 6.03 shall be forfeited and his or her Account balance for the next Plan Year shall start again at zero. No carryover of unused Account balances shall be permitted from one Plan Year to the next.

If a Participant terminates coverage under one or more Benefit Programs under one or more of his Accounts due to his termination of employment as an Employee or a Change in Status, then he or she shall forfeit any unused amounts remaining credited to such Account after claims and deductions with respect to the period prior to such termination of employment or Change in Status have been satisfied in accordance with the Plan.

The Administrator shall determine the aggregate forfeitures for any particular Plan Year, and as directed by the Company in its sole discretion, the Administrator shall: (a) apply such forfeitures, insofar as possible to the reasonable expenses of maintaining and administering the Plan for the Plan Year in which the forfeiture occurs; or (b) divide the total forfeitures for the Plan Year by the total number of Plan Participants for that Plan Year to determine the amount to allocate to the Account of each Participant, and allocate the determined amount to each Participant's Account to be used to reimburse claims incurred by the Participant under the Dependent Care Flexible Spending Account during the subsequent Plan Year; such allocation to be made without regard to a Participant's individual claims or elected levels of coverage.

29

FOGEL 68

**ARTICLE VII**
**HEALTHCARE FLEXIBLE SPENDING ACCOUNT**

**Section 7.01 <u>Type of Benefit</u>.** Pursuant to Article V, a Participant may elect to contribute a portion of his or her Compensation to the Healthcare Flexible Spending Account on a pre-tax basis. The amounts contributed to the Healthcare Flexible Spending Account are then used to reimburse the Participant for Medical Care Expenses as described in Section 7.04. The Healthcare Flexible Spending Account is intended to be a self-insured medical reimbursement plan within the meaning of Section 105(h) of the Code and a flexible spending arrangement within the meaning of Proposed Regulation Section 1.125-2. The Employers and the Administrator will take whatever steps necessary to maintain and operate the Healthcare Flexible Spending Account in accordance with the nondiscrimination requirements of Sections 105(h) and 125 of the Code.

**Section 7.02 <u>Maximum Contribution</u>.** The maximum amount a Participant may elect to contribute to the Healthcare Flexible Spending Account shall be determined by the Company each year and communicated to Participants in the annual enrollment materials.

### Section 7.03 <u>Benefits After Termination and Reinstatement After Return</u>.

(a)　A Participant in the Healthcare Flexible Spending Account who terminates employment and who does not elect continuation coverage as provided for herein, shall be deemed to have revoked his or her participation under the Healthcare Flexible Spending Account. Such former Employee shall continue to be eligible to claim reimbursement for expenses incurred before the effective date of the former Employee's termination of employment.

(b)　In the event an Employee does not have coverage under the Healthcare Flexible Spending Account during FMLA leave (because the Employee chooses to revoke coverage or does not pay the required Employee contributions during FMLA leave), upon returning from FMLA leave, the Employer shall permit the Employee a choice between: (i) resuming coverage at the original level and making up the unpaid Employee contributions; or (ii) resuming coverage at a level that is reduced under the proration rule described below and resuming Employee contributions at the original level. Where the Employee selects the latter and the Plan has already made disbursements to the Employee that exceed the Employee contributions that will be paid for the Plan Year, the Employer may not require the Employee to pay any more than the remaining Employee contributions due. For purposes of this Section 7.03, the proration rule provides that upon reinstatement, an Employee's coverage under the Healthcare Flexible Spending Account will be prorated for the period during which no contributions were paid, and reduced by prior reimbursements.

(c)　If the Healthcare Flexible Spending Account coverage continues during the FMLA leave, the proration method shall not apply.

**Section 7.04 <u>Medical Care Expenses</u>.** Each Participant shall be entitled to reimbursement from his or her Healthcare Flexible Spending Account for those medical and dental care expenses incurred during a Plan Year that are deductible expenses incurred for

"medical care" as defined by Section 213(d)(1)(A) and (B) of the Code (excluding amounts paid for over-the-counter drugs or for a long-term care insurance contract within the meaning of Section 7702B(b) of the Code) for the treatment of the Participant or his or her eligible dependents, but which expenses are not payable under any group health or dental care plan under which the individual receiving such treatment is covered. Medical Care Expenses shall not include premiums for medical coverage, but may include deductibles and co-payments.

For this purpose, the term "eligible dependents" shall refer only to the Participant's Spouse, Domestic Partner (as of January 1, 2007) and dependent children that would be considered dependents under Section 152 of the Code (without regard to subsections (b)(1), (b)(2), and (d)(1)(B)). A Participant's dependent children shall include:

(a)    the unmarried children of the Participant or the Participant's Spouse (including newborn children, foster children, children who are placed with the Participant for adoption provided that the Participant assumes the legal obligation for support of such children in anticipation of the adoption, and legally adopted children) who are either (i) under age 19, or (ii) are both full time students and under age 23.

(b)    children who (i) immediately before attaining the age and/or student status limits in (a) above, are covered by the Plan, and (ii) upon first reaching those limits, are incapable of self-sustaining employment because of mental or physical handicap, as determined by the Administrator from time to time, based on such medical or psychiatric reports and other evidence as the Administrator shall require from physicians (including psychiatrists or psychologists) selected or approved by the Administrator; and

(c)    alternate recipients under a QMCSO.

**Section 7.05 Claim and Payment Procedures**.   A Participant must file claims for reimbursement of Medical Care Expenses from his or her Healthcare Flexible Spending Account to the Claims Administrator in the manner prescribed by the Claims Administrator. Claims shall be honored only if:

(a)    incurred for Medical Care Expenses of the Participant or his or her eligible dependent;

(b)    incurred for treatment rendered while the recipient was covered by the Healthcare Flexible Spending Account; and

(c)    substantiated by (i) a written statement from an independent third party (such as the service provider) stating that the expense was incurred, identifying the treatment or service provided and giving the amount of the expense; and (ii) a written statement from the Participant that the expense has not been reimbursed and is not reimbursable from any other source of coverage.

For this purpose, a Participant or eligible dependent has incurred a Medical Care Expense when he or she receives the medical care that gives rise to the Medical Care Expense, regardless of when the Participant or his or her eligible dependent is formally billed or charged for, or pays the Medical Care Expense.

31

FOGEL 70

The Participant may be required to furnish additional information, such as receipts, Insurance Company explanations of benefits, and statements from the health care service provider. Payments pursuant to this Section shall be made only to Participants, and no payment shall be made directly to the provider of the medical care services, treatment or supplies.

**Section 7.06 Forfeitures**. Claims received by the Administrator after the March 31 immediately following the close of the Plan Year for expenses incurred during that closed Plan Year will be untimely and not eligible for reimbursement under the Plan. A Participant or former Participant shall not be entitled to receive cash or any other form of compensation or benefits with respect to any unused balance in his or her Healthcare Flexible Spending Account after all timely claims have been processed as of the end of a Plan Year. Similarly, no balance remaining after the expiration of the period for submitting claims for one Plan Year will be carried forward into any succeeding Plan Year. Any such unused balance shall be forfeited pursuant to Section 6.05.

Any Account balances remaining unclaimed for more than one year after issuance of the corresponding reimbursement check will be forfeited and the forfeited amounts will be returned to the Company to the extent permitted by law.

**Section 7.07 Statements**. The Claims Administrator shall issue to each Participant in writing at the conclusion of each Plan Year a statement describing the total credit to his/her Healthcare Flexible Spending Account for such Plan Year and the type and amount of debits from his/her Healthcare Flexible Spending Account for such Plan Year.

## ARTICLE VIII
## DEPENDENT CARE FLEXIBLE SPENDING ACCOUNT

**Section 8.01 Type of Benefit**. Pursuant to Article V, a Participant may elect to contribute a portion of his or her Compensation to the Dependant Care Flexible Spending Account on a pre-tax basis. The amount contributed to the Dependent Care Flexible Spending Account is used to reimburse the Participant for Dependant Care Expenses as defined in Section 8.04. The Dependent Care Expense benefit is intended to be a dependent care assistance plan benefit within the meaning of Section 129 of the Code, and a flexible spending arrangement within the meaning of Regulation Section 1.125-2. The Company and the Administrator will take whatever steps necessary to maintain and operate the Dependent Care Flexible Spending Account in accordance with the nondiscrimination requirements of Sections 129 and 125 of the Code.

**Section 8.02 Maximum Contribution**. The maximum amount a Participant can elect to have contributed to his or her Dependent Care Flexible Spending Account shall be determined by the Company each year and communicated to Participants in the annual enrollment materials; provided, however, that in no event shall such amount exceed $5,000, or $2,500 for a married taxpayer filing as a single individual.

**Section 8.03 Benefits After Termination**. If a Participant terminates employment during a Plan Year, the Participant shall be entitled to reimbursement only for Dependent Care Expenses incurred within the Plan Year, either before or within 30 days following the date

32

employment terminates, and only if the Participant applies for such reimbursement in accordance with Section 8.06.  No such reimbursement shall exceed the remaining balance, if any, in the Participant's Dependent Care Flexible Spending Account for the Plan Year in which the expenses were incurred.  In the event of the Participant's death, the Participant's Spouse (or, if none, the Participant's executor or administrator) may apply on the Participant's behalf for reimbursements permitted under this Section.

**Section 8.04 <u>Dependent Care Expenses</u>**.    Each Participant shall be entitled to reimbursement from his or her Dependent Care Flexible Spending Account for those Dependent Care Expenses incurred during a Plan Year that are eligible employment-related expenses under the child and dependent care credit provisions of Section 21(b)(2) of the Code and that do not exceed the earned income limit specified in Section 8.05, but only to the extent of the balance in the Participant's Dependent Care Flexible Spending Account when the claim is processed for such Plan Year.

The following rules (and any other applicable rules of Sections 21(b)(2) and 129 of the Code) apply in determining whether a Participant's expenses are for reimbursable "Dependent Care Expenses" under this Article:

(a)    The expenses must be incurred to enable the Participant (and if the Participant is married, the Participant's Spouse) to be gainfully employed (or in active search of employment) during the period in which there is at least one qualifying individual (as defined in Section 8.04(b)) in the Participant's household, and the expenses must be for either (i) expenses for household services that are attributable in part to the care of a qualifying individual, or (ii) expenses for the care of a qualifying individual.  Expenses are for the care of a qualifying individual if the primary function is to ensure the individual's well-being and protection.  Amounts paid for food, lodging, clothing or education are not for the care of a qualifying individual, although if care is provided in such a manner that the expenses attributable to such goods or services are incidental to and inseparable from the individual's care, then the full amount will be deemed for the individual's care.  If an expense is partly for household services or the care of a qualifying individual and partly for other goods or services, a reasonable allocation must be made.  Educational expenses for a child in the kindergarten or higher grade level are not payments for the care of a qualifying individual eligible for reimbursement.

(b)    "Qualifying individuals" are any of the following persons who live in the household maintained by the Participant (or by the Participant and his or her Spouse):

(i)    a qualifying child under Code Section 152(a)(1) who has not attained age 13; or

(ii)    a Dependent who is physically or mentally incapable of caring for himself or herself and who has the same principal place of abode as the Participant for more than one-half of the Plan Year.

In the case of qualifying individuals described in (b)(ii) above, expenses incurred for services outside the Participant's household will be employment-related only

CH1 10780302.19

if the qualifying individual regularly spends at least 8 hours per day in the participant's household.

(c)    With respect to divorced or separated parents, a child shall be a qualifying individual with respect to a Participant who is the child's custodial parent (the parent with whom the child resided for the greater portion of the calendar year).    The foregoing notwithstanding, if a child meets the following conditions, the child shall be treated as a qualifying individual of the parent who has custody for the greater portion of the calendar year:

(i)    the child is under the age of 13 or is physically or mentally incapable of caring for himself;

(ii)    the child receives over one-half (½) of his or her support during the calendar year from one or both parents who are divorced or legally separated under a decree of divorce or separate maintenance or a written separation agreement, or live apart at all times during the last 6 months of the calendar year; and

(iii)    the child is in the custody of one or both of the parents for more than one-half (½) of the calendar year.

(d)    This Plan will not reimburse a Participant for payments made to either (i) a child of the Participant if the child was under age 19 at the end of the Plan Year, or (ii) a person the Participant or the Participant's Spouse can claim as a dependent for federal income tax purposes.

**Section 8.05  Earned Income Limit**.    For any Plan Year, reimbursement under this Plan for Dependent Care Expenses shall not exceed the Participant's earned income limit calculated under the following rules.    For purposes of this Section 8.05, "earned income" means the total wages, salary, and other Employee compensation and any net earnings from self-employment for the Plan Year.

(a)    In the case of a Participant who is not married at the close of the Plan Year, the limit equals the Participant's earned income.

(b)    In the case of a Participant who is married at the close of the Plan Year, the limit equals the lesser of the Participant's earned income or the earned income of the Participant's Spouse.

(c)    During any month in the Plan Year, if the Participant's Spouse is either a full-time student at an educational institution or is physically or mentally not able to take care of himself, the Spouse shall be deemed to have "earned income" for that month of $250.00 (or $500.00 if there are at least two qualifying individuals (as defined in Section 8.04(b)).

(d)    A married Participant who is legally separated or living apart will be considered not married if he or she is treated as not married under the rules of Sections 21(e)(3) and (4) of the Code.

CHI 10780302.19

FOGEL 73

Section 8.06 **Claim and Payment Procedures**.  A Participant must file claims for reimbursement of eligible Dependent Care Expenses from his or her Dependent Care Flexible Spending Account with the Claims Administrator on the appropriate form furnished by the Claims Administrator.  The Participant will be required to furnish receipts and statements from the providers of dependent care, but the Participant will complete the provider information section of the claim form and certify that this information is true.

All claims submitted by a Participant during a reimbursement period shall be processed as of the end of that reimbursement period on the basis of the balance in the Participant's Dependent Care Flexible Spending Account at the end of such reimbursement period.  To the extent that any claims cannot be paid in full because credit in the Participant's Dependent Care Flexible Spending Account is insufficient to cover the claim, the claim shall be held for payment in the next succeeding reimbursement period(s) of such Plan Year, but shall not be carried over or charged against the balance of any subsequent Plan Year.

Payments pursuant to this Section shall be made only to Participants, and no payment shall be made directly to the provider of the dependent care.

Section 8.07 **Forfeitures**.  Claims received by the Claims Administrator after the March 31 immediately following the close of a Plan Year for expenses incurred during that closed Plan Year will be untimely and not eligible for reimbursement under the Plan.  A Participant or former Participant shall not be entitled to receive cash or any other form of compensation or benefits with respect to any unused balance in his Dependent Care Flexible Spending Account after all timely claims have been processed as of the end of a Plan Year.  Similarly, no balance remaining after the expiration of the period for submitting claims for one Plan Year will be carried forward into any succeeding Plan Year.  Any such unused balance shall be forfeited pursuant to Section 6.05.

Section 8.08 **Statements.**  The Claims Administrator shall issue to each Participant in writing at the conclusion of each Plan Year a statement describing the total credits to his or her Dependent Care Flexible Spending Account for such Plan Year and the type and amount of debits from his or her Dependent Care Flexible Spending Account for such Plan Year.

## ARTICLE IX
## SPECIAL COVERAGE PROVISIONS

Section 9.01 **COBRA Continuation Coverage.**  This Section shall only apply to Benefit Programs that would be considered a "group health plan" under Section 5000(b)(1) of the Code.

(a)    Qualifying Events.  A Participant or qualified beneficiary who would otherwise lose group health plan coverage as a result of a "qualifying event," as defined below, shall be entitled to elect continuation of group health plan coverage under the Benefit Program as provided by COBRA.  The coverage shall be identical to the coverage provided persons to whom a qualifying event has not occurred.  If coverage is modified for individuals who have not incurred a qualifying event, continuation coverage shall be modified in the same way for

CHI 10780302.19

FOGEL 74

individuals who have elected COBRA continuation coverage. A "qualifying event" is any of the following:

    (i)    termination as an Employee (other than for gross misconduct) or reduction of hours worked so as to render the Participant ineligible for group health plan coverage under a Benefit Program, including termination of employment following a leave under FMLA;

    (ii)    the Participant's death;

    (iii)    divorce or legal separation of the Participant from his qualified beneficiary Spouse;

    (iv)    for a Spouse and Dependent children, loss of coverage due to the Participant becoming entitled to Medicare; or

    (v)    for a Dependent child, ceasing to qualify as an eligible dependent under the applicable Benefit Program.

To lose coverage means to cease to be covered under the same terms and conditions as in effect immediately before the qualifying event; provided that if coverage is reduced or eliminated in anticipation of an event (e.g. in anticipation of a divorce), then the reduction of elimination is disregarded in determining whether an event would cause a loss of coverage.

    (b)   <u>Qualified Beneficiary.</u>  For purposes of this Section 9.01, a "qualified beneficiary" includes a Participant's Dependent child, and/or Spouse who is a covered Dependent under a Benefit Program that is a group health plan subject to the requirements of COBRA on the day before a qualifying event, as provided in Code Section 4980B(g). "Qualified beneficiary" shall also mean a child who is born to or placed for adoption with the Participant during the period of COBRA continuation coverage, provided that the Participant notifies the Claims Administrator in writing within 30 days of the child's birth, adoption or placement for adoption

    (c)   <u>Notice to Claims Administrator</u>.  The Claims Administrator may establish reasonable procedures for providing the notices required by this Section 9.01(c).

    (i)    A Participant or qualified beneficiary shall notify the Claims Administrator in writing within 60 days after the later of:

    (A)    the date of a divorce or legal separation, the date an eligible Dependent child shall cease to qualify as an eligible Dependent under the applicable Benefit Program, or the date of a second qualifying event;

    (B)    the date coverage would be lost as a result of the event; or

36

FOGEL 75

(C)    the date on which the qualified beneficiary is informed of the responsibility to provide notice and the Plan's procedures for providing notice to the Claims Administrator.

All rights to continued Benefit Program coverage shall be lost by the failure to timely give this required written notice to the Claims Administrator.

(ii)    An eligible Participant may elect COBRA continuation coverage for an eligible child who is born to, adopted by, or placed for adoption with such Participant while the Participant's COBRA continuation coverage (or right to elect COBRA continuation coverage) is effective, provided that the Participant has notified the Claims Administrator in writing within 30 days of the child's birth, adoption, or placement for adoption.

(iii)    An Employer shall notify the Claims Administrator of the following qualifying events within 30 days of the event, or within 30 days following the date coverage ends if the Benefit Program provides that continuation coverage commences on the date coverage is lost:

(A)    the Participant's death;

(B)    termination or reduction in hours that the Participant works; or

(C)    the Participant becoming entitled to Medicare.

(iv)    A Participant or qualified beneficiary entitled to COBRA continuation coverage with a maximum duration of 18 months shall notify the Claims Administrator if found by the Social Security Administration to have been disabled at any time during the first 60 days of continuation coverage. This notice must be given within 60 days after the later of:

(A)    the date of the disability determination by the Social Security Administration;

(B)    the date on which the qualifying event occurred;

(C)    the date on which the Participant or qualified beneficiary loses or would lose coverage under the Plan as a result of the qualifying event; or

(D)    the date on which the Participant or qualified beneficiary is informed of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the Claims Administrator;

provided, however, that the notice is received before the end of the first 18-months of COBRA continuation coverage.

37

FOGEL 76

(v)     A Participant or qualified beneficiary who has been found to have been disabled (as described in Section 9.01(c)(iv)) shall notify the Claims Administrator of a subsequent determination by the Social Security Administration that the individual is no longer disabled. This notice must be provided within 30 days after the later of:

    (A)     the date of the final determination by the Social Security Administration that the disabled individual is no longer disabled; or

    (B)     the date on which the disabled Participant or qualified beneficiary is informed of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the Claims Administrator.

(d)     <u>Notice to Participant and Qualified Beneficiary.</u>

(i)     The Claims Administrator must advise the Participant and all qualified beneficiaries of the right to continue coverage not later than:

    (A)     14 days after being notified of a qualifying event, or

    (B)     if the Employer is the Claims Administrator, not later than 44 days after occurrence of the qualifying event or, if the Benefit Program provides that continuation coverage commences the date coverage is lost, not later than 44 days after the date coverage is lost.

(ii)     If the Claims Administrator receives a notice under Section 9.01(c) and the individual is not entitled to COBRA continuation coverage, the Claims Administrator shall provide notice to the individual that COBRA continuation is not available.

(iii)     If COBRA continuation coverage terminates earlier than the end of the maximum period described in Section 9.01(g), then the Claims Administrator shall provide notice to the Participant and his qualified beneficiary of the date of termination (in accordance with applicable regulations) as soon as possible after the Claims Administrator's determination that coverage will terminate.

(iv)     Notice of the right to continued coverage to a qualified beneficiary Spouse shall be deemed notice to any qualified beneficiary children residing with such Spouse. Notwithstanding the preceding sentence, a single notice addressed to a Participant and Spouse may be provided under this Article IX, provided that the most recent information available to the Claims Administrator indicates that both reside at the same address. Each qualified beneficiary that is a covered Dependent child may be notified by providing a single notice to either the Participant or Spouse, provided that

38

FOGEL 77

the most recent information available to the Claims Administrator indicates that such covered Dependent resides at the same address as the individual to whom notice is given. An election to receive or to waive coverage for a qualified beneficiary child may be made by the Participant or his Spouse with whom the qualified beneficiary child resides.

(e)  Election of Coverage. If the Participant or qualified beneficiary do not elect continuation coverage within this election period, then the right to continuation coverage based on COBRA rules will be lost. Coverage must be elected within 60 days of the latest of the following:

  (i)  the qualifying event; or

  (ii)  the date the Participant or qualified beneficiary is advised by the Claims Administrator of the right to continued coverage.

(f)  Payment for Coverage.

  (i)  The Participant and/or qualified beneficiary will be required to pay up to 102% of the group rate for the continued coverage as determined by the Claims Administrator and have the option to make these payments in monthly installments. Such monthly installment payments are due by the 30th day after the first day of the month for which payment is made. Installments that are paid later than such 30-day grace period shall not be deemed timely and shall result in coverage being terminated.

  (ii)  Contribution amounts and benefits for continuation coverage are subject to change. The Participant will be notified of any changes in contribution amounts or benefits available under the applicable Benefit Program.

  (iii)  If the Participant or qualified beneficiary elects continuation of coverage after the qualifying event, then the Participant or qualified beneficiary will have 45 days from the date of election to start paying for that coverage. The first payment must include the cost of coverage for the entire period from the date coverage was lost due to the qualifying event at least through the date of payment. There is no grace period for the first payment. Subsequent monthly installment payments are due by the 30th day after the first day of the month for which payment was late. Installments that are paid after such 30-day grace period shall not be deemed timely and shall result in COBRA coverage being terminated.

  (iv)  The Benefit Program will not be required to bill covered individuals for continuation coverage. If any payment for continuation coverage is postmarked or otherwise sent after the date that payment is due, continuation coverage under the Benefit Program will terminate and will not be reinstated. An exception will be made for "insignificant underpayment" of a monthly installment. A payment will be deemed an

39

FOGEL 78

insignificant underpayment provided that the deficiency is no greater than the lesser of:

(A) $50 or such other amount as the Internal Revenue Service Commissioner may provide; or

(B) 10% of the installment amount due.

In such a case, the Plan will notify the Participant of the deficiency, and the Participant will have 30 days from the date of such notice to pay the deficiency.

(g) Period of Coverage.

    (i) If elected, the maximum period for continued coverage is as follows:

        (A) 18 months from the date coverage is lost on account of a qualifying event involving termination of employment or reduction in hours; and

        (B) 36 months from the date coverage is lost on account of any other qualifying event.

    (ii) The maximum period described in subparagraph (i)(A) may be extended if:

        (A) COBRA continuation coverage is triggered by the Participant's termination of employment or reduction in hours and either the Participant or qualified beneficiary is found by the Social Security Administration to have been disabled at any time during the first 60 days of continuation coverage, then the disabled person and his covered family members shall be eligible for up to 29 months of continued coverage (an additional 11 months) provided notice is given to the Claims Administrator as provided in Section 9.01(c)(iv). The Claims Administrator may assess an increased charge of up to 150% of the cost of Benefit Program coverage for the additional 11 months of coverage; or

        (B) If a second qualifying event that gives rise to a 36-month maximum coverage period occurs within the applicable 18 or 29 month period, the period of coverage may be extended up to 36 months from the date of the first qualifying event for the Participant's qualified beneficiary Spouse and qualified beneficiary child. This extended coverage period shall be available when one of the following events occurs during such original period of continued coverage:

            (1) the Participant's death;

FOGEL 79

(2)     divorce or legal separation of the Participant from his qualified beneficiary Spouse; or

(3)     for a qualified beneficiary child, ceasing to qualify as an eligible Dependent under the applicable Benefit Program.

To be eligible for this additional coverage, the Participant or his qualified beneficiary must notify the Claims Administrator within 60 days of the second qualifying event and before the applicable 18 or 29 month period of continued coverage ends.

(iii)     Coverage shall end before the end of the maximum period on the first of the following, if any, to occur:

(A)     the date all Employers cease to provide any group health plan coverage to any Employee;

(B)     the date the Participant or qualified beneficiary fails to make any required installment contribution payment;

(C)     the date that there has been a final determination by the Social Security Administration that the Participant or qualified beneficiary who has elected to extend coverage for up to 29 months due to disability is no longer disabled;

(D)     the Employer terminates the Employee's coverage for cause (for example, submission of a fraudulent claim by the Employee); or

(E)     the first day after the Participant or qualified beneficiary makes a COBRA election on which the Participant or qualified beneficiary becomes:

(1)     a covered employee or dependent under any other group health plan other than TRICARE or any other government-sponsored medical care program while that person is on a Leave of Absence under USERRA; or

(2)     entitled to Medicare.

However, if the Participant or qualified beneficiary becomes covered by another group health plan and has a pre-existing condition that is not covered by such other plan, then COBRA coverage (at least for that pre-existing condition) shall not be terminated due to such other coverage.

(iv)     Continuation coverage is provided subject to eligibility under the law. The Claims Administrator reserves the right to terminate continuation coverage retroactively if the individual is determined to be ineligible for

41

FOGEL 80

continuation coverage. The Claims Administrator intends to provide continuation coverage only to the extent required by law and shall administer continuation coverage according to those requirements. This Section shall not create any rights in excess of the minimum required by law.

(h)    Healthcare Flexible Spending Account. Notwithstanding any provision in the Plan to the contrary, COBRA continuation coverage as provided in this Section will not be provided under the Healthcare Flexible Spending Account:

(i)    for any Plan Year after the Plan Year in which the qualifying event occurs, with respect to any Participant or covered Dependent, as long as:

(A)    the benefits under the Healthcare Flexible Spending Account are excepted benefits within the meaning of Sections 9831 and 9832 of the Code; and

(B)    the cost of 12 months of COBRA continuation coverage under the Healthcare Flexible Spending Account for the Plan Year in which the qualifying event occurs equals or exceeds the maximum benefit available to the Participant or covered Dependent under the Healthcare Flexible Spending Account for the Plan Year; and

(ii)    for the Plan Year in which the qualifying event occurs, if as of the date of the qualifying event, such Participant or covered Dependent cannot become entitled to receive during the remainder of such Plan Year a benefit under the Healthcare Flexible Spending Account that exceeds the maximum amount that the Participant or covered Dependent must pay for COBRA continuation coverage for the remainder of such Plan Year. For purposes of this item, in determining the amount of the benefit under the Healthcare Flexible Spending Account that the Participant or covered Dependent can become entitled to receive during the remainder of the Plan Year in which the qualifying event occurs, the Healthcare Flexible Spending Account may deduct from the maximum benefit available to the Participant any reimbursable claims submitted to the Healthcare Flexible Spending Account before the date the qualifying event occurred.

(i)    Continuation Coverage After Relocation. If a Participant or qualified beneficiary relocates to an area not served by his or her region-specific health coverage benefit program or option, the Participant or qualified beneficiary shall be given, within a reasonable period of time after requesting other coverage, an opportunity to elect alternative or extended coverage if there is another program or option available to Participants who have not experienced a qualifying event that will serve the Participant's or qualified beneficiary's health care needs. The alternative coverage must be effective as of the later of the date of the Participant's or qualified beneficiary's relocation, or the first of the month following the month in which the alternative coverage is requested.

CHI 10780302.19

FOGEL 81

(j)    Trade Adjustment Assistance Rights.  A Participant or Dependent who lost group health plan coverage as a result of the Participant's termination of employment and did not elect COBRA continuation coverage in connection with such loss shall have a second opportunity to elect such coverage during the 60-day period that begins on the first day of the month in which the Participant becomes eligible for trade adjustment assistance ("TAA") under the provisions of the Trade Act of 2002, but only if such election is made not later than six months after the date of the Participant lost coverage due to the termination of employment that entitles him to TAA.  To be eligible for this second election, the Participant or his or her Dependent Spouse must notify the Claims Administrator in writing of such TAA eligibility within 60 days of the date the Participant becomes eligible for TAA.  Coverage elected in accordance with this Section 9.01(j) shall become effective at the beginning of the 60-day election period described above.

**Section 9.02  Conversion of Coverage.**    Unless the Program Documents provide otherwise, the Plan shall not provide conversion coverage; provided, however, that nothing in a Benefit Program shall preclude a Participant from exercising any conversion option made available to him or her by an Insurance Company under an Insurance Company contract.  Unless the Program Documents provide otherwise, neither the Claims Administrator nor any Employer shall have any obligation to provide notice of any such conversion option.

**Section 9.03  Other Continuation Coverage.**  Under the requirements of USERRA and FMLA, the Claims Administrator shall offer to continue Benefit Program coverage providing group health plan benefits to certain Participants and Dependents who are covered under such Benefit Program.  A person who would otherwise lose group health plan coverage as a result of a leave of absence under USERRA or the FMLA shall be entitled to continue such coverage under the Benefit Program as provided by USERRA or the FMLA, as applicable.  The coverage shall be identical to the coverage provided persons who are not on a leave of absence under USERRA or the FMLA.

(a)    USERRA Continuation Coverage.

(i)    Group Health Benefits.  This subparagraph shall govern the continuation of coverage under a Benefit Program providing group health plan benefits for Participants entitled to protection under USERRA.  The Claims Administrator shall adopt such rules for the administration of this paragraph as it deems necessary and appropriate.

(A)    Uniformed Service for 30 Days or Less.  If a Participant takes a leave of absence from his or her employment to perform Uniformed Service for a period of 30 days or less, the Participant shall be treated as being actively at work during such leave of absence for purposes of continuation of group health plan coverage under the Benefit Program.

(B)    Uniformed Service for 31 Days or More.  If a Participant takes a leave of absence from his or her employment to perform Uniformed Service for a period of 31 days or more, the Participant

43

FOGEL 82

shall have the right to elect to continue group health plan coverage under the Benefit Program for himself or herself and each of his or her covered Dependents. The duration of continued coverage under USERRA shall extend from the effective date of the Participant's leave of absence to perform Uniformed Service until the earliest of the following dates:

 (1) the last day of the 24 month period beginning on the effective date of the Participant's leave of absence;

 (2) the date the Participant fails to make a required USERRA contribution payment; or

 (3) the date the Participant's reemployment rights under USERRA expire.

 (ii) <u>Other Benefits</u>. A Benefit Program that does not provide group health plan benefits shall provide continuation coverage for Participants entitled to protection under USERRA to the same extent such coverage is made available to a Participant under the leave that provides the most favorable continuation treatment under that Benefit Program.

 (iii) <u>Relationship With COBRA</u>. The USERRA continuation rights described above are independent of the Participant's right to elect COBRA continuation coverage. Notwithstanding the foregoing, if the Participant's leave of absence to perform Uniformed Service results in a loss of group health plan coverage, the Participant shall be entitled to elect COBRA continuation coverage, as provided in Section 9.01 and, if elected, COBRA continuation coverage shall begin after the 30 day period described in subparagraph (i) ends. In all other respects, the Participant's COBRA continuation rights shall run concurrently with the USERRA continuation rights

 (b) <u>FMLA Continuation Coverage</u>. This subsection shall govern the continuation of coverage under a Benefit Program providing group health plan benefits for Participants entitled to protection under the FMLA.

 (i) <u>Right to Continue Coverage</u>. A Participant who has worked for an Employer for at least one year, and for at least 1,250 hours over the previous 12 months, shall be permitted to continue group health plan coverage under the Benefit Program for a period of up to 12 weeks while on a leave of absence under the FMLA for any of the following reasons:

 (A) to care for the Participant's child after birth or placement for adoption or foster care;

 (B) to care for the Participant's Spouse, son, daughter, or parent who has a serious health condition; or

44

FOGEL 83

(C)     for a serious health condition that makes the Participant unable to perform his or her job.

(ii)    <u>Termination of Coverage</u>.  Notwithstanding the foregoing, a Participant's coverage shall end earlier if:

    (A)     the Participant informs the Employer of the Participant's intent not to return from FMLA leave; or

    (B)     the Participant fails to return from FMLA leave and terminates employment.

(iii)   <u>Employee Contributions</u>.  Any share of the group health plan contribution which is paid by the Participant prior to the FMLA leave shall continue to be paid by the Participant during FMLA leave.  If Participants are not required to pay group health plan contributions, a Participant on FMLA leave also shall not be required to pay contributions (except in some cases when the Participant fails to return to work after FMLA leave, as explained below).  If, while a Participant is on FMLA leave, Participants are required to begin paying contributions or if contributions are raised or lowered, the Participant shall be required to pay the new contribution rates.

(iv)    <u>Employer's Right to Recover Contributions</u>.  The Employer has the right to recover contributions it pays for maintaining group health plan coverage during FMLA leave as follows:

    (A)     if a Participant on unpaid FMLA leave fails to return to work after FMLA leave, the Employer may recover its share of group health plan contributions, unless the Participant does not return to work due to:

        (1)     a serious health condition which would entitle the Participant to leave under the FMLA; or

        (2)     other circumstances beyond the Participant's control, such as the Participant's Spouse unexpectedly being transferred to a job location more than 75 miles from the Participant's work site, a relative or individual other than an immediate family member having a serious health condition and the Participant being needed to provide care, or the Participant being laid off while on leave.  (Circumstances beyond the Participant's control do not include a mother deciding not to return to work to stay home with a newborn child or a Participant remaining in a distant location with a parent who no longer requires the Participant's care.)

45

FOGEL 84

(3)     If a Participant does not return to work because of (1) or (2) above, the Employer may require medical certification of the Participant's or family member's serious health condition.  If the Participant does not provide such certification within 30 days, the Employer may recover group health plan contributions paid during the period of unpaid FMLA leave.

(4)     a Participant who returns to work for at least 30 days is considered to have "returned" to work.

(B)     the Employer cannot recover its share of group health plan contributions if the Participant was on paid leave.

(C)     the amount that an Employer may recover under a self-insured group health plan is limited to only the Employer's share of allowable contributions as would be calculated under COBRA, excluding the 2% fee for administrative costs.

(D)     the Employer can recover its share of group health plan contributions through deductions from any sums due to the Participant.  Alternatively, the Employer may initiate legal action against the Participant.

(v)     COBRA Qualifying Event.  A qualifying event occurs if, after the end of the FMLA leave (as determined under Department of Labor Regulations 28 C.F.R. Part 825), a Participant does not return to work and, but for COBRA continuation coverage, that Participant would lose group health coverage.  In such a case, the qualifying event shall be deemed to have occurred on the last day of the Participant's FMLA leave.

Notwithstanding the provisions of this subsection, the Company may adopt policies or practices from time to time that allow for continuation of coverage under a Benefit Program beyond the minimum period of coverage required by the FMLA.

### Section 9.04  Certificates of Creditable Coverage.

(a)     Automatic.  Each HIPAA Program generally will automatically provide a Certificate of Creditable Coverage to any Participant or Dependent after the individual loses coverage under that program.  The HIPAA Program will provide individuals with an automatic Certificate of Creditable Coverage within the following time frames:

(i)     for an individual who is entitled to elect COBRA continuation coverage, no later than when a notice is required to be provided for a qualifying event;

(ii)     for an individual who is not entitled to elect COBRA continuation coverage, within a reasonable time after coverage ceases; and

46

FOGEL 85

(iii) for an individual who has elected COBRA continuation coverage, within a reasonable time after cessation of COBRA continuation coverage or, if applicable, after the expiration of any grace period for the payment of contributions.

A HIPAA Program shall not issue an automatic Certificate of Creditable Coverage for Dependents until the HIPAA Program has reason to know that a Dependent has lost coverage under the HIPAA Program.

(b) Upon Request. A Certificate of Creditable Coverage will be provided upon request, if the request is made in writing to the Claims Administrator within 24 months after the individual loses coverage under a HIPAA Program. In that case, the Certificate of Creditable Coverage will be provided at the earliest time that the HIPAA Program, acting in a reasonable and prompt fashion, can furnish it.

(c) Manner Provided. Each HIPAA Program may provide the Certificate of Creditable Coverage in any manner permitted by applicable regulations.

Section 9.05 **Required Coverage.** Notwithstanding anything contained in any Program Document to the contrary, the following provisions shall apply to each Benefit Program:

(a) Minimum Hospital Stay. To the extent required by the Newborns' and Mothers' Health Protection Act of 1996, as amended from time to time, each Benefit Program may not, under federal law, restrict benefits for any Hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, federal law does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable). In any case, the Benefit Program may not, under federal law, require that any provider obtain authorization from the Benefit Program for prescribing a length of stay not in excess or 48 hours (or 96 hours). A Benefit Program may require, as a condition of the Participant reducing his or her out-of-pocket costs, a Participant to notify it in advance of a hospital admission in connection with a childbirth. This Section shall not create any rights in excess of the minimum required by law.

(b) Mental Health Benefits. To the extent required by the Mental Health Parity Act of 1996, as amended from time to time, each Benefit Program subject to that act shall provide for parity of aggregate lifetime dollar limits and annual dollar limits with respect to mental health benefits that may be provided under the Benefit Program. The foregoing shall not apply to Benefit Program benefits with respect to treatment of substance abuse or chemical dependency. Nothing in the Plan shall be construed to require any Benefit Program to provide coverage for mental health benefits. This Section shall not create any rights in excess of the minimum required by law.

(c) Benefits for Reconstructive Surgery Following Mastectomy. To the extent required by the Women's Health and Cancer Rights Act of 1998, as amended from time to time, each Benefit Program subject to that act shall provide coverage to a Participant or Dependent who elects breast reconstruction in connection with a mastectomy for (i) all stages of

47

FOGEL 86

reconstruction of the breast in which the mastectomy was performed; (ii) surgery and reconstruction of the other breast to produce symmetrical appearance; and (iii) prostheses and physical complications of mastectomy, including lymph edemas. Such coverage shall be provided in a manner determined in consultation with the treating physician and Participant or Dependent. This Section shall not create any rights in excess of the minimum required by law.

## ARTICLE X
## COORDINATION OF BENEFITS AND
## RECOVERY OF BENEFIT OVERPAYMENT

**Section 10.01 <u>Coordination of Benefits</u>**. Except as specifically provided otherwise in an applicable Program Document, this Section shall apply to the coordination of benefits with respect to any medical or health benefit.

(a) <u>General</u>. The rules set forth in this Section coordinate the payment of benefits under the Plan with other group medical plans under which a Participant or covered Dependent is covered so that the Participant or covered Dependent receives all of the benefits to which he is entitled, but not to exceed 100% of total allowable expenses. When a claim is made, the order of benefit determination rules set forth below determine whether the Plan is a "primary plan" or a "secondary plan." When the Plan is primary, its benefits are determined before those of any other plan and without considering any other plan's benefits. When the Plan is secondary, its benefits are determined after those of another plan and may be reduced because of the primary plan's benefits. No plan pays more than it would without the coordination provision.

(b) <u>Definitions</u>. For purposes of this Section, the following definitions shall apply:

(i)     An "allowable expense" means any necessary, reasonable health care service or expense, including deductibles and copayments, that is covered, at least in part, by any of the other group medical plans covering the person. When a plan provides benefits in the form of services, (for example an HMO) the reasonable cash value of each service will be considered an allowable expense and a benefit paid. An expense or service, or a portion thereof, that is not covered by any of the plans is not an allowable expense.

(ii)    "Other group medical plans" means the following types of medical, dental, and vision care benefits:

(A)     coverage under a governmental program or provided or required by law, except a state Medicaid plan under Title XIX of the Social Security Act;

(B)     group insurance or group-type coverage, whether insured or uninsured. This includes group or group type coverage under health maintenance organizations and other pre-payment, group practice or individual practice coverage;

48

FOGEL 87

(C)    group-type contracts that are contracts not available to the general public and that can be obtained and maintained only because of membership in or in connection with a particular organization or group; and

(D)    medical benefits coverage under group, group-type and individual automobile "no fault" and traditional automobile "fault" type contracts.

Each contract or other arrangement is a separate group medical plan. If an arrangement has two parts and the coordination of benefit rules apply only to one of the two, each of the parts is a separate group medical plan.

(c)    Order of Benefit Determination Rules.  When two or more plans pay benefits, a plan without a coordinating provision is always the primary plan. If all plans have such a provision, the first of the following rules that describes which plan is primary shall determine the order of payment:

(i)    Non-Dependent or Dependent.  The plan under which the individual is the eligible individual (rather than a covered Dependent) is primary and the other is secondary, unless such person is a Medicare beneficiary.

(ii)    Child of Parents Not Separated or Divorced.  If a covered Dependent child is covered under both parents' plans, the birthdays of the covered Dependent child's parents are used to determine which plan is primary. The plan of the parent whose birthday (month and day) comes before the other parent's birthday in the calendar year will be primary. If both parents have the same birthday, then the plan that has had coverage in effect for the covered Dependent child for the longest period of time is primary.

(iii)    Child of Parents Separated or Divorced.  If the parents are separated or divorced and a court order makes one parent responsible for the child's health care, the plan of that parent is primary. If there is no court order, the following shall apply:

(A)    the plan of the parent with custody is primary;

(B)    the plan of the person married to the parent with custody (step-parent) is secondary; and

(C)    the plan of the parent without custody pays third.

If neither paragraphs (i), (ii) or (iii) applies, the plan covering the individual for the longest period of time is primary.

(iv)    Active or Inactive Employee.  The plan that covers a person as an employee who is neither laid off nor retired (or that person's dependent)

49

is primary. If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

(v)     Continuation Coverage.  If a person whose coverage is provided under a right of continuation provided by federal or state law also is covered under another plan, the plan covering the person as an employee, member, subscriber or retiree (or as that person's dependent) is primary, and the continuation coverage is secondary.  If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

(vi)    Longer or Shorter Length of Coverage.  The plan that covered the person longer is primary.

(vii)   Other Rules Do Not Apply.  If the preceding rules do not determine the primary plan, the allowable expenses shall be shared equally between the plans.  In addition, the Plan will not pay more than it would have paid had it been primary.

(d)     Right to Receive and Release Needed Information.  Certain facts about health care coverage and services are needed to apply these coordination of benefits rules and to determine benefits payable under this Plan and other plans.   A Participant or covered Dependent shall give information about coverage under any other plans under which such individual is covered when he submits a claim for benefits under a Benefit Program.  The Claims Administrator may get the facts it needs from or give them to other organizations or persons for the purpose of applying these rules and determining benefits payable under this Plan and other plans covering the person claiming benefits. The Claims Administrator need not tell, or get the consent of, any person to do this.

(e)     Facility of Payment.  A payment made under another plan may include an amount that should have been paid under this Plan.  If it does, the Claims Administrator may pay that amount to the organization that made that payment.  That amount will then be treated as though it were a benefit paid under this Plan.  The Claims Administrator will not have to pay that amount again.  The term "payment made" includes providing benefits in the form of services, in which case "payment made" means reasonable cash value of the benefits provided in the form of services.

(f)     Right of Recovery.   If the amount of the payments made by the Claims Administrator is more than it should have paid under this coordination of benefits provision, it may recover the excess from one or more of the persons it has paid or for whom it has paid or any other person or organization that may be responsible for the benefits or services provided for the Covered Person.  The "amount of the payments made" includes the reasonable cash value of any benefits provided in the form of services.

50

FOGEL 89

**Section 10.02  Medicare-Eligible Employees and Dependents.**  This Section shall only apply to "medical benefits" (within the meaning of Medicare) provided under the Benefit Programs.

(a)     Each Medicare-eligible Employee covered by a Benefit Program providing medical benefits shall continue to be covered by such Benefit Program, unless: (i) he or she elects, in writing, to have Medicare for primary coverage; or (ii) he or she enrolls in Medicare Part D prescription drug coverage, in which case Medicare Part D shall be primary coverage for prescription drug coverage.

(b)     Each Medicare-eligible Dependent of an Employee covered by an applicable Benefit Program shall continue to be covered by the Benefit Program, unless: (i) he or she elects, in writing, to have Medicare for primary coverage; or (ii) he or she enrolls in Medicare Part D prescription drug coverage, in which case Medicare Part D shall be primary coverage for prescription drug coverage.

(c)     Notwithstanding anything in subsections (a) or (b) to the contrary, Medicare shall automatically be the primary coverage for a Medicare-eligible Participant who is covered by an applicable Benefit Program and who:

        (i)     begins a regular course of renal dialysis;

        (ii)     receives a kidney transplant without first beginning dialysis; or

        (iii)     becomes disabled for Medicare purposes

at the earliest time at which Medicare is permitted to be primary under Section 1862(b) of the Social Security Act and regulations thereunder, regardless of whether such person actually enrolls for Medicare.

(d)     To the extent permitted by law, Medicare will be the primary coverage for a Participant (other than an Employee) or such Participant's Dependent who is covered by an applicable Benefit Program and who attains age 65.

**Section 10.03  Subrogation, Reimbursement and Recovery for Third Party Liability.** As a condition for receiving benefits under the Plan, each Covered Person agrees to and grants the Plan the right to subrogation, the right to reimbursement, and the right of recovery as set forth herein.  When a Covered Person becomes sick or injured as a result of the act or omission of another person or party and the Covered Person receives benefits under the Plan for such injuries, the Covered Person must reimburse the Plan for benefits received from all recoveries from a third party (whether by lawsuit, settlement or otherwise) and the Plan's share of the recovery will not be reduced because the Covered Person has not received the full damages claimed, unless the Plan agrees in writing to such a reduction.  If the Covered Person breaches this third party reimbursement provision, then the Covered Person agrees to indemnify the Plan for all costs of recovering third party reimbursements.  To the extent that any Program Document also contains provisions regarding subrogation, reimbursement, or right to recovery of expenses, this Section 10.03 and the applicable Program Document shall both apply so as to grant the Plan the greatest possible rights with respect to subrogation, reimbursement, and recovery of such

51

FOGEL 90

expenses or benefits. Except as specifically provided otherwise in an applicable Program Document, this Section 10.03 shall apply to any health or disability benefit provided through the Benefit Programs.

(a)     Right of Subrogation. As a condition to participation in or the receipt of benefits under the Plan, each Covered Person agrees that the Plan shall have the right of subrogation with respect to the full amount of benefits paid to or on behalf of a Covered Person as the result of an injury, illness, disability or death that is or may be the responsibility of any Third Party. The Plan shall also have a lien upon any recovery from such Third Party to the full amount of benefits paid and may, at its option, file suit or intervene in any pending lawsuit to secure and protect its rights. The Plan's right of subrogation shall apply to the first dollar of any recovery obtained from the Third Party, even if the recovery obtained is less than the amount needed to make the Covered Person whole.

(b)     Reimbursement Agreement. If a Covered Person incurs expenses that are excluded in accordance with this provision of the Plan because they are or may be the responsibility of a Third Party, the Covered Person will be required, as a prerequisite to receiving Plan benefits, to sign a reimbursement agreement in a form acceptable to the Administrator acknowledging the Covered Person's obligation to reimburse the Plan for any benefits or expenses paid by the Plan from the first dollars recovered from any source. If expenses are incurred by a minor, the Administrator may require that the minor's parent or legal guardian execute the reimbursement agreement and agree to be bound by it. The Administrator may, in its discretion, withhold benefit payments that might otherwise be advanced, and/or initiate an action at law or in equity in its own name or in the name of the Covered Person, in order to enforce, secure, or protect the Plan's rights under this provision. If the Covered Person elects not to execute such an agreement, the Plan is not obligated to provide any benefit payments.

(c)     Right of Reimbursement. Whether or not a Covered Person executes a reimbursement agreement, in the event that the Plan provides benefits to a Covered Person and the Covered Person recovers a payment, either by settlement, judgment, no-fault automobile insurance statute, or otherwise, from any Third Party or other source, then the Covered Person shall immediately reimburse the Plan for the full amount of any and all benefits paid in connection with such injury, illness, disability or death, up to the amount of the recovery. This right of reimbursement applies regardless of the label assigned to the recovery, and regardless of any purported allocation or itemization of such recovery to specific types of injuries. If the recovery is for damages other than for medical or dental care expenses, such as pain and suffering, the Covered Person will still be required to reimburse the Plan first. The Plan shall have a lien upon any such recovery in the amount of benefits or expenses paid by the Plan. The Plan's right of reimbursement shall apply to the first dollar of any recovery obtained from the Third Party, even if the recovery obtained is less than the amount needed to make the Covered Person whole.

(d)     Procedures for Subrogation and Reimbursement. Each Covered Person or his or her legal representative must do whatever is requested by the Administrator with respect to the exercise of the subrogation and reimbursement rights of the Benefit Program and the Employers, and will do nothing to prejudice those rights. In addition, each Covered Person or

52

FOGEL 91

his or her legal representative, in conjunction with making a claim for Benefit Program benefits, must inform the Administrator in writing whether the Covered Person was injured by a Third Party, and must provide the following information in a timely, prompt fashion as a condition to receipt of Benefit Program benefits:

(i)     the name, address, and telephone number of the Third Party that in any way caused the injury, and of the attorney representing the Third Party;

(ii)    the name, address, and telephone number of the Third Party's insurer and any insurer of the Covered Person;

(iii)   the name, address, and telephone number of the Covered Person's attorney with respect to the Third Party's act;

(iv)    prior to the meeting, the date, time and location of any meeting between the Third Party or his or her attorney and the Covered Person, or his or her attorney;

(v)     all terms of any settlement offer made by the Third Party or his or her insurer or the Covered Person's insurer;

(vi)    all information discovered by the Covered Person, or his or her attorney, concerning the insurance coverage of the Third Party;

(vii)   the amount and location of any funds that are recovered by the Covered Person from the Third Party or his or her insurer or the Covered Person's insurer, and the date that the funds were received;

(viii)  prior to settlement, all information related to any oral or written settlement agreement between the Covered Person and the Third Party or his or her insurer or the Covered Person's insurer;

(ix)    all information regarding any legal action that has been brought on behalf of a Covered Person against the Third Party or his or her insurer; and

(x)     all other information requested by the Administrator.

No Covered Person (or the person's legal representative) may retain an attorney with respect to the Third Party without the prior written consent of the Administrator. As a condition of receiving benefits under the Benefit Program, each Covered Person (and that person's legal representatives) hereby:

(i)     waives the assertion of any attorney-client privilege against an Employer with regard to an attorney retained by the Covered Person;

(ii)    agrees that an Employer may assume, at its discretion, the defense of any action that has been or could be brought against the Third Party by the Covered Person (or that person's legal representatives);

CHI 10780302.19

FOGEL 92

(iii)   agrees that an Employer must be given the opportunity to approve any settlements before they are made with the Third Party;

(iv)   agrees to consent to judgment for the Plan;

(v)   agrees not to assert a defense under Section 502 of ERISA to a claim made by the Plan; and

(vi)   agrees that a claim brought by the Plan to enforce its rights under this Section 10.03 is an equitable claim.

Any funds recovered by a Covered Person (or that person's legal representative) from a Third Party (or the Third Party's insurer) must and are deemed to be held in constructive trust for the benefit of the Benefit Program and the Employer to the extent of the amount of Benefit Program benefits until reimbursement, with the Covered Person (or that person's legal representative) as trustee and fiduciary.

(e)   <u>Coverage for Expenses Caused by a Third Party</u>.  The Administrator may, in its sole discretion, cease to pay benefits under a Benefit Program if a Covered Person refuses to execute a reimbursement agreement.  The Administrator may cease to pay benefits subject to a reimbursement agreement if, in the discretion of the Administrator, the Covered Person has failed or is failing to fulfill his or her duty to cooperate or to comply with the provisions of this Section 10.03.

(f)   <u>Right of Recovery and Offset</u>.  The Plan shall have the right to recover any benefits paid to a Covered Person or his or her health care provider that a Covered Person fails to reimburse to the Plan under the provisions of this Section 10.03.  To the extent not otherwise paid to the Plan, the amount due to the Plan will reduce any other present or future benefits payable from the Plan to or on behalf of the Participant.  In addition the Administrator may, in its sole discretion, employ any other lawful means to recover overpayment on behalf of the Plan.  These rights are in addition to any other rights and remedies that the Plan may have.

(g)   <u>Attorneys' Fees and Expenses</u>.  Neither the Benefit Program nor any Employer will be responsible for any attorneys' fees or expenses incurred in connection with any sums recovered by the Covered Person (or that person's legal representative) from the Third Party; provided, however, that if the Administrator has consented to the retention of the Covered Person's attorney, the total amount for which the Covered Person is liable shall not exceed his or her recovery net of all legal fees and expenses.

**Section 10.04  <u>Recovery of Benefit Overpayment</u>.**  If any benefit from a Benefit Program paid to or on behalf of a Covered Person should not have been paid or should have been paid in a lesser amount, and the Covered Person or other recipient fails to repay the amount promptly, then the overpayment may be recovered by the Administrator to the extent permitted by law from any monies then payable, or which may become payable, in the form of salary, wages, or benefits payable under any Employer sponsored benefit programs, including the applicable Benefit Program.  The Administrator also reserves the right to recover any such overpayment by appropriate legal action.

54

FOGEL 93

## ARTICLE XI
## ADMINISTRATION

**Section 11.01  Administration.**  The Administrator shall be the Committee or any other entity or individual designated by the Board of Directors or Chief Executive Officer of the Company, or its delegate.  The principal duty of the Administrator is to see that the Plan is carried out, in accordance with its terms, for the exclusive purposes of providing benefits to the Participants and their beneficiaries and defraying reasonable administrative expenses of the Plan, and operated consistently for similarly situated individuals.  Except as provided in Section 12.01(b), the Administrator shall be the "named fiduciary" of the Plan, within the meaning of Section 402(a) of ERISA for all Benefit Programs that are subject to ERISA.

### Section 11.02  Committee.

(a)     Appointment.  The Committee shall be appointed by the Chief Executive Officer, and shall have the specific delegated powers and duties described in this Article XI and such further powers and duties as may be delegated to it by the Company.  Any member of the Committee may resign or be removed by the Board of Directors or Chief Executive Officer and new members may be appointed by the Board of Directors or the Chief Executive Officer.  The Committee shall consist of at least three but not more than five persons.  The Committee shall select a Chairman and may select a Secretary (who may, but need not, be a member of the Committee) to keep its records or to assist it in the doing of any act or thing to be done or performed by the Committee.  The Committee shall advise the Trustee, if any, of any such persons selected.  The Secretary shall keep a record of all meetings and forward all necessary communications to the Company.  The members of the Committee who are employed by the Company shall serve without compensation for their services on the Committee, but all reasonable expenses incurred in the performance of their duties shall be paid by the Company.

(b)     Action.  A majority of the members of the Committee at the time in office shall constitute a quorum for the transaction of business at any meeting.  Any determination or action of the Committee may be made or taken by a majority of the members present at any meeting thereof or without a meeting by a resolution or written memorandum concurred in by a majority of the members then in office.  The Committee may adopt such bylaws and regulations as it deems desirable for the conduct of its affairs and may adopt such rules as it deems necessary, desirable, or appropriate.  All rules and decisions of the Committee shall be uniformly and consistently applied to all Participants in similar circumstances.

**Section 11.03  Liability and Indemnification.**  The Company and any person to whom it may delegate any duty or power in connection with administering the Plan, the Committee and the officers and directors of the Company, shall be entitled to rely conclusively upon, and shall be fully protected in any action taken or suffered by them in good faith in the reliance upon, any accountant, counsel, other specialist or other person selected by the Committee or in reliance upon any tables, valuations, certificates, opinions or reports which shall be furnished by any of them. The Board of Directors, the Chief Executive Officer and the Committee and the individual members thereof shall be indemnified by the Company against any and all liabilities arising by reason of any act or failure to act made in good faith in accordance with the Plan, including expenses reasonably incurred in the defense of any related claim.  A Plan fiduciary that is a third

CHI 10780302.19

FOGEL 94

party service provider or an insurer shall be entitled to indemnification only to the extent provided in a written agreement with such service provider.

**Section 11.04 Powers and Authority of Administrator.** The Administrator will have full power to administer the Plan in all of its details, subject to applicable requirements of law. For this purpose, the Administrator's powers will include, but will not be limited to, unilateral discretion to do the following, in addition to any other powers provided by this Plan:

(a) To make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan, including (i) the establishment of claims review procedures in accordance with Section 503 of ERISA or other applicable law and regulations, (ii) the establishment of QMCSO procedures in accordance with Section 609 of ERISA, and (iii) rules and regulations for the conduct of business by the Administrator;

(b) To interpret the Plan and to determine all questions arising under or in connection with the Plan, including all questions of eligibility to participate and obtain benefits under the Plan, its interpretation thereof in good faith to be final and conclusive on all interested persons. The Administrator has sole discretionary authority to grant or deny benefits under this Plan. Benefits under this Plan will be paid only if the Administrator decides, in its discretion, that the Participant is entitled to them; provided, however, that the Administrator may delegate to a Claims Administrator, in accordance with Article XII, the right and discretion to make determinations as to claims;

(c) To appoint such agents, counsel, accountants, consultants and other persons (regardless of whether they also provide services to the Company) as may be required to assist in administering the Plan;

(d) To allocate and delegate its responsibilities under the Plan and to designate other persons from time to time to carry out any of its responsibilities under the Plan, any such allocation, delegation or designation to be in writing;

(e) To request of and obtain from any Employee, Employer or the Company such information and records as it deems necessary and proper;

(f) To develop enrollment and any other forms necessary for Plan administration; and

(g) To delegate the duty of claims decisions and adjudication to an Insurance Company or third party administrator. Such Insurance Company or third party administrator shall be the Claims Administrator or Claims Fiduciary under this Plan.

All actions and determinations of the Administrator shall be final and binding upon all Employees, Participants, Dependents, beneficiaries, Employers, the Company and any other interested parties.

**Section 11.05 Records and Reports.** The Administrator shall maintain such records of its activities and of Participants and operations as it deems necessary and appropriate. Plan records pertaining to the Company, the Employers or Employees (subject to any privacy and confidentiality protections required by law or established by the Administrator's rules) shall be

FOGEL 95

available for examination by the Company at reasonable times during normal business hours. The Administrator's Plan records pertaining to a Participant shall be available for examination by such Participant upon written request at reasonable times during normal business hours.

To the extent required by applicable law, the Administrator shall provide each eligible Employee from time to time with a written explanation of the Plan in form and substance sufficient to satisfy the summary plan description requirements of Department of Labor Regulations Sections 2520.102-2 through 2520.102-4. Upon written request, the Administrator will furnish a Participant (or beneficiary) with a copy of the latest updated summary plan description, the latest annual report, any trust agreement, contract or other instrument under which the plan is established or operated within 30 days of the request.

The Administrator shall make such reports to the Company as it shall reasonably request, and such reports to government authorities as applicable law shall require.

## ARTICLE XII
## CLAIMS ADMINISTRATION

**Section 12.01  General.**  All claims for benefits under the Plan shall be submitted to and decided by such persons or organizations as the Administrator may from time to time designate, in the form and within the time specified by the Administrator. The Administrator may delegate its authority and responsibilities under this Article to a Claims Administrator, provided such delegation is in writing. Any reference to the Administrator in this Article shall mean the applicable Claims Administrator if the relevant authority and responsibility has been delegated by the Administrator to that Claims Administrator. The Administrator has sole discretionary authority to grant or deny benefits under the Plan. Benefits under the Plan shall be paid only if the Administrator decides in its sole discretion that the Claimant is entitled to them. The Administrator's decisions made pursuant to this Section are intended to be final and binding on Participants, beneficiaries and others.

(a)  Applicable Procedures.  For all Health Care Claims, the expedited claims procedures set forth in Section 12.03 shall apply. For disability claims, the claims procedures set forth in Section 12.04 shall apply. For all other claims (including claims relating to eligibility) filed under the Plan, the claims procedures set forth in Section 12.05 shall apply. If a Benefit Program provides a second level of appeal or the claim relates to eligibility, Section 12.06 shall apply.

Notwithstanding the foregoing, to the extent that the Administrator properly delegates its claims authority to a Claims Administrator, the Claims Administrator may apply alternative time frames than that set forth in this Article. In such circumstance, such alternative time frames shall control. In any case, each claims procedure set forth in this Article or applied by the Claims Administrator is intended to comply with Department of Labor Regulations Section 2560.503-1.

(b)  Insured Programs.  Notwithstanding any provision of this Plan to the contrary, to the extent that an Insurance Company (or other Claims Administrator) administers claims under a Benefit Program, the claims procedure pertaining to such benefits may provide for review of and decision upon denied claims by such company. The Insurance Company shall determine

CHI 10780302.19

FOGEL 96

claims related to eligibility only to the extent eligibility depends on an insurance requirement such as evidence of insurability. In such case, the Insurance Company or other Claims Administrator shall be the "named fiduciary" for purposes of such Benefit Program, as permitted under Department of Labor Regulations Section 2560.503-1(g).

**Section 12.02  Processing of Claims.**  Unless a Program Document provides for a shorter period, all claims must be submitted within one year after the date the claim accrues. The Administrator shall process a claim promptly after it receives complete written proof of the claim. The Administrator may process an Urgent Care Claim without a complete written proof of claim, provided that any benefit paid is conditioned upon the Administrator receiving a complete written proof of claim within a reasonable period of time thereafter. If the Administrator finds that benefits are payable under the Plan, it shall send payment to the Claimant, unless such individual authorizes payment to be made directly to the provider of services or supplies.

**Section 12.03  Health Care Claims.**

(a)  Definitions.  For purposes of this Section, the following definitions shall apply:

  (i)  "Concurrent Care Claim" means a Health Care Claim to extend an ongoing course of treatment beyond the period of time or number of treatments authorized by the Administrator.

  (ii)  "Health Care Claim" means a request by a Claimant for a benefit under a Benefit Program that is a group health plan (i.e., an employee welfare benefit plan within the meaning of ERISA Section 3(1) to the extent that such plan provides "medical care" within the meaning of ERISA Section 733(a)) that is made in accordance with the rules and procedures established by the Administrator.

  (iii)  "Post-Service Claim" means a Health Care Claim that is not a Pre-Service Claim, Urgent Care Claim or Concurrent Care Claim.

  (iv)  "Pre-Service Claim" means a Health Care Claim with respect to which the terms of a Benefit Program condition receipt of the benefit, in whole or in part, on approval of the benefit in advance by the Administrator in advance of obtaining medical care.

  (v)  "Urgent Care Claim" means a Health Care Claim for medical care not yet performed but, if delayed:

    (A)  could seriously jeopardize the Claimant's life, health or the ability to regain maximum function; or

    (B)  in the opinion of a physician who has knowledge of the Claimant's medical condition, would subject the Claimant to severe pain that cannot be adequately managed without the care or medical treatment for which the Claimant is filing the claim.

58

(b)    Time Limits for Initial Claims.  Any person who believes that he is then entitled to receive a health care benefit under the Plan, including one greater than that initially determined by the Administrator, may file a Health Care Claim in writing with the Administrator.    The Administrator shall notify a Claimant of its benefits determination, depending on the type of claim, within a specific time period, as set forth in this subsection.

(i)    Urgent Care Claim: The Administrator shall provide notice of the Plan's benefit determination to a Claimant as soon as possible, but no later than 72 hours after the Plan receives an Urgent Care Claim.  However, if the Claimant does not follow the Plan's claims procedure or does not provide sufficient information with a claim the Administrator shall notify the Claimant of the deficiency as soon as possible, but not later than 24 hours after receiving the claim.  Such notice shall describe the proper claims procedure and/or the specific information necessary to complete the Urgent Care Claim.  If an Urgent Care Claim is incomplete or the Administrator requires more information, a Claimant shall have at least 48 hours to provide the specified information.  In the case of an incomplete initial claim, the Administrator shall notify a Claimant of its benefits determination no later than 48 hours after the earlier of:

(A)    the time the Administrator receives the specified information; or

(B)    the end of the period in which a Claimant was allowed to provide the required information.

(ii)    Pre-Service Claim (Not Involving An Urgent Care Claim): The Administrator shall notify a Claimant of a Plan's benefit determination within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after the Administrator receives a Pre-Service Claim.  The Administrator may extend this 15-day period one time for up to 15 days, if the Administrator determines that more time is necessary due to matters beyond the Plan's control.  The Administrator shall notify a Claimant before the end of the initial 15-day period if an extension is necessary.  If the extension is necessary because a Claimant did not submit required information, the Administrator shall, in the notice, specifically describe the required information and shall provide the Claimant with an additional 45 days to provide the information.  In this case, the time period allowed for making the benefits determination is tolled from the date the notice is sent to the Claimant until the date Claimant responds to the notice.  If the Claimant does not follow the Plan's claims procedure, the Administrator shall notify the Claimant as soon as possible, but not later than five calendar days after receiving the Pre-Service Claim.  The notice will describe the proper procedure for filing the Pre-Service Claim.

(iii)    Concurrent Care Claim: For a Concurrent Care Claim relating to Urgent Care, the Administrator shall notify a Claimant as soon as possible, taking

into account the medical exigencies, but generally no longer than 24 hours, provided that any such claim is made to the Plan at least 24 hours before the prescribed period of time or number of treatments expires. For a Concurrent Care Claim relating to non-Urgent Care, the Administrator shall notify a Claimant sufficiently in advance of the reduction or termination of the Claimant's treatment to allow a Claimant to appeal and obtain a review of the Concurrent Care Claim before the treatment is reduced or terminated.

(iv)    Post-Service Claim: The Administrator shall notify a Claimant of a Plan's benefit determination not later than 30 days after the Administrator receives a Post-Service Claim. If the Administrator determines that more time is necessary due to matters beyond the Plan's control, the Administrator may extend this 30-day period one time, for up to 15 days. The Administrator shall notify a Claimant before the end of the initial 30-day period if an extension is necessary. If the extension is necessary because a Claimant did not submit required information, the Administrator shall, in the notice, specifically describe the required information and shall provide a Claimant with an additional 45 days to provide the information. In this case, the time period allowed for making the benefits determination is tolled from the date the notice is sent to a Claimant until the date the Claimant responds to the notice.

(c)    Notice of Initial Denial. The Administrator's denial of a claim shall be written in a manner calculated to be understood by the Claimant and shall include:

(i)    the specific reason or reasons for the benefit determination;

(ii)    references to specific Plan provisions on which the benefit determination is based;

(iii)    a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)    a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the Claimant's claim;

(v)    an explanation of the appeal procedure;

(vi)    if an internal rule, guideline, protocol or similar criteria was relied upon in making the decision, either a copy of that document or a statement that such document was relied upon and that a copy shall be furnished (free of charge) upon request;

(vii)    if the decision was based on medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or

clinical judgment for the determination, applying the Plan's terms to the Claimant's medical circumstances, or a statement that such an explanation shall be provided free of charge upon request; and

(viii)    a statement that the Claimant has the right to bring civil action under ERISA Section 502(a) following a denial upon appeal.

(d)    <u>Claimant's Right to Appeal</u>.  A Claimant (or his duly authorized representative) whose claim is denied in whole or in part by the Administrator may, within 180 days after receipt of denial of his claim or, if no notice of denial was received, within 180 days of the date the notice should have been provided:

(i)    submit a written request for review by the Administrator;

(ii)    receive reasonable access to, copies (free of charge) of all documents, records and other information relevant (within the meaning of Department of Labor Regulation Section 2560.503-1(m)(8)) to the Claimant's claim; and

(iii)    submit written comments, documents, records and other information relating to the claim for benefits.

(e)    <u>Independent Review</u>.  The review of the initial decision concerning a Claimant's claim shall be performed by someone who is neither the original decision maker nor the subordinate of the original decision maker.  In reviewing the initial decision, the decision maker shall not give any deference to the initial decision and he shall consider all information relevant to the claim, not just information relied upon (or available) when the original decision was made.  The decision maker shall also consider any information submitted by the Claimant.

If the benefit determination is based in whole or in part on a medical judgment, the decision maker reviewing the claim shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment issue; provided that such health care professional shall be an individual who is neither an individual who was consulted in connection with the initial claim denial that is the subject of the appeal nor the subordinate of any such individual.  The Plan shall disclose to the Claimant the identity of medical or vocational experts whose advice was obtained by the Plan in connection with the review, even if the advice was not relied upon in making the final decision.

(f)    <u>Time Limits for Decision on Appeal</u>.  The Administrator shall furnish the Claimant with a written decision providing the final decision concerning the claim as soon as practicable from the date of the request for appeal was submitted, but not later than:

(i)    72 hours (36 hours in the event the Administrator offers two levels of appeal) after receipt of the Claimant's request for review of an Urgent Care Claim benefit determination;

FOGEL 100

(ii)    30 days (15 days in the event the Administrator offers two levels of appeal) after receipt by the Plan of the Claimant's request for review of a Pre-Service Claim benefit determination; or

(iii)   60 days (30 days in the event the Administrator offers two levels of appeal) after the receipt by the Plan of the Claimant's request for review of a Post-Service Claim benefit determination.

(g)    Notice of Decision on Appeal.  The decision concerning an appeal of a claim shall be written in a manner calculated to be understood by the Claimant and shall include:

(i)    the specific reason or reasons for the benefit determination;

(ii)   references to specific Plan provisions on which the benefit determination is based;

(iii)  a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the Claimant's claim;

(iv)   an explanation of any voluntary appeal procedures offered by the Plan, if any;

(v)    if an internal rule, guideline, protocol or similar criteria was relied upon in making the decision, either a copy of that document or a statement that such document was relied upon and that a copy shall be furnished (free of charge) upon request;

(vi)   if the decision was based on medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the Plan's terms to the Claimant's medical circumstances, or a statement that such an explanation shall be provided free of charge upon request; and

(vii)  a statement that the Claimant has the right to bring civil action under ERISA Section 502(a) following a denial upon appeal.

(h)    Notwithstanding the foregoing, Claimants may not seek benefits under the Plan in judicial or administrative proceedings without first complying with and fully exhausting the procedures set forth in this Section 11.3.  In addition, all such actions must be brought within 180 days of receiving the Administrator's notice of denial or, if no notice of denial was received, within 180 days of the date the notice should have been provided.  The decisions made pursuant to this Section 11.3 shall be final and binding on Claimants and any other party.

**Section 12.04  Disability Claims.**

(a)    Time Limits for Initial Claims.  Any person who believes that he is then entitled to receive a disability benefit under the Plan, including one greater than that initially determined

62

FOGEL 101

by the Administrator, may file a claim in writing with the Administrator. The Administrator (or his designee) shall, within 45 days of the receipt of a claim, either grant or deny the claim in writing. An extension of 30 days will be allowed for processing the claim if necessary due to matters beyond the Plan's control and the Claimant receives notice of such extension before the expiration of the initial 45-day period. The notice shall state the special circumstances involved and the date a decision is expected. If, before the end of the first 30-day extension period, the Administrator determines that, due to matters beyond the control of the Plan, a decision cannot be rendered within that extension period, the period for making the determination may be extended for up to an additional 30 days, provided the Administrator notifies the Claimant before the expiration of the first 30-day extension period of the circumstances requiring the additional extension and the date as of which the Plan expects to render a decision. In the case of any extension under this subsection (a), the notice of extension shall specifically explain the standards on which the entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim, and the additional information needed to resolve those issues, and the Claimant shall be afforded at least 45 days within which to provide the additional information. If additional information is requested to resolve the issues, the time period allowed for making the benefits determination is tolled from the date the notice is sent to a Claimant until the date the Claimant responds to the notice.

(b)    Notice of Initial Denial. The Administrator's denial of a claim shall be written in a manner calculated to be understood by the Claimant and shall include:

      (i)    the specific reason or reasons for the benefit determination;

      (ii)    references to specific Plan provisions on which the benefit determination is based;

      (iii)    a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary;

      (iv)    a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the Claimant's claim;

      (v)    an explanation of the appeal procedure;

      (vi)    if an internal rule, guideline, protocol or similar criteria was relied upon in making the decision, either a copy of that document or a statement that such document was relied upon and that a copy shall be furnished (free of charge) upon request;

      (vii)    if the decision was based on medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the Plan's terms to the Claimant's medical circumstances, or a statement that such an explanation shall be provided free of charge upon request; and

FOGEL 102

(viii)    a statement that the Claimant has the right to bring civil action under ERISA Section 502(a) following a denial upon appeal.

(c)    Claimant's Right to Appeal. A Claimant (or his duly authorized representative) whose claim is denied in whole or in part by the Administrator may, within 180 days after receipt of denial of his claim or, if no notice of denial was received, within 180 days of the date the notice should have been provided:

(i)    submit a written request for review by the Administrator;

(ii)    receive reasonable access to, copies (free of charge) of all documents, records and other information relevant (within the meaning of Department of Labor Regulation Section 2560.503-1(m)(8)) to the Claimant's claim; and

(iii)    submit written comments, documents, records and other information relating to the claim for benefits.

(d)    Independent Review. The review of the initial decision concerning a Claimant's claim shall be performed by someone who is neither the original decision maker nor the subordinate of the original decision maker. In reviewing the initial decision, the decision maker shall not give any deference to the initial decision and he shall consider all information relevant to the claim, not just information relied upon (or available) when the original decision was made. The decision maker shall also consider any information submitted by the Claimant.

If the benefit determination is based in whole or in part on a medical judgment, the decision maker reviewing the claim shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment issue; provided that such health care professional shall be an individual who is neither an individual who was consulted in the connection with the initial claim denial that is the subject of the appeal nor the subordinate of any such individual. The Plan shall disclose to the Claimant the identity of medical or vocational experts whose advice was obtained by the Plan in connection with the review, even if the advice was not relied upon in making the final decision.

(e)    Time Limits for Decision on Appeal. The Administrator shall furnish the Claimant with a written decision providing the final determination of the claim. The decision shall be issued as soon as reasonable after the date of the request for appeal was submitted, and usually within 45 days of the date in which the written appeal was submitted. The Administrator may take an additional 45 days to make this decision if special circumstances are present. The Administrator shall give the Claimant notice if this extension is necessary before expiration of the initial 45-day period. In no event shall such extension exceed a period of 45 days from the end of the initial 45-day period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the determination on review.

(f)    Notice of Decision on Appeal. The decision concerning an appeal of a claim shall be written in a manner calculated to be understood by the Claimant and shall include:

64

(i)     the specific reason or reasons for the benefit determination;

(ii)    references to specific Plan provisions on which the benefit determination is based;

(iii)   a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the Claimant's claim;

(iv)    an explanation of any voluntary appeal procedures offered by the Plan, if any;

(v)     if an internal rule, guideline, protocol or similar criteria was relied upon in making the decision, either a copy of that document or a statement that such document was relied upon and that a copy shall be furnished (free of charge) upon request;

(vi)    if the decision was based on medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the Plan's terms to the Claimant's medical circumstances, or a statement that such an explanation shall be provided free of charge upon request; and

(vii)   a statement that the Claimant has the right to bring civil action under ERISA Section 502(a) following a denial upon appeal.

(g)     Notwithstanding the foregoing, Claimants may not seek benefits under the Plan in judicial or administrative proceedings without first complying with and fully exhausting the procedures set forth in this Section 11.4. In addition, all such actions must be brought within 180 days of receiving the Administrator's notice of denial or, if no notice of denial was received, within 180 days of the date the notice should have been provided. The decisions made pursuant to this Section 11.4 are final and binding on Claimants and any other party.

### Section 12.05 **All Other Claims.**

(a)     Time Limits for Initial Claims.  Any person who believes that he is then entitled to receive a benefit under the Plan, including one greater than that initially determined by the Administrator, may file a claim in writing with the Administrator.  (The Administrator may establish and maintain separate procedures for submitting eligibility claims that do not require a claim to be in writing.)  The Administrator (or his designee) shall, within 90 days of the receipt of a claim, either grant or deny the claim in writing.  An extension of 90 days will be allowed for processing the claim if special circumstances are involved and the Claimant is notified of such extension before the expiration of the initial 90-day period.  The notice shall state the special circumstances involved and the date a decision is expected.  If no notice is received during that period, the claim shall be deemed denied and the Claimant may request a review of the decision.

CHI 10780302.19

FOGEL 104

(b)     Notice of Initial Denial. The Administrator's denial of a claim shall be written in a manner calculated to be understood by the Claimant and shall include:

(i)     the specific reason or reasons for the benefit determination;

(ii)     references to specific pertinent Plan provisions on which the benefit determination is based;

(iii)     a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)     a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant (within the meaning of Department of Labor Regulation 2560.503-1(m)(8)) to the Claimant's claim;

(v)     an explanation of the appeal procedure; and

(vi)     a statement that the Claimant has the right to bring civil action under ERISA Section 502(a) following a denial upon appeal.

Notwithstanding the foregoing, if the Administrator does not timely respond to a claim in writing, the claim shall be deemed denied.

(c)     Claimant's Right to Appeal. A Claimant (or his duly authorized representative) whose claim is denied in whole or in part by the Administrator may, within 60 days after receipt of denial of his claim:

(i)     submit a written request for review by the Administrator;

(ii)     receive reasonable access to, copies (free of charge) of all documents, records and other information relevant (within the meaning of Department of Labor Regulation Section 2560.503-1(m)(8)) to the Claimant's claim; and

(iii)     submit written comments, documents, records and other information relating to the claim for benefits.

(d)     Time Limits for Appeal. The Administrator shall furnish the Claimant with a written decision providing the final determination of the claim. The decision shall be issued as soon as reasonable after the date of the request for appeal was submitted, and usually within 60 days of the date in which the written appeal was submitted. The Administrator may take an additional 60 days to make this decision if special circumstances are present. The Administrator shall give the Claimant notice if this extension is necessary before termination of the initial 60-day period. The notice shall state the special circumstances involved and the date a decision is expected. In no event shall such extension exceed a period of 60 days from the end of the initial 60-day period.

FOGEL 105

(e)    <u>Notice of Appeal</u>. The decision concerning an appeal of a claim shall be written in a manner calculated to be understood by the Claimant and shall include:

      (i)    the specific reason or reasons for the denial;

      (ii)    references to specific Plan provisions on which the benefit determination is based; and

      (iii)    a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant (within the meaning of Department of Labor Regulation 2560.503-1(m)(8)) to the Claimant's claim;

      (iv)    an explanation of the voluntary appeal procedures offered by the Plan, if any, and

      (v)    a statement that the Claimant has the right to bring civil action under ERISA Section 502(a) following a denial upon appeal.

**Section 12.06  <u>Second Appeal</u>.**  If the Benefit Program provides for a second level of appeal, the Claimant must submit a written request for review within 180 days after receipt of denial of his first appeal. In connection with the second appeal, the Claimant can again review relevant documents and submit issues and comments in writing. The Claimant shall also have the right to request copies of all relevant documents (free of charge). The second appeal will be subject to the same standards and time limits that apply to the first appeal. If the second appeal is provided, the time limit in Section 12.03(f)(ii) and (iii) shall be reduced by one-half.

**Section 12.07  <u>Exhaustion of Administrative Remedies</u>.**  Claimants shall not be entitled to challenge the Administrator's determinations in judicial or administrative proceedings without first complying with the administrative claims procedures set forth in the applicable Program Document or under this Article, as appropriate. All such claims must be brought within the timeframes set forth above for the Claimant's type of claim. The decisions made pursuant to applicable administrative claims procedures are final and binding on the Claimant and any other party. If the Claimant has complied with and exhausted the appropriate claims procedures and intends to exercise his right to bring civil action under ERISA Section 502(a), the Claimant must bring such action within 12 months following the date on which the Claimant is notified of the Administrator's final decision on appeal. If the Claimant does not bring such action within such 12 month period, the Claimant shall be barred from bringing an action under ERISA related to his claim.

**Section 12.08 Incompetency.** If any person entitled to payments under the Benefit Programs is a minor or under other legal disability or otherwise incapacitated so as to be unable to manage his financial affairs, or is otherwise incapable of giving a valid receipt and discharge for any payment, the following provision shall apply. If the payment is to be made by an Insurance Company, such payment shall be made in accordance with the terms of the contract under which such benefit is payable. If the payment is to be otherwise made, the Administrator, in its discretion, may direct that all or any portion of such payment be made:

        (i)      to such person;

        (ii)     to such person's legal guardian or conservator; or

        (iii)    to such person's Spouse or to any other person,

in any manner the Administrator considers advisable, to be expended for his benefit. The decision of the Administrator (or, where applicable, that of the Insurance Company) shall, in each case, be final and binding upon all persons. Any payment made pursuant to the power herein conferred shall operate as a complete discharge of the obligations of the Benefit Programs, the Company, the Employers, the Administrator and any Insurance Company, with respect to such payment.

**ARTICLE XIII**
**AMENDMENT AND TERMINATION**

**Section 13.01 Amendment.** The Company reserves the discretionary right to modify or amend the Plan, including any Appendix hereto, in any respect, at any time and from time to time, retroactively or otherwise, by a written instrument adopted by the Board of Directors or its designee and duly executed on behalf of the Company. However, no Plan amendment shall be valid which would cause the Plan to fail any applicable qualification requirements of Sections 79, 105, 125 or 129 of the Code, or any successors thereto, so long as such statutes apply to this Plan. The Administrator shall have the right to amend any provision of the Plan that is administrative, procedural, or ministerial in nature, and any written policy, rule, procedure or similar action adopted by the Administrator that is inconsistent with any administrative, procedure or ministerial provision of the Plan shall be deemed an amendment.

Notwithstanding the foregoing, the Committee may amend one or more Benefit Programs through the issuance of a Program Document to the extent that such amendment (a) is necessary or appropriate for such Benefit Programs to remain in compliance with applicable laws or regulations; (b) will not increase the anticipated annual cost of the Benefit Program by more than $250,000 or significantly decrease the benefits to any Participant or covered Dependent; or (c) is intended only to implement directions and transactions approved by the Board of Directors of the Company.

**Section 13.02 Termination of the Plan.** The Company reserves the right to terminate the Plan or any Benefit Program at any time as designated by a written instrument adopted by the Board of Directors or its designee and duly executed on behalf of the Company. Upon termination of the Plan, the Company shall direct the Administrator to either restore any unused Account balances to the Compensation of each respective Participant or to continue to apply

CHI 10780302.19

FOGEL 107

such balances towards Participants' benefits in accordance with Article VI for the remainder of the Plan Year, subject to forfeiture thereafter.

## ARTICLE XIV
## PARTICIPATING EMPLOYERS

**Section 14.01  Adoption of Plan.**  Any Affiliate may, with the written consent of the Company, adopt the Plan by resolution of its board of directors or other governing body.  The employers who have adopted the Plan are listed in Appendix B hereto, which shall be amended from time to time.

**Section 14.02  Administration.**  As a condition to adopting the Plan, and except as otherwise provided herein, each Employer shall be deemed to have authorized the Company and the Administrator of the Plan to act for it in all matters arising under or with respect to the Plan and shall comply with such other terms and conditions as may be imposed by the Company and the Administrator.

**Section 14.03  Company as Agent for Employers.**  Each Affiliate that becomes an Employer, by doing so, appoints the Company as its agent to exercise on its behalf all of the powers and authorities conferred upon the Company by the terms of the Plan, including, but not limited to, the power to amend and terminate the Plan.  The authority of the Company to act as such agent shall continue unless and until the Employer terminates participation in the Plan pursuant to Section 14.04.

**Section 14.04  Termination.**  Each Employer may cease to participate in the Plan or in any Benefit Program with respect to its Participants by written notice to the Administrator.

## ARTICLE XV
## HIPAA PRIVACY AND SECURITY

**Section 15.01  General.**  The Health Care Components are subject to this Article and shall comply with the standards for privacy of individually identifiable health information as set forth in the Privacy Rule and, effective April 20, 2005, the security standards for the protection of Electronic PHI as set forth in the Security Rule.

**Section 15.02  Authorized Employees.**  Only Authorized Employees shall be permitted to use, disclose, create, receive, access, maintain, or transmit PHI or Electronic PHI on behalf of a HIPAA Health Plan.  The use or disclosure of PHI by Authorized Employees shall be restricted to the HIPAA Health Plan administration functions that the Company performs on behalf of a HIPAA Health Plan, pursuant to Section 15.03.

(a)     Company employees who perform the following functions on behalf of the HIPAA Health Plans are Authorized Employees:

(i)      claims determination and processing functions;

(ii)     HIPAA Health Plan vendor relations functions;

69

FOGEL 108

(iii)    benefits education and information functions;

(iv)    HIPAA Health Plan administration activities;

(v)    legal department activities;

(vi)    HIPAA Health Plan compliance activities;

(vii)    information systems and HRIS support activities;

(viii)    payroll and finance activities;

(ix)    internal audit functions; and

(x)    human resources functions.

(b)    In addition to those individuals described in subsection (a) above, the Committee who performs claims appeals and other decision-making functions on behalf of the HIPAA Health Plans, the HIPAA Health Plans' Privacy and Security Official, and Company employees to whom the HIPAA Health Plans' Privacy and Security Official has delegated any of the following responsibilities shall also be Authorized Employees:

(i)    implementation, interpretation, and amendment of the Privacy Policy;

(ii)    Privacy Rule training for Company employees;

(iii)    investigation of and response to complaints by Participants and/or employees;

(iv)    preparation and maintenance of the Health Care Components' privacy notice;

(v)    distribution of the Health Care Components' privacy notice;

(vi)    response to requests by Participants to inspect or copy PHI;

(vii)    response to requests by Participants to restrict the use or disclosure of their PHI;

(viii)    response to requests by Participants to receive communications of their PHI by alternate means or in an alternate manner;

(ix)    amendment and response to requests to amend Participants' PHI;

(x)    response to requests by Participants for an accounting of disclosures of their PHI;

(xi)    response to requests for information by the Department of Health and Human Services;

CHI 10780302.19

FOGEL 109

(xii)  approval of disclosures to law enforcement or to the military for government purposes;

(xiii)  maintenance of records and other documentation required by the Privacy Rule or the Security Rule;

(xiv)  negotiation of Privacy Rule and Security Rule provisions into contracts with third party service providers; or

(xv)  approval of access to Electronic PHI.

**Section 15.03** **Permitted Uses and Disclosures.** Authorized Employees may access, request, receive, use, disclose, create, and/or transmit PHI only to perform certain permitted and required functions on behalf of Health Care Components, consistent with the Privacy Policy. This includes:

(a)  uses and disclosures for the Health Care Components' own Payment and Health Care Operations functions;

(b)  uses and disclosures for another HIPAA Health Plan's Payment and Health Care Operations functions;

(c)  disclosures to a health care provider, as defined under 45 C.F.R. Section 160.103, for the health care provider's treatment activities;

(d)  disclosures to the Company, acting in its role as Plan sponsor, of (i) summary health information for purposes of obtaining health insurance coverage or premium bids for the Health Care Components or for making decisions to modify, amend, or terminate the Health Care Components; or (ii) enrollment or disenrollment information;

(e)  disclosures of a Participant's PHI to the Participant or his personal representative, as defined under 45 C.F.R. Section 164.502(g);

(f)  disclosures to a HIPAA Health Plan for the other HIPAA Health Plan's Payment or Health Care Operations activities;

(g)  disclosures to a Participant's family members or friends involved in the Participant's health care or payment for the Participant's health care, or to notify a Participant's family in the event of an emergency or disaster relief situation;

(h)  uses and disclosures to comply with workers' compensation laws;

(i)  uses and disclosures for legal and law enforcement purposes, such as to comply with a court order;

(j)  disclosures to the Secretary of Health and Human Services to demonstrate the Health Care Components' compliance with the Privacy Rule;

71

FOGEL 110

(k)    uses and disclosures for other governmental purposes, such as for national security purposes;

(l)    uses and disclosures for certain health and safety purposes, such as to prevent or lessen a threat to public health, to report suspected cases of abuse, neglect, or domestic violence, or relating to a claim for public benefits or services;

(m)    uses and disclosures to identify a decedent or cause of death, or for tissue donation purposes;

(n)    uses and disclosures required by other applicable laws; and

(o)    uses and disclosures pursuant to the Participant's authorization that satisfies the requirements of 45 C.F.R. Section 164.508.

**Section 15.04  Certification Requirement.**  The Health Care Components shall disclose PHI and Electronic PHI to Authorized Employees only upon receipt of a certification by the Company that the Company agrees:

(a)    not to use or further disclose PHI other than as permitted or required by this Article and the Privacy Policy or as required by law;

(b)    to implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic PHI that the Company creates, receives, maintains, or transmits on behalf of the Health Care Components;

(c)    to take reasonable steps to ensure that any agents, including subcontractors, to whom the Company provides PHI or Electronic PHI received from the Health Care Components agree to:

(i)    the same restrictions and conditions that apply to the Company with respect to such PHI; and

(ii)    implement reasonable and appropriate security measures to protect such Electronic PHI.

(d)    not to use or disclose PHI for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Company other than another HIPAA Health Plan;

(e)    to report to the Health Care Components any use or disclosure of PHI that is inconsistent with the uses or disclosures described in Section 15.03 or any Security Incident of which the Company becomes aware;

(f)    to make available PHI for inspection and copying in accordance with 45 Section C.F.R. 164.524;

72

FOGEL 111

(g)    to make available PHI for amendment, and to incorporate any amendments to PHI in accordance with 45 C.F.R. Section 164.526;

(h)    to make available PHI required to provide an accounting of disclosures in accordance with 45 C.F.R. Section 164.528;

(i)    to make its internal practices, books, and records relating to the use and disclosure of PHI received on behalf of the Health Care Components available to the Secretary of Health and Human Services for purposes of determining compliance by the Health Care Components with the Privacy Rule;

(j)    if feasible, to return or destroy all PHI received from the Health Care Components that the Company still maintains in any form and retain no copies of such PHI when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of PHI infeasible; and

(k)    to take reasonable steps to ensure that there is adequate separation between the Health Care Components and the Company's activities in its role as Plan sponsor and employer, and that such adequate separation is supported by reasonable and appropriate security measures.

**Section 15.05  Mitigation.**  In the event of non-compliance with any of the provisions set forth in this Article,

(a)    the HIPAA Privacy and Security Official shall address any complaint promptly and confidentially.  The HIPAA Privacy and Security Official first will investigate the complaint and document his investigation efforts and findings.

(b)    if PHI has been used or disclosed in violation of the Privacy or Security Policy or inconsistent with this Article, the HIPAA Privacy and Security Official shall take immediate steps to mitigate any harm caused by the violation and to minimize the possibility that such a violation will recur.

(c)    if an Authorized Employee or other Company employee is found to have violated the Privacy or Security Policy, such personnel shall be subject to disciplinary action up to and including termination.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**Section 16.01  Limitation of Rights.**  The establishment, maintenance and provision of the Plan shall not be considered or construed as (a) giving to any Employee any right to continue in the employment of any Employer; (b) limiting the right of any Employer to discipline or discharge any of its Employees; (c) creating any contract of employment between any Employer and any Employee; or (d) conferring any legal or equitable right against the Administrator, the Company, or the Employers.

CHI 10780302.19

FOGEL 112

**Section 16.02  Rights to Employers' Assets.**  Except as provided in Articles VII and VIII, all Account balances reflect general assets of the Employers, and all payments made under this Plan are made from the general assets of the Employers.  No Participant shall have any right to or interest in any assets of the Employers, except as specifically provided in this Plan.  The Administrator shall have no liability to any Participant, the Company or any Employer for making any payment or providing any benefit pursuant to this Plan, and shall merely direct such payments to be made by the Company in accordance with the Plan.

**Section 16.03  No Assignments.**  Unless specifically permitted by a Program Document, the right of any Participant to receive any benefits under the Plan shall not be alienable by assignment.  In addition, the right of any Participant to receive any benefits shall not be subject to any claims by any creditor of or claimant against the Participant; and any attempt to reach such amounts by any such creditor or claimant, or any attempt by the Participant to confer on any such creditor or claimant any right or interest with respect to such amounts, shall be null and void, except as provided in Section 609 of ERISA with respect to QMCSO.  No Compensation reduction elections or other contributions under this Plan shall cause any Employer to be liable for, or subject to, any manner of debt or liability of any Participant.  Notwithstanding the foregoing, wage garnishments under applicable state law shall be permitted to reach cash benefits received by the garnishee under this Plan, unless otherwise prohibited by law.

**Section 16.04  Severability.**  Any provision of the Plan shall be severable, so that if any Plan provision is held invalid or unenforceable, such invalid or unenforceable provision shall be severed from the Plan and the Plan shall operate without regard to such severed provision.  In such event, the Plan will be construed and enforced as if such severed provision had not been included herein, to the extent necessary to preserve the status of the Plan as qualified cafeteria plan under Section 125 of the Code.

**Section 16.05  No Guarantee of Tax Consequences.**  The Company makes no commitment or guarantee that any amounts paid to or for the benefit of a Participant under this Plan will be excludible from the Participant's gross income for federal or state income tax purposes, or that any other federal or state tax treatment will apply to or be available to any Participant.  Each Participant is obligated to determine whether each payment under this Plan is excludible from the Participant's gross income for federal and state income tax purposes, and to notify the Company if the Participant has reason to believe that any such payment is not so excludible.

**Section 16.06  Gender and Number.**  Except as otherwise clearly indicated by the context, whenever used in the Plan a masculine pronoun shall include the feminine and neuter genders, words used in the singular shall include the plural, and words used in the plural shall include the singular, as circumstances make such meanings applicable.

**Section 16.07  Governing Law.**  The Plan shall be construed in accordance with the laws of the State of Illinois (determined without regard to any conflicts of law provisions), to the extent not preempted by federal law.

74

FOGEL 113

**Section 16.08 <u>Headings</u>.**  All headings and captions used in this Plan are used as a matter of convenience and for reference only, and in no way shall they be considered in determining the scope or intent of the Plan or in interpreting or construing any Plan provisions.

IN WITNESS WHEREOF, the Company has caused this duly adopted Plan to be executed below by its duly authorized officer or representative on this _19_ day of _December_ _____, 2006 to be effective as of the Effective Date stated herein.

**EVANSTON NORTHWESTERN
HEALTHCARE CORPORATION**


By _William R. Luehrs  12/19/06_

Its:  Chief Human Resources Officer

**AND**

By: _Mark R. Neaman  12/20/2006_

Its:  Chief Executive Officer

CH1 10780302.19

FOGEL 114

## APPENDIX A
## BENEFIT PROGRAMS

The following Benefit Programs are consolidated into the Plan and each and every Program Documents is hereby incorporated by reference as if fully set forth herein:

(1)     Evanston Northwestern Healthcare Group Health and Prescription Drug Program including:

- Exclusive Provider Organization (EPO)

- Exclusive Provider Organization Plus (EPO Plus)

- Preferred Provider Organization (PPO)

(2)     Dental Program, including:

- Dental Health Maintenance Organization (DMO)

- Preferred Provider Organization (PPO)

(3)     Short-Term Disability, including:

- Basic Short-Term Disability Program for Hourly and Hourly Professional Employees*

- Supplemental Short-Term Disability*

(4)     Long-Term Disability Insurance Program for Full-Time Salaried, Physician, and Management Employees

(5)     Voluntary Long-Term Disability

(6)     Basic Group Term Life & AD&D Insurance

(7)     Supplemental AD&D

(8)     Supplemental Life Insurance

(9)     Dependent Life Insurance

(10)    Employee Assistance Program

(11)    Healthcare Flexible Spending Account

(12)    Dependent Care Flexible Spending Account*

(13)    Voluntary Individual Insurance

76

FOGEL 115

- Supplemental Short-Term Disability

- Whole Life

(14)  Travel Accident Program

(15)  Severance Plan(s)

(16)  Long-Term Care

\* Indicates Benefit Programs that are not subject to ERISA.

CH1 10780302.19

FOGEL 116

**APPENDIX B**
**PARTICIPATING EMPLOYERS**

The following entities are participating Employers:

| |
|---|
| Evanston Northwestern Healthcare Corporation |
| ENH Faculty Practice Associates |
| The Radiation Medicine Institute |
| ENH Visiting Nurse Association |
| ENH VNA Home Services |
| ENH Research Institute |
| ENH Medical Group Inc. |
| Evanston Northwestern Healthcare Foundation |

CHI 10780302.19

FOGEL 117